```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UMG RECORDING, INC., et al.,

 4                    Plaintiffs,

 5           v.                              11 Civ. 8407 (TPG)

 6   ESCAPE MEDIA GROUP, INC., et al.,
                                             Argument
 7                    Defendants.

 8   ------------------------------x

 9                                           New York, N.Y.
                                             April 6, 2012
10                                           11:15 a.m.
     Before:
11
             HON. THOMAS P. GRIESA
12
                                             District Judge
13

14
             APPEARANCES
15

16   JENNER & BLOCK
             Attorneys for Plaintiffs
17   BY:  ANDREW H. BART
             GIANNI P. SERVODIDIO
18           ALISON I. STEIN

19
     FRANKFURT KURNIT KLEIN & SELZ P.C.
20           Attorneys for Defendants
     BY:  EDWARD H. ROSEHTHAL
21           MARISA SARIG

22
     ROSENBERG & GIGER P.C.
23           Attorneys for Defendants
     BY:  JOHN J. ROSENBERG
24           MATTHEW H. GIGER

25
```

```
 1              (Case called)

 2              THE COURT:  Good morning.  We have some motions.  Who

 3   would like to speak for the motions?

 4              MR. ROSENTHAL:  Your Honor, Edward Rosenthal from

 5   Frankfurt, Kurnit, Klein & Selz.  We represent five of the

 6   individual defendants in this case:  Nikola Arabadjiev, Chanel

 7   Munezero, Benjamin Westermann-Clark, Paul Geller, and John

 8   Ashenden.  The first four of those have made motions for

 9   dismiss for lack of personal jurisdiction.  We would like to

10   address that motion.

11              Then my suggestion, if it's acceptable to the Court,

12   is that Mr. Rosenberg will address the motions that his client

13   filed on jurisdiction as well as the motion that his client

14   made to dismiss the complaint for lack of jurisdiction, a

15   motion in which all of our clients join.

16              This is John Rosenberg.

17              MR. ROSENBERG:  Your Honor, we represent the

18   defendants Escape Media, Sam Tarantino, and Josh Greenberg.

19   One of those defendants, Mr. Greenberg, has moved to dismiss

20   for lack of personal jurisdiction, so it follows Mr.

21   Rosenthal's motion.  There is then a separate motion by all

22   three of our defendants, joined in by Mr. Rosenthal's clients,

23   that is different.  It goes to whether the complaint adequately

24   alleges an infringement claim.  I didn't know if the Court

25   wanted to do the jurisdictional motions separately.
```

1          THE COURT:  I'll do it in any order you lawyers would

2    like.

3          MR. ROSENBERG:  I would propose we do the

4    jurisdictional motion, Mr. Rosenthal, then myself, then Mr.

5    Bart, then the separate motion to dismiss.  Mr. Bart, is that

6    OK?

7          THE COURT:  That makes a lot of sense.  You are making

8    a motion on behalf of?

9          MR. ROSENTHAL:  Arabadjiev, Westermann-Clark, and

10   Geller.

11         THE COURT:  Arabadjiev -- give me the names again.

12         MR. ROSENTHAL:  Chanel Munezero, Benjamin Westermann-

13   Clark, and Paul Geller.

14         THE COURT:  Go ahead.

15         MR. ROSENTHAL:  Your Honor, all four of those

16   individual defendants are young men who live in Florida who

17   make less than $40,000 a year.  Three of them have barely ever

18   been to New York.

19         Mr. Arabadjiev was in New York once to make a

20   connecting flight at JFK.  Mr. Munezero was in New York once

21   when he was driving to Canada, so he drove through New York.

22   Mr. Westermann-Clark has visited New York twice in the last

23   five years, once to go to a music festival and once to

24   interview public relations firms for Escape.  None of those

25   activities by any of those three had anything to do with any of

 1    the allegations in the complaint.

 2            Mr. Geller has been in New York more often than that.

 3    He does not live here despite the allegations in the complaint.

 4    He lives in Florida.  I will talk a little bit more about his

 5    trips to New York in a moment.

 6            This is a motion under New York's long arm statute

 7    section 302(a)(3)(ii), which is the part of New York's long arm

 8    statute that deals with torts committed outside of the state

 9    that have an impact inside the state.  Your Honor, the long arm

10    statute in New York and the due process principles that

11    underlie it are all about fairness.  They are all about whether

12    it is fair to have somebody made to come to New York and be

13    subject to jurisdiction in New York, to be hailed into court in

14    New York, as all the cases say.  It is not fair for any of

15    these young men to be hailed into New York.

16            The plaintiffs here have basically attempted to paint

17    the defendants with bad conduct, the bad conduct of Escape that

18    is alleged in the complaint, and to argue that somehow, because

19    they work for Escape, they are subject to jurisdiction here.

20    Basically, the plaintiffs' papers are all about conflating the

21    activities of Escape with the activities of the individual

22    defendants.  That's not fair, your Honor.

23            The long arm statute requires that in order to be

24    hailed into court, a defendant has to reasonably expect his

25    acts to have consequences in New York and the defendant has to

 1    derive substantial revenue from interstate or international

 2    commerce.

 3         In our papers we address the purposeful availment part

 4    of this case in quite a bit of detail.  I'd like to focus on

 5    the substantial revenue aspect of this.  Plaintiff has not

 6    cited any cases where individual employees of a company -- they

 7    have stock options; one of them has a tiny amount of actual

 8    stocked owned through the vesting of those options, the

 9    exercise of those options -- where people who make $40,000 or

10    year or less can be dragged into New York just because their

11    employer makes money here.  Just because you get a salary in

12    Florida from a company that may have revenue based in New York

13    is not sufficient to justify having those defendants hailed

14    into court here.

15         In their declarations, each of those defendants talks

16    about their salary history.  I think the one that made the most

17    made $40,000 in 2011.  The others made between $25,500 in the

18    case of Nikola Arabadjiev to in the 30's for the other people.

19         Plaintiffs allege in their complaint and their papers

20    that these defendants get bonuses depending on the extent of

21    their illegal conduct.  That is not true.  They don't get

22    bonuses.  One of the four, Paul Geller, received a $3,000 bonus

23    in 2011 as a result of his work, which is basically handling --

24         THE COURT:  Let me interrupt you.

25         MR. ROSENTHAL:  Sure.

1          THE COURT:  Back up a little bit.  Escape is a

2     corporation, right?

3          MR. ROSENTHAL:  Yes, it is.

4          THE COURT:  It's incorporated where?

5          MR. ROSENTHAL:  I'm going to refer to Mr. Rosenberg

6     for most of the questions, but I believe it is a Florida

7     corporation.

8          THE COURT:  You can go back and forth.  I think the

9     principal place of business is in Florida.

10          MR. ROSENTHAL:  Yes.

11          THE COURT:  Is it a Florida corporation?

12          MR. ROSENBERG:  I believe, your Honor, it's a Delaware

13     corporation.  I can't represent that.  That's my recollection

14     as I stand here.  It's not a New York corporation, your Honor.

15          MR. ROSENTHAL:  According to the complaint, Escape,

16     which is a company, is a Delaware corporation.

17          THE COURT:  It is a corporation.  Does it have

18     officers.

19          MR. ROSENTHAL:  Yes, it has officers.

20          THE COURT:  Who are the officers?  Does it have a

21     president or chairman of the board?  Does it have officers?

22          MR. ROSENTHAL:  It does have officers.  I believe Mr.

23     Rosenberg would be in a better position to --

24          MR. ROSENBERG:  Your Honor, the chairman is an

25     individual who I believe resides in Boulder, Colorado.

1          THE COURT:  Is he a defendant?

2          MR. ROSENBERG:  No.

3          THE COURT:  There is a chairman.  OK.

4          MR. ROSENBERG:  I believe the president or CEO, is Mr.

5     Tarantino.  While he resides in Florida, we are not moving to

6     dismiss him on jurisdictional grounds.

7          THE COURT:  He is the president, right?

8          MR. ROSENBERG:  I believe so, or CEO, or both.

9          THE COURT:  Tarantino.

10         MR. ROSENBERG:  No motion to dismiss that individual

11    on jurisdictional grounds, your Honor.

12         THE COURT:  All right.  Are there other officers?

13    Let's get very specific.  Let's put aside Mr. Geller for the

14    moment.  The three other persons that are involved in your

15    motion, are they officers?

16         MR. ROSENTHAL:  Mr. Westermann-Clark is no longer an

17    officer with the company.  I do not believe he was an officer.

18    He may have been a vice president.  This is one of those

19    companies that was a startup.  Many of the employees have

20    titles as vice president.

21         THE COURT:  Is he no longer with the company?

22         MR. ROSENTHAL:  Mr. Westermann-Clark is no longer with

23    the company.

24         THE COURT:  When did he leave?

25         MR. ROSENTHAL:  Recently, since the filing of the

1    complaint.  Mr. Munezero and Mr. Arabadjiev I do not believe

2    are officers of the company.

3         THE COURT:  What do they actually do for the company?

4    Let's take up Mr. Geller last.  The other three, what do they

5    do?

6         MR. ROSENTHAL:  Mr. Arabadjiev is in quality

7    assurance, which is to make sure that the system works as it

8    should work.  Mr. Munezero is a software programmer.

9         THE COURT:  Mr. Westermann-Clark, what was he?

10        MR. ROSENTHAL:  Mr. Westermann-Clark was a writer who

11   worked on materials for the company.  He was a copywriter and

12   editor.  His title was communications agent.

13        THE COURT:  Copyright writer and?

14        MR. ROSENTHAL:  Editor.

15        THE COURT:  Were they paid salaries?

16        MR. ROSENTHAL:  Yes, they were paid salaries.

17        THE COURT:  You gave that.  Give that to me again.

18        MR. ROSENTHAL:  Mr. Arabadjiev made $25,500 in 2011.

19   I can go back a year before that.  He made $14,800 the year

20   before, in 2010.  Mr. Munezero made $40,000 in 2011 and $36,000

21   in 2010.

22        THE COURT:  Mr. Westermann-Clark?

23        MR. ROSENTHAL:  Mr. Westermann-Clark made $36,000 in

24   2011 and $30,000 in 2010.

25        THE COURT:  To shortcut this, let's just talk about

1 those three.  What is the basis for asserting personal

2 jurisdiction over them?  Can I ask the plaintiff's lawyer?

3          MR. BART:  Sure, your Honor.  Your Honor, this case

4 relates not specifically or not only to the operations of

5 Escape Media.  The case is centered around the activity of

6 these specific defendants.  This case is one that relates to

7 uploading, the taking of sound files by these defendants and

8 putting them into the Grooveshark system so they could be

9 distributed and played throughout the United States and in

10 particular in New York.

11          This is not some random act by these particular

12 defendants, nor were they chosen as a matter of harassment.

13 These defendants were chosen because the data that was given to

14 us by the company showed that these defendants were responsible

15 for over 70,000 sound files being illegally uploaded into the

16 Grooveshark system.

17          THE COURT:  All three of them?

18          MR. BART:  We have actually provided in the complaint

19 the specific numbers, as far as we know, from the corporate

20 defendant as to how many they have uploaded.  For example, I

21 believe Mr. Munezero uploaded 40,000 tracks.  These are major

22 players in the company.

23          THE COURT:  They uploaded, personally uploaded?

24          MR. BART:  Yes.  They took a sound file and they

25 imported it into the database that Grooveshark then used to

10

1    play, we contend illegally, millions and millions of times.

2          The gravamen of this case is that Grooveshark

3    operates -- by the way, it operates with an office here in New

4    York that they opened -- operates in New York.  They have

5    transmitted a hundred million illegal copies of sound files to

6    New York residents during the time period that we have data

7    for.  The amount of infringement is staggering.  These

8    particular defendants are involved and are named because they

9    personally, as part of their employment, under the direction of

10   some of the others --

11         THE COURT:  Under the direction of whom?

12         MR. BART:  Of the executive defendants, meaning Mr.

13   Tarantino, Mr. Greenberg, and we contend Mr. Geller as well.

14         -- were directed to upload.

15         Let me back up one second because I think this will be

16   helpful.  The reason why these uploads are important is that

17   Grooveshark is a system that appeals to people who want to hear

18   music for free.  They don't want to pay the record companies,

19   they don't want to pay the artists.  They want to go online and

20   listen to a song that they want to listen to.  The only way

21   that Grooveshark can be a viable player in this marketplace is

22   if they have everything, if they have all the major songs, so

23   that somebody going to their site will know, I can find what I

24   want there.

25         In order to make sure, and this is really the center

1    of this case, to make sure that all of the major hits of the

2    day are available, Grooveshark intentionally seeded, told their

3    employees and personally uploaded illegal sound files in their

4    database so they could go out into the marketplace and be a

5    comprehensive music library that people would go to.  This has

6    been staggeringly successful, as I indicated, just from the

7    sheer number of streams that have gone to members in New York.

8         THE COURT:  To get to the long arm statute, for these

9    individuals -- again, I'm not talking about Mr. Geller for the

10   moment, just the three others -- how about this requirement in

11   the statute that they derive substantial revenue from

12   interstate or international commercial?  It isn't talking about

13   expect.  It says and derives substantial revenue from

14   interstate or international commerce.  What about that?

15        MR. BART:  First off, your Honor, I think that one of

16   the mistakes in the defendants' presentation is that they are

17   arguing that this imports some sort of wealth standard, that

18   people who earn below some subjective amount of money cannot be

19   held subject to jurisdiction under the long arm statute.  There

20   is no support for that notion at all.  In fact, we have cited

21   case law in our opposition brief showing that courts have held

22   amounts of money as low as $158 earned in interstate commerce

23   to be sufficient to satisfy this standard.

24        What is required, and I agree with Mr. Rosenthal, what

25   is really at issue here is an overall sense of fairness.

 1          THE COURT:  I want to talk specifically about derives

 2    substantial revenue from interstate or international commerce.

 3    How do the plaintiffs comply with that for the three people

 4    we're talking about?  And one at a time of course.  Go ahead.

 5          MR. BART:  I think there are several ways that they do

 6    that.  One is through their compensation from the company.

 7    They are compensated for, as we allege in the complaint, their

 8    actions in uploading these transaction which go into interstate

 9    commerce.  We haven't had a chance to test this, but they have

10    said, we haven't been compensated or our salary is not

11    dependent in any way on the profits or the revenues of Escape.

12          The problem with that statement is, as employees, are

13    they even competent to say what the basis of their salary is?

14    The only people who would know why they are being compensated

15    and how they are being compensated are the company executives

16    themselves who set the salaries.  There is nothing in the

17    report that reflects that.

18          A second thing is that they have all had very, very

19    substantial stock options.  These stock options, with the

20    success of things like Facebook, can easily be worth millions

21    of dollars if this company goes public.  It is our contention

22    in the complaint that they are awarded stock options for their

23    interstate actions, for their actions in uploading materials

24    that are then going to be distributed throughout the United

25    States and internationally.  And those allegations have not

1   been contradicted.

2           THE COURT:  Without getting into the details of dates,

3   and so forth, is it correct that all three were granted stock

4   options?

5           MR. BART:  Yes.  They all admit that they have been

6   granted stock options.  It's in their declarations.  What we

7   said was their compensation includes compensation based upon

8   their interstate activities that are at the very center of what

9   is at issue in this case.

10          As your Honor remembers, we requested jurisdictional

11  discovery.  That was deferred at that point.  They came in with

12  declarations.  The declarations said a few interesting things.

13  They purported to tell the Court how their salary was created

14  and what the factors were that went into that.  I respectfully

15  submit that is incompetent testimony, because the employee

16  doesn't know.

17          The executives are here and didn't support that

18  testimony with their own declarations.  And they specifically

19  acknowledged the stock options that they have received.  That

20  is in the record before your Honor, that they have received

21  stock options which we have contended were granted and the

22  number was granted in direct relation to their interstate

23  activities.

24          Putting aside the discovery issue, if they wanted to

25  rebut that, that testimony or that allegation conceivably could

1    have been rebutted with an introduction of an employee stock

2    option plan, with testimony of people who set up the plan.

3    None of that exists.  Rather, what exists in the declaration is

4    very carefully sculpted language which says none of this was

5    based upon the revenues or profitability of Escape.  But that

6    is not what we are contending it was based on.

7         THE COURT:  Did Escape make money?  If so, how?

8         MR. BART:  Escape makes money by selling subscriptions

9    to, among others, users in New York:

10        THE COURT:  I know this is in the papers, but what

11   does selling a subscription actually mean?

12        MR. BART:  I apologize, your Honor.  There are

13   different ways that a user can interact with Grooveshark.  You

14   can go onto the site and you can click on a song and hear it.

15   You can also enter into an agreement with Grooveshark where it

16   will actually take your credit card -- there is a commercial

17   transaction -- and you are entitled to greater access, storage,

18   and rights in the Grooveshark system with regard to your own

19   music supply.

20        Grooveshark makes money in two primary ways.  One way

21   is by entering into these deals with customers, including these

22   credit card deals with New York residents.  The second way is

23   they sell advertising.  So, Escape makes money based upon the

24   exploitation.

25        From the plaintiffs' perspective, the whole business

1  model is set up so that they make money off the exploitation of

2  our sound recordings without us ever receiving a penny for it.

3  There is nothing else they do.  There really isn't anything

4  else they do but for exploiting our music.

5       They take all the revenues, even though they admit in

6  correspondence that they owe us for it.  They make the money

7  from selling subscriptions.  They make the money from

8  advertising.  These exhibits before your Honor recognize that

9  they owe money to the plaintiffs and have decided that they

10  will go ahead and build their business in the interim and, to

11  use their language, beg for forgiveness as opposed to trying to

12  negotiate a license.

13       THE COURT:  Let's go back to these three.

14       MR. BART:  OK.

15       THE COURT:  I think it is the law that if you have an

16  employee of a company, the company may be deriving substantial

17  revenue from interstate commerce.  But just because you're an

18  employee of that company and maybe get a salary from that

19  company, that is not enough.

20       MR. BART:  I don't disagree with that, your Honor.

21       THE COURT:  You're saying that this situation is

22  different?

23       MR. BART:  Yes, your Honor, I am saying that this is

24  different.  As a matter of fact, there are nightmare scenarios

25  presented in the defendants' papers where they say accepting

1    jurisdiction over these defendants would lead to a scenario

2    where any employee of an interstate company could be hailed

3    into court anywhere.  That is absolutely not what we are

4    saying.

5         Here what we are talking about is interstate activity

6    of the employee.  We are talking specifically about the conduct

7    of these employees.

8         THE COURT:  If they were simply functionaries obeying

9    orders from Tarantino or Greenberg or Geller or whoever, if all

10   the decisions, the concepts, the management, if it was all done

11   and these people were low-level functionaries simply typing in

12   stuff, that would be one thing.  But I take it you feel that

13   that is not the case.

14        MR. BART:  Yes, we feel it is not the case.  We are at

15   a stage in the proceedings where we are dealing just with a

16   pleading.  We are dealing with a motion to dismiss.  The

17   defendants are challenging the issue of whether or not these

18   employees were in fact directed to do this.

19        What we do know for a fact is that these employees did

20   upload this massive number of illegal songs into the system.

21   We received a database from the corporate defendant which

22   identifies these individuals by number.  We matched it up and

23   were able to tell the Court these people were engaged

24   personally in massive amounts of copyright infringement.

25        That copyright infringement is going to be the core of

1    the case in this court whether they are here or not, whether we

2    have to commence a separate action against them in Florida for

3    the very same infringements that your Honor is going to be

4    addressing against the defendants who recognize that this Court

5    has jurisdiction over them.

6         What we are saying for purposes of the instant motion

7    is that we have alleged that they personally were engaged in

8    massive infringement, that they personally were compensated as

9    a result those infringements, and that those allegations are

10   sufficient to state a claim against them at this stage of the

11   proceeding.

12        We can take discovery.  They can make a motion at the

13   end for summary judgment, whenever they feel it is appropriate,

14   put in an evidentiary record.  But for purposes of a complaint,

15   we have identified something very different from a corporation

16   with low-level functionaries.  First off, we don't think that

17   these people are in any way low-level functionaries.

18        One minor point of correction.  Mr. Westermann-Clark,

19   who is identified as having been some PR person, was the vice

20   president of public relations.  He was the face of this

21   Grooveshark website to the world.  He interacted with public

22   relations companies here in New York.  He was not a low-level

23   functionary.

24        The reason that these people have significant stock

25   options is because they are vested, long-term employees in this

C46rumpe

1    company.  I think that what we are dealing with is a situation

2    where we have the requisite allegations.  There really isn't

3    any challenge, any good faith challenge, to the other standards

4    of the long arm statute.  It all really comes down to this.  I

5    think we have made the sufficient allegations.  Their

6    evidentiary responses have huge gaping holes in them which I

7    think are intentional, because I don't think they can say what

8    they need to say.

9          THE COURT:  Let's go back.  What do you say now?  Then

10   go on to Mr. Geller.

11         MR. ROSENTHAL:  Your Honor, again, what plaintiff is

12   doing is conflating activities of the company to these

13   individuals.

14         THE COURT:  Who is acing for the company?  The company

15   wasn't AT&T.

16         MR. ROSENTHAL:  The company was not AT&T.  In order to

17   meet the substantial revenue part of the long arm statute --

18         THE COURT:  I'm talking about what they did.

19   According to the complaint, this was the important wrongdoing,

20   this uploading and who did it.  It was all done by Mr.

21   Greenberg or Mr. Tarantino or Mr. Geller?

22         MR. ROSENTHAL:  Your Honor, there are allegations in

23   the complaint that we have to accept as true for purposes of

24   this motion even though they may be disputed, including some of

25   the things Mr. Bart said.  But the fact that there may have

1   been conduct that violates plaintiff's rights does not relate

2   to whether or not defendants received substantial revenue from

3   interstate commerce.  They have put in declarations that they

4   received salary only plus some small, not some gigantic, stock

5   option.  If this turns out to be Facebook, this will be a bit

6   of a surprise to everybody.  They were not tied to any illegal

7   conduct.  The salary was not tied to the number of uploads.

8   They have put in declarations that say that.

9         Mr. Bart makes light of our comment that their

10  allegations would mean that you could subject just about every

11  employee to jurisdiction just about everywhere.  But under the

12  plaintiffs' theory, if the plaintiff comes in and says some

13  employee of McDonald's did something wrong and that employee

14  makes $30,000, then somehow or other that person's salary is

15  supposed to be derived from interstate commerce.

16        The cases say deriving revenue means placing goods and

17  services in the stream of commerce, revenue from placing goods

18  or services in the stream of commerce.  It doesn't mean getting

19  salary from a Florida-based company.

20        THE COURT:  Didn't they place goods in interstate

21  commerce?

22        MR. ROSENTHAL:  They did not receive money from

23  placing goods in interstate commerce.

24        THE COURT:  They received money for doing what they

25  did, and they placed goods in interstate commerce.

```
 1              MR. ROSENTHAL:  That's like saying, your Honor, that

 2    an employee of McDonald's who is flipping burgers --

 3              THE COURT:  No.  This is not McDonald's.

 4              MR. ROSENTHAL:  But, your Honor, just because the

 5    fruits of the labor of somebody lead to interstate commerce --

 6              THE COURT:  This was a tiny, tiny company.  What is

 7    alleged here is that the actual wrongdoing that placed these

 8    whatever you call them in interstate commerce, including

 9    commerce to New York, it was done by these people personally.

10    What are they making money for?  Insofar as the record shows,

11    they are not making money for filling out workman's

12    compensation forms or something.

13              MR. ROSENTHAL:  They have different jobs.  One of them

14    works on software programming.  One of them works on

15    communications.

16              THE COURT:  Unless this is not in the complaint, the

17    allegation is they personally did these huge uploads.

18              MR. ROSENTHAL:  That's the allegation.

19              THE COURT:  That is in the complaint, is it not?

20              MR. BART:  Yes, it is.

21              MR. ROSENTHAL:  That is alleged in the complaint.  Mr.

22    Rosenberg had a comment he wanted to make.

23              MR. ROSENBERG:  If I may, your Honor, because it

24    permeates all of this, the issue is not whether they uploaded

25    songs or whether those songs went into interstate commerce;
```

1    it's whether they purposefully directed them to New York.  This

2    isn't about how bad the defendants' conduct is alleged to have

3    been.  These allegations are way grandiose and overblown.  The

4    test, your Honor, is whether they specifically directed them to

5    New York as opposed to simply every state in the union.  The

6    cases are uniform and legion on that point.

7          With all respect, it's not about how bad they were,

8    allegedly, it's about their contacts with New York.  There is

9    case after case that says that a website that equally serves

10   every state in the country is not directed at New York even

11   though people, many people, millions of people in New York may

12   access it.

13         What is missing from this analysis -- there are

14   actually many things.  When we get to my defendant, I'll

15   address others.  But from this discourse what is missing is one

16   scintilla of evidence that any defendant specifically targeted

17   New York.  Every one of these alleged acts took place in

18   Florida, people sitting around allegedly uploading songs in

19   Florida to a Florida-designed website that's only based in

20   Florida, where it is physically present.

21         Unless the defendants can both allege with specific

22   facts and prove that there was a purposeful targeting of New

23   York, their jurisdictional argument fails, your Honor.  Or else

24   every one who has a website that allegedly violates somebody's

25   rights in New York would be equally subject to jurisdiction in

1  every one of the 50 states of this country where the website is

2  accessible.

3           The issue, your Honor, is not wrongful conduct, it's

4  purposeful availment and targeting of the forum state.

5  Interestingly, Mr. Bart, eloquently, as he always does, at

6  length, I don't mean that critically, in depth, never once

7  suggested that any defendant purposefully targeted New York as

8  opposed to any other state.  That's the end of it, your Honor.

9           THE COURT:  How do you answer that?

10          MR. BART:  My first answer is that I was trying to

11  answer your Honor's questions dealing with substantial revenue

12  from interstate commerce.

13          THE COURT:  You were.  We have another issue here.

14          MR. BART:  We do have another issue.  That rather than

15  respond to emotional argument, the simple fact is that that the

16  law is very clear, and we have cited the cases, that if they

17  knew that their products, their uploads, were destined for New

18  York, that satisfies the test.

19          This is not something where you have a list of goods

20  that are for sale and anybody anywhere in the world can buy

21  them.  Rather, what you have is a system which has paid

22  agreements with people in New York, which is targeting people

23  in New York, which has an office in New York, which is having

24  meetings with New York record companies, public relations

25  companies.

 1          The issue of whether Escape Media focused its

 2     activities on New York really is not even an issue in this

 3     case.  The evidence is overwhelming even at a motion to dismiss

 4     stage.  They made an election to open an office only here.  The

 5     documents that we attached to our pleadings and to our papers

 6     show that there were direct negotiations here with record

 7     companies, with public relations companies.  Some of these

 8     uploads actually took place here.  There is no question that

 9     these tracks were in fact destined for New York; a

10     hundred million of them actually wound up here.

11          The standard that Mr. Rosenberg is trying to argue is

12     that unless you can show some subjective proof that in the

13     heads of these people they knew that it was going only to New

14     York, you don't have jurisdiction.  That is simply not the law.

15     It's being fabricated out of whole cloth.

16          You have activity that is geared to, that is destined

17     for New York, where these people know that they are indirectly

18     serving the New York market.  By uploading their songs, these

19     illegal files, into the network, they know that, for example,

20     they are going to New York and California.  Those are the two

21     biggest markets.  We have it from their own database.  Their

22     records reflect all of their attempts to focus their activity.

23          As your Honor aptly picked up, this is a small company

24     and these people are playing significant roles in this company.

25     The very people that we are talking about are working on the

1   software that enables these transactions with New Yorkers to

2   take place.  They know because they are working on the code,

3   they are designing the system that allows all of this to come

4   here.  That's what they do for a living.

5           THE COURT:  Let's go back.  Let's finish with the

6   defense.  It's their motion.  Let's finish with their argument.

7   Whenever you can, if you could go on to Mr. Geller.

8           MR. ROSENTHAL:  Your Honor, I just want to point out

9   you're right, this is not McDonald's, but it's a company that

10  does have a significant number of employees.  I believe it has

11  about a hundred or had about a hundred.  Attached to the

12  complaint there is a 12-page website, pages from a website,

13  that describe a number of different employees aside from the

14  first two, Mr. Greenberg and Mr. Tarantino.  They are in

15  alphabetical order.  Theoretically, under plaintiffs' theory

16  all of those people could have been brought to court in New

17  York irrespective of any amount of compensation from interstate

18  commerce or their activities with respect to New York.

19          THE COURT:  Is there any allegation that all these

20  other people uploaded thousands of --

21          MR. ROSENTHAL:  No, there is not that allegation, your

22  Honor.

23          THE COURT:  Go ahead.

24          MR. ROSENTHAL:  Your Honor, plaintiff has wonderful

25  lawyers here.  They had ample opportunity in the briefing here

1   to come in with cases that support the idea that you can bring

2   individuals in on this theory.  But the cases, even the case

3   Mr. Bart cited about the small amount of revenue required for a

4   business to be subject to jurisdiction here, those are

5   businesses.  Those aren't individuals.

6          Plaintiff doesn't have a case based on the salary of a

7   low-level employee to show that that person is subject to

8   jurisdiction in New York irrespective of whether that

9   particular person --

10         THE COURT:  What about Mr. Geller?

11         MR. ROSENTHAL:  Mr. Geller has more involvement with

12  New York.  Like the others, he makes very little money.  He

13  made $36,000 last year and 24,000 --

14         THE COURT:  What was his function in the company?

15         MR. ROSENTHAL:  Excuse me?

16         THE COURT:  What is his function in the company?

17         MR. ROSENTHAL:  He works on governmental affairs,

18  legislative affairs for the company.  He has a title of senior

19  vice president.  His major role is to deal with the company's

20  efforts with respect to legislation and government.  He also

21  deals to some extent with trying to obtain clients and partners

22  for the company.

23         He was not with the company at the inception despite

24  the suggestion in the complaint that he has been there.  He

25  joined the company in 2010, so he's not somebody who was

 1   involved in whatever the original intentions were.  He does not

 2   create any products for the company or any software.  The

 3   company's website and software existed more or less in its

 4   current form at the time that he joined the company.

 5        Like the others, the only real difference with Mr.

 6   Geller is that he has a higher title and that he has come to

 7   New York.  But he has not come to New York in connection with

 8   illegal uploading.

 9        THE COURT:  What do you have to say about Mr. Geller?

10   He didn't do the uploading, right?

11        MR. BART:  He did.

12        THE COURT:  What?

13        MR. BART:  He did.  He did thousands of uploads

14   personally.  In addition to that, he is a member of senior

15   management.  As counsel said, he is senior vice president of

16   external affairs.  He is actively engaged in New York, not just

17   with government but he is the face of their public relations

18   effort.  He has negotiated with public relations firms here in

19   New York.  He has a constant presence.  According to his own

20   declaration, he has been to New York nine times on Grooveshark

21   business.  He has had speaking engagements.  He is actively

22   involved in Grooveshark's extensive New York operation.

23        As I said before, they have an office here.  Part of

24   the reason they have the office here is because the New York

25   music media is here and the media is here, and it is important

1      for Grooveshark as a music company to have a presence here.

2      It's the only office that they have set up, and he plays a

3      significant role because he interacts with that community.

4              So, in addition to all of the facts, his uploads,

5      which really repeats the argument that we have had before -- I

6      don't want to burden your Honor with repetitive argument.  What

7      makes his case even weaker is the fact that he has personal,

8      direct, ongoing dealings in New York other than just uploading

9      his songs and knowing that his products are destined for the

10     New York market.

11              THE COURT:  Let's go on to Mr. Greenberg.

12              MR. ROSENBERG:  Thank you, your Honor.  If I could

13     clarify a few things.  Mr. Bart claims that the whole purpose

14     of this alleged unlawful activity was to seed this computer

15     system.  He also alleges in the complaint, not from employee

16     uploads, that there were 15 million recordings already on the

17     system.  He wants you to believe, and there is a plausibility

18     standard under Iqbal, he wants you to believe that these

19     employees uploaded 60, 70,000 songs because they needed to seed

20     a system that has 15 million recordings on it.

21              The second thing I'd like to say is Mr. Bart knows

22     that despite the allegations of the complaint and the grandiose

23     allegations, these uploads, many, we don't even know how many,

24     weren't uploads at all.  That has been explained to him.  He

25     can make these allegations, but he knows that it's much more

1    complicated than that.

2         This isn't some illegal shop down in Florida that is

3    uploading these songs to seed a system.  As I said, the system

4    has 15 million recordings on it.

5         The second way that we are sort of off the topic, if I

6    can respectfully say that, the issue is minimum contacts and

7    whether the contacts relate to the claims.  If someone had a

8    meeting about public relations in New York, -- the claim is

9    that in Florida that person uploaded -- that is not a

10   sufficient relationship between the claim and the contact.

11        Mr. Bart argues about how important these employees

12   were.  There was a lengthy discussion with your Honor about

13   that.  I draw to your Honor's attention the case in Capitol

14   Records v. MP3tunes from this Court, Judge Pauley, 2008.  Mr.

15   Bart knows it well.  He was counsel in that case.

16        There, your Honor, the defendant, who was challenging

17   personal jurisdiction, was the founder of the company, the

18   chief executive officer, a substantial shareholder, the only

19   director, the chairman of the board, who, quote, had extremely

20   hands on and involved in his company's strategic decisions and

21   day-to-day operations, very technologically savvy, and

22   regularly involved in technological decisions.  Indeed, there

23   was an allegation that the defendant in that case was the

24   company.  But this court, Judge Pauley, said that that is just

25   all conclusions.

1          THE COURT:  Who said that?

2          MR. ROSENBERG:  Judge Pauley.  Judge Pauley said

3  despite the fact that this man was the company, involved in

4  every aspect -- this was also an allegedly infringing Internet

5  site.  Here is what Judge Pauley wrote, your Honor, which I

6  think disposes of all of these motions in favor of defendants.

7          "Plaintiff's assertion that Robertson," that's the

8  defendant there, "benefits from and exercises control over

9  MP3tunes infringing activities is conclusory."  Then it goes to

10  cite the evidence, very similar to this, that there might have

11  been some conversations or what-have-you.  The court says,

12  "This is insufficient to show he exercised control over the

13  corporation's allegedly infringing activities in New York.

14  Robertson's position as chief operating officer, director, and

15  shareholder are also insufficient to show his control over the

16  infringing activities."

17          So, someone who had every position with the company,

18  this court found on analogous facts, actually more compelling

19  facts there than here --

20          THE COURT:  But what is alleged here is that the

21  defendants, these individuals, committed the infringing

22  activity.

23          MR. ROSENBERG:  In Florida, your Honor.  That's what

24  was alleged about Mr. Robertson.

25          THE COURT:  Let's not mix up the issues.  You referred

1    to a decision of Judge Pauley.  He wasn't talking about where

2    it was done.  He was talking about the fact that this

3    particular defendant did not do the infringement activity, did

4    not control it, did not have a relation.  That was all you

5    talked about in your recitation of that case.  Here the

6    allegation is that these defendants personally did the

7    infringement activity.  Am I right, Mr. Bart?

8              MR. ROSENBERG:  I can say yes, that is the allegation,

9    your Honor.

10             THE COURT:  OK.

11             MR. ROSENBERG:  But we are conflating issues.  If

12   that's the case, there is no jurisdiction, because those acts

13   took place in Florida.

14             THE COURT:  Please.  We are taking one step at a time.

15   I'm responding to what you recited.  We have the interstate

16   commerce, and so forth.  The allegation here, as I understand

17   it, is that these defendants did the infringing activity, which

18   was the uploading.  Am I right, Mr. Bart?

19             MR. BART:  Yes, absolutely, your Honor.

20             THE COURT:  The next point, let's talk about Mr.

21   Greenberg.  That's your client.  You are moving on behalf of

22   Mr. Greenberg, right?

23             MR. ROSENBERG:  Yes.  Mr. Greenberg is someone who

24   attended the University of Florida in Gainesville in 2005.  He

25   has lived in Gainesville, Florida, only since then.  He dropped

```
 1    out of college with Mr. Tarantino.  They started this company

 2    in 2006.  He's only worked in Florida.

 3            I would describe him affectionately as a techno-nerd.

 4    He is one of these guys that develops software and websites.

 5    All of that was done in Florida.  The website was created

 6    exclusively in Florida.  It is to this date maintained

 7    exclusively in Florida.  There are no computer servers located

 8    in New York.  He has never worked on the Grooveshark, Escape's

 9    website in New York.

10            THE COURT:  What does he do for the company?

11            MR. ROSENBERG:  He designed the website and maintains

12    the website in Florida.

13            THE COURT:  But he designs the website, right?

14            MR. ROSENBERG:  Yes, your Honor.

15            THE COURT:  Is it the website that is complained

16    about?

17            MR. ROSENBERG:  Yes, your Honor.  The cases hold that

18    designing and being involved in a website that equally targets

19    every state in the country, the cases say that --

20            THE COURT:  I know.  You made that point.

21            MR. ROSENBERG:  It says you can't have jurisdiction or

22    else there jurisdiction in every state.  There would be

23    jurisdiction in Guam.  I'm teasing.  I don't know if it is

24    available there.  But it is available in Nevada, it's available

25    in Montana.
```

```
 1            THE COURT:  What about the fact there is an office
 2   here, there are attempts to get public relations activity here?
 3   This is not a situation where somebody sits in Florida and does
 4   something that can only affect 50 states equally.
 5            MR. ROSENBERG:  Your Honor, those --
 6            THE COURT:  There is an office here, is there not?
 7            MR. ROSENBERG:  But that can't be attributed to Mr.
 8   Greenberg.  That's why Escape isn't challenging jurisdiction.
 9   Just because a company has an office in New York doesn't mean
10   the technology officer in Florida is subject to jurisdiction in
11   New York.  It just doesn't mean that, your Honor.
12            We seem to be off of what both the constitutional and
13   statutory basis of personal jurisdiction is.  That's whether a
14   defendant personally had sufficient contacts with the forum
15   state, whether he personally, not the company he works for,
16   purposefully availed himself of the forum state.
17            If you would favor us with a review when we are done
18   of the MP3tunes-Capitol Records decision, it is dispositive of
19   this.
20            THE COURT:  That was Judge Pauley?
21            MR. ROSENBERG:  Yes.  We can't conflate what Escape
22   does in New York -- by the way, Escape doesn't distribute
23   anything.  There is a computer.  People can listen, like the
24   radio, unless you want to say that a radio station distributes
25   hundreds of millions of songs because it plays it.  People go
```

```
 1    onto their computer all over the country and listen to music.

 2    That's all this is, your Honor.  This is not sale of a

 3    hundred million recordings in New York.  That's such a mixed

 4    characterization.

 5         All Mr. Greenberg did was he sat in Florida as this

 6    what I describe as a techno-nerd and he developed a website in

 7    Florida.  That's where he stays and lives.  He's been to New

 8    York once since 2009 on Escape business to look at vacant

 9    office space.  That has nothing to do with his alleged

10    uploading.  There is no nexus between his incredibly minimal

11    contacts with New York and what he is alleged to have done.

12         THE COURT:  What do you say about Mr. Greenberg, Mr.

13    Bart?

14         MR. BART:  Thank you, your Honor.  I think the case

15    against Mr. Greenberg is an extremely simple one, and that is

16    that he has admitted, his declaration admits, that he is the

17    architect of the website that makes millions of unauthorized

18    copies of our recordings available to the public without

19    payment.  His responsibilities include design and functionality

20    of the website, ensuring the availability of sound recordings,

21    overseeing the data collection efforts.  He personally knows

22    and has responsibility for who is using Grooveshark and where.

23         By the way, there was a lot of testimony in that last

24    presentation.  I want your Honor to be aware that the notion

25    that this is a radio where it's just played and they do
```

1   nothing, aside from the fact that it is argument which is

2   inappropriate on a motion to dismiss, is factually wrong.  What

3   Grooveshark does is it physically transfers a file, a sound

4   file that contains a recording --

5         This is the way the system works.  They have sound

6   recordings on the Grooveshark servers.  They transfer that file

7   to the computers of the listeners.  This is not a radio where

8   you're sitting in your car passively listening.  Grooveshark is

9   affirmatively transferring files from their servers to each of

10  the users.

11        All 100 million acts in New York were done on the

12  website that Mr. Greenberg designs, oversees, and set up to

13  accomplish just that.  His role, he is the mastermind here.  He

14  may be the CTO, the chief technology officer, as opposed to the

15  CEO, but without him none of this works.  He is the person who

16  designed the system that enables all of these uploads to reach

17  all of the users here in New York.

18        In addition to that, he is a principal shareholder.

19  He holds more shares than all but one other shareholder.  He

20  has traveled to New York on business.  He has been involved in

21  the decision to open the New York office and the selection of

22  it.

23        THE COURT:  Did he receive a salary?

24        MR. BART:  Yes.

25        THE COURT:  What?

```
 1                MR. ROSENBERG:  Your Honor, $50,000 was I believe his

 2     most recent salary, derived solely from his activities in

 3     Florida.

 4                MR. BART:  That again is argument that we addressed

 5     before.  He is compensated for designing a system that enables

 6     these servers to transmit files into New York.  That ultimately

 7     is the distinction between that and the MP3tunes case.  I'll

 8     deal with it very, very briefly.

 9                Aside from the fact that Mr. Robertson is in that case

10     right now, that's irrelevant.  What is relevant is that in the

11     decision that Mr. Rosenberg mischaracterized, he was choosing

12     to advise your Honor of what the plaintiffs argue instead of

13     what the judge found.

14                THE COURT:  The judge being?

15                MR. BART:  The judge being Judge Pauley.

16                THE COURT:  That's Judge Pauley's case.

17                MR. BART:  Yes, it was Judge Pauley's case.  Judge

18     Pauley found that there was no evidence that this particular

19     person, Mr. Robertson, controlled the activities of the

20     company.

21                THE COURT:  He recited all that.

22                MR. BART:  There was one point that I do want to make

23     for the record.  Unlike the case here, where Mr. Greenberg

24     said, I designed it, I have these responsibilities, Robertson

25     denied it.  Everything that Mr. Rosenberg read --
```

1          THE COURT:  I think I understand that.

2          MR. BART:  The distinction is that -- I think it is a

3     dispositive distinction on this motion -- Mr. Greenberg comes

4     into this court and submits a declaration.  In paragraph 5 of

5     that declaration it says, "I have the primary responsibility

6     for the design and functionality of this service."

7          That statement alone, and certainly together with his

8     personal uploads, is sufficient to get him on personal

9     jurisdiction for purposes of a motion to dismiss.  There is no

10    case anywhere that presents a defendant like Mr. Greenberg, who

11    has that degree of involvement, that degree of personal

12    responsibility, for designing the very instrument that is on

13    trial, involved personally in creating illegal uploads.

14          THE COURT:  Let's bring this to a close.  I'm denying

15    the motions to dismiss for lack of personal jurisdiction.  Let

16    it by said that I'm very conscious of the fact that there is a

17    requirement of due process and fairness in respect to

18    defendants who are sued who live in Florida.  In my view, there

19    has to be a very substantial basis for holding them within the

20    personal jurisdiction of this federal court in New York.

21          I also would have no intention of holding them within

22    this Court's jurisdiction if they were merely employees of some

23    company who committed a tortious act.  When I say mere

24    employees, if they had either no relation to the tortious

25    activity or some rather tenuous relationship to the tortious

1   activity.

2          Here what is alleged -- and we'll come to this in more

3   detail in a moment when we get to the substantive motion --

4   what is alleged here is that music was uploaded into a website

5   so that someone could have access to that website and play the

6   music.  That is alleged to be a copyright infringement.  The

7   alleged tortious act, the alleged wrongful act, is really the

8   uploading of the music into the website.

9          I hope I've got that reasonably technically described.

10  I think that is the essence even if it isn't quite technically

11  perfect.  But that is the tortious act.  That is the act of

12  alleged infringement.

13         What is alleged here is that Greenberg designed this

14  website, designed this activity.  What is further alleged is

15  that Arabadjiev and Munezero and Westermann-Clark did large-

16  scale up loadings.  They weren't simply employees off on the

17  side dealing with various overhead issues.  They were alleged

18  to have actually done the tortious acts.

19         Mr. Geller is alleged to have also participated in

20  this uploading.  In addition, Mr. Geller is alleged to have

21  come to New York, where there is a company office, and carried

22  on various activities in New York for the benefit of the

23  company.

24         All of these individual defendants received salaries

25  and at least some of them received stock options.  What were

1   their salaries paid for?  The salaries were paid because they

2   were doing what is alleged to have been wrongful.  They weren't

3   paid for various and sundry administrative duties.  The

4   allegation is that in this rather small company they were doing

5   the alleged infringing acts.  It is certainly an inference from

6   the circumstances and the complaint that what they were paid

7   for involved either solely or principally the infringing

8   activity.

9       At least on Arabadjiev and Munezero and

10  Westermann-Clark and Geller, the basis for personal

11  jurisdiction is in New York C.P.L.R. section 302(a)(3)(ii).

12  That statutory language is "commits a tortious act without the

13  state, causing injury to person or property within the state,

14  if he expects or should reasonably expect the act to have

15  consequences in the state and derived substantial revenue from

16  interstate or international commerce."

17      What I am holding is that on the present record there

18  is sufficient evidence and there are sufficient allegations

19  that are reliable for present purposes that each defendant

20  committed a tortious act outside the state.  Obviously, they

21  will deny that it was a tortious act.

22      The cause of action is based on the allegation that

23  they committed tortious acts outside New York, namely, the

24  either designing or actually doing the uploading, in Geller's

25  case also and I guess Greenberg's case carrying on activities

1    that assisted that, directly assisted that.

2              There is a requirement, although this is implied in

3    the statute, that the cause of action arise from that act.

4    Certainly the cause of action arises from these alleged

5    tortious acts.  It must be shown reasonably on the record that

6    the tortious act caused injury to a person or property in New

7    York.  There is no problem about that particular provision,

8    because copyright owners are in New York and the claim is that

9    they were injured in New York.

10             We then come to the next element that must be proved,

11   that the defendant expected or should reasonably have expected

12   the act to have consequences in New York.  In a situation where

13   the company has an office in New York and where it is surely

14   reasonably alleged that New York would be a major market or the

15   major market for this alleged infringing activity, that element

16   is satisfied, in my view.

17             Then we come to the final element that must be shown,

18   and that is that the defendant derives substantial revenue from

19   interstate commerce.  I think I have covered that in what I

20   said earlier.  The compensation may be salaries, but to some

21   extent stock options.  The record would indicate that each

22   defendant involved was obtaining the salary for doing what is

23   alleged to have been wrong.  Certainly what was alleged to have

24   been done wrong involved interstate commerce, without any

25   question.

1            The motions to dismiss for personal jurisdiction are

2      denied.

3            Let us go on to the motion to dismiss for failure to

4      state a claim.  Who wants to argue that?

5            MR. ROSENBERG:  I'll be arguing that, your Honor,

6      although Mr. Rosenthal's clients have joined in that.  I bring

7      this motion on behalf of all three our clients:  Escape Media,

8      Mr. Tarantino, and Mr. Greenberg.

9            In a certain way the Court's ruling just announced on

10     the jurisdictional motions underscores the importance of this

11     motion.  What plaintiffs allege is that eight different

12     defendants infringed hundreds of plaintiffs' recordings, but

13     the plaintiffs do that without either identifying all the works

14     that are at issue or without identifying which defendants

15     allegedly infringed which works and when.  Under authority that

16     is so well-settled that Mr. Bart quotes it as well in his

17     brief, that simply doesn't state a cognizable copyright

18     infringement claim.

19            I want to make clear that we are not suggesting that

20     the case be dismissed with prejudice.  We are just suggesting

21     that a proper amended complaint needs to be filed.

22     Exacerbating that essential pleading deficiency is the fact

23     that when they try to impute liability on Escape, what the

24     plaintiffs do is they refer to an anonymous comment that some

25     unidentified person made to a blog post on a website.

1        Even Mr. Bart's argument on jurisdiction was

2   permeated, although he didn't reference it specifically, with

3   that anonymous hearsay , unauthenticated blog post -- it's

4   supposedly from an employee of Escape, but he doesn't identify

5   himself or herself -- who said that he was paid a bonus for

6   uploading songs.

7        My clients absolutely refute that.  They base their

8   entire claim against Escape, to impute liability against

9   Escape, on an anonymous, unreliable blog post.  The cases say

10  they have to do better than that.

11       Again, your Honor, we are not suggesting that there is

12  no basis upon which plaintiffs could allege -- we will no doubt

13  dispute the allegation -- we are not saying there is no basis

14  upon which they could allege liability against Escape.  We are

15  just saying in the vernacular they need to do it better so they

16  should also have to amend that aspect of their complaint

17       What plaintiffs allege are they are the world's

18  largest record companies.  They say that they own, but they

19  don't identify, some of the copyrights in the most important

20  recordings ever made.  They don't identify what those songs

21  are.

22       Then what they do is say, here is a chart we have, and

23  they include a chart that allegedly shows the number of uploads

24  by certain of the defendants.  Interestingly, not even all of

25  the defendants.  Some of them.  But they don't say what works

1    were uploaded.  They just say this defendant uploaded, I'm

2    making up the number, 1300.  For this one Mr. Bart said 40,000.

3    But they don't say what the works are.

4          And, your Honor, those uploads they don't even claim

5    were necessarily all works that plaintiffs even own.  That

6    chart is irrelevant and unilluminating as to the statement of a

7    cognizable infringement claim.  They apparently recognize that,

8    so they cure, they claim, that glaring deficiency by attaching

9    a representative list -- that's what they call it, a

10   representative list -- of some of the works they say were

11   infringed but not all of the works.  They acknowledge it's not

12   all of them, but they don't say which defendant allegedly

13   infringed which work and when.

14         There are four elements to state a cognizable claim

15   for infringement.  The first is, and I'm quoting from I believe

16   the Jacobs case, although it is cited in many cases, plaintiffs

17   have to allege, quote, which specific original works are the

18   subject of the copyright claim, the specific works at issue.

19   They have to allege that.  It would seem kind of self-evident.

20   They have to allege that a particular plaintiff owns the

21   copyright in those works, that they have been registered.  Most

22   fundamentally, your Honor, and I'm quoting again, by what acts

23   and during what time the defendant infringed the copyright.

24         Plaintiffs, remarkably, have failed to meet any one of

25   those standards.  They have to meet all of them.  They haven't

43

1    met any of them.

2         The first element:  Identify the specific works at

3    issue.  Again, they vaguely refer to thousands of works.  They

4    have a chart that doesn't identify works.  Then they put in a

5    representative list that they admit doesn't state all of the

6    works at issue.  By acknowledging that, that's dispositive.

7         There is the Plunkett case we cite at page 5 of our

8    reply.  It's the same issue.  There was a multipage schedule

9    with registration numbers for some of the works, but the

10   plaintiffs said, our claim isn't limited to those works.

11   That's exactly what happened here.

12        The court said you haven't met the pleading threshold.

13   The court said, quote, "Plaintiff has not provided a list of

14   the works potentially at issue in this case and thus fails to

15   meet the first requirement."  That's a quote of alleging an

16   infringement claim.  Obviously, you have to tell us what works

17   are at issue.  You can't say we will supplement it later

18   depending on what we might find out.

19        The cases that plaintiffs cite are exactly the

20   opposite.  There the lists embraced all of the works that were

21   infringed, but the plaintiffs said we don't know if we are

22   going to allege every one of those was infringing, but they are

23   all on the list.  So the universe of allegedly infringing works

24   was before the court.  That is not true here.  You can't bring

25   a claim and say here is some of what you did wrong and we will

44

1    get to other works you infringe later.

2          The second and third elements, ownership and

3    registration.  The representative list, leaving UMG out,

4    because it does have its own list.  Five plaintiffs together

5    say, we own these 201 works, but they don't say which plaintiff

6    owns which of the 200 works.  Three plaintiffs collectively say

7    we own the copyrights in 200 of these works.  But, again, they

8    don't say which plaintiff owns which works.  So as to eight of

9    the plaintiffs, we don't know which works they allegedly own.

10          They do the same with registration.  This is

11    remarkable.  They put registration numbers next to these works

12    and they say if the defendants want, we can go look up hundreds

13    and hundreds of registration numbers and maybe we can figure

14    out which plaintiff owns what work as though there is a new

15    pleading requirement that a defendant cure a plaintiff's

16    pleading deficiency.

17          The most remarkable concession to me was they said

18    actually even some of the registration numbers don't identify

19    any plaintiff as the owner of the work.  I'm at a loss to

20    understand.  If we did go through this exercise, we'd find some

21    works that aren't even registered by plaintiffs, which means

22    they failed to satisfy the second and third requirements.

23          The most glaring or egregious failure is the fourth:

24    By what acts and during what time each defendant infringed the

25    plaintiffs' copyrights.  What do they do?  They lump all the

1   defendants together collectively, defendants infringed.  They

2   don't even give us a hint of which works were allegedly

3   infringed by which defendants.  The chart I have mentioned is

4   unilluminating.  It just has numbers.  It says 1200 uploads.

5   It doesn't tell what a defendant did or when.

6          The representative list, remarkably, doesn't even

7   attempt to tie any particular alleged infringement to a

8   particular defendant.  No defendant has a clue from the

9   complaint which work he allegedly infringed and, importantly,

10  when.

11         The alleged infringement, your Honor, is the

12  uploading.  Mr. Bart covered that in his jurisdictional

13  argument and the Court embraced that in its ruling on that

14  motion.  It's the upload.  Upload takes place at a specific

15  time.  That could have significant statute of limitations

16  issues.  They don't bother to tell us when it occurred.

17         By the way, they are going to tell you under Rule 8

18  they can lump all the defendants together.  We have cited

19  cases.  Each defendant has to be put on notice of what he did.

20  That's what Rule 8 in the copyright infringement and pleading

21  cases we have cited say.

22         So, what excuse do we get for this incredible sort of

23  blunderbuss fashion of putting lists of songs and letting the

24  defendants figure it out?  The first is they say they weren't

25  able to do it and they allege, and this is offensive, your

1   Honor, that my clients improperly designated certain materials

2   as highly confidential in the state court action, we frustrated

3   their ability to identify it.

4        We didn't designate those documents that data is

5   highly confidential.  Mr. Bart and I negotiated an agreement,

6   and in an email he agreed to the designation.  That was

7   something he agreed to.

8        More importantly, before Universal commenced this

9   case -- UMG was the first case, and there are affidavits in

10  about this -- Mr. Bart called us and asked us if we would

11  dedesignate the information as to universal.  Guess what, your

12  Honor.  Despite all this bad faith he says we allegedly engaged

13  in, we said fine.  We dedesignated it.  One month before UMG

14  started this action, it had all that data, unfettered by any

15  confidentiality restrictions, and it chose not to satisfy its

16  pleading obligations.

17       Then the other two plaintiffs joined the lawsuit, I

18  think actually the other eight or nine, but owned by the Sony

19  group and the Warner group, and Mr. Bart asked if we will

20  dedesignate.  There are issues regarding that before the state

21  court because of the protective order.  Once again we were in

22  court.  We told the judge we didn't need to see her, and my

23  clients agreed to that dedesignation.

24       That day Mr. Bart's partner, who is sitting here, sent

25  us an agreement.  We got him our comments that evening.  And

1    they sat on it for two weeks.  Why?  So they could come in here

2    and say, oh, we have been frustrated in our ability to know

3    this information.

4         We dedesignated it.  They had it before they filed

5    their oppositions.  They certainly had it long before today.

6    Rather than to allege a proper complaint of copyright

7    infringement, they opted to not identify the works, not

8    identify which plaintiff owns them, not identify who has the

9    registrations, and not tell any defendant what he did in

10   respect of what work and when.  That's a total failure to meet

11   the pleading standards and it's very simple.

12        You know what they say?  The other excuse they use is,

13   oh, the defendants can figure out what songs they infringe,

14   they know what they did, because they have the data and it's a

15   simple matter for them to figure it out.  But we don't need to

16   figure out the plaintiffs' claims.

17        THE COURT:  Isn't this going to be basically an issue

18   of law in this case?  In other words, I think that it probably

19   is not really disputed what the company did.  I would think

20   that if there is any dispute, that can be resolved rather

21   easily.  But I assume there is an issue of law ultimately as to

22   whether this activity is an infringing activity or whether it

23   isn't.

24        If it is clear that it is an infringing activity, then

25   I think the issues about liability on whose part, and so forth,

 1   can be resolved.  Isn't there a basic issue of law here?

 2              MR. ROSENBERG:  Your Honor, there are tremendously

 3   disputed facts before you even get to the law.

 4              THE COURT:  What are the tremendously disputed facts?

 5              MR. ROSENBERG:  As to whether these were even uploads,

 6   your Honor.  I don't want to argue outside the motion, but your

 7   Honor raised it, just so you will be aware of this.  The way

 8   the database -- this is my understanding, and I'm not

 9   technologically savvy -- was set up, a number of different acts

10   by the employees would end up leading a chart that says uploads

11   but they are not uploads.  For example, I'm told there is a way

12   to tag compositions.  That simply means I like this and I'd

13   like to listen to it.  That is not an uploading at all.  But

14   that shows up on the chart.  Mr. Bart knows this.  We explained

15   this to him.  He chooses now to ignore it.

16              THE COURT:  I would imagine that Escape and Groove

17   whatever it is called --

18              MR. ROSENBERG:  Grooveshark.

19              THE COURT:  Grooveshark.  What is done can be

20   ascertained, can't it?  There is something that goes on within

21   the Escape company.  Something goes on.  What goes on I would

22   think would be not a deep dark secret.  What conclusions you

23   draw from what goes on may be quite controversial, but what

24   goes on, what is done, I would imagine if we could all take a

25   trip to Florida or something, we could probably visit the

1     company and find out exactly what's done right then and there.

2     Couldn't we?

3            MR. ROSENBERG:  Your Honor, they have a pleading

4     obligation.  With all respect --

5            THE COURT:  I'm asking you a question.  Would you like

6     to answer it?

7            MR. ROSENBERG:  The answer is it's not at all that

8     simple.  The answer is no, your Honor.  There is a huge

9     database.  Some of them may have been uploads.  Many, many of

10    them were not uploads.  Many are about the statutory period.

11    We have a right to know the claim.

12           THE COURT:  The company is down in Florida.  They are

13    people doing something, right?  They are not just sitting on

14    the beach.  They are doing something, right?

15           MR. ROSENBERG:  Yes, your Honor.

16           THE COURT:  They are doing something.

17           MR. ROSENBERG:  They have many different jobs and

18    responsibilities, many.

19           THE COURT:  What is it that they are doing?  I'm not

20    trying to get an answer.  I imagine that that can be

21    ascertained.  Then you've got the issue of what inferences,

22    what conclusions can be drawn from the facts about what is

23    done.

24           MR. ROSENBERG:  Your Honor, that's all true, but that

25    is putting the cart before the horse.

1          THE COURT:  It is not the cart before the horse.  What

2     I'm saying is that ultimately what we will have, I'm sure, is a

3     body of facts which can be ascertained and arguments on the

4     law.

5          MR. ROSENBERG:  Very respectfully, your Honor, if that

6     is true, then the Plunkett case and all the cases that say that

7     they have to meet a pleading threshold to plead an infringement

8     case go out the window because, and I say this quite

9     respectfully, the new standard is we can throw this out and

10    figure it out later.  But that's not the pleading cases

11    require.  You are telling defendants to guess what the claim is

12    against us.  With all respect, your Honor, there is no law that

13    supports any of that.

14         THE COURT:  No law that supports any of what?

15         MR. ROSENBERG:  Of saying that even though they

16    haven't alleged all the works, even though they haven't alleged

17    which plaintiff owns which, and even though they haven't

18    alleged by what acts each defendant allegedly infringed and

19    when -- all four of the pleading requirements they have

20    ignored.  Respectfully, your Honor, you're saying that's fine.

21         THE COURT:  I can address everything you're talking

22    about, and I'm sure it will be addressed.  But I wanted to look

23    forward a little bit.  I'm pretty sure the pleading is OK, but

24    I haven't heard all the arguments.

25         Ultimately, we are really going to have an issue of

1   law about whether this practice does or does not infringe the

2   copyrights of the plaintiffs.  That's where we are going to go.

3   Please don't tell me that I'm ignoring the laws about pleading.

4   I have some acquaintance with this.  Let's hear from the other

5   side.

6          MR. ROSENBERG:  We did have a second argument on

7   pleading as well.  I don't know if you want to hear that.

8          THE COURT:  I know your arguments.  I'm quite well

9   aware of that.

10          MR. BART:  Thank you, your Honor.  I'll keep it brief.

11   I think the pleading completely advises the defendants of the

12   claims against them.  There are schedules attached to the back

13   of the complaint which are works that are at issue in this

14   case.

15          All we said was that we expect that during discovery

16   we may well find others.  What we do with those others, how it

17   gets amended, how it gets added to the case, is not really an

18   issue we have to address now, nor is there any suggestion in

19   the law that we are somehow limited by what we may discovery in

20   facts later to what we can allege now.  What we have alleged

21   now is that there are 2400 works that are at issue.  We have

22   identified what they are.  What's more, they came from the

23   defendants.  The only reason we have this information is

24   because they gave it to us.

25          That brings me to the one substantive point that I

1    want to make during this short argument.  There is a big

2    difference between a traditional copyright infringement case

3    and an Internet case.  In the cases that the defendants are

4    relying on, you're dealing with public performances out in the

5    open, where it is reasonable to expect that a plaintiff can say

6    what took place, where, when, and how.

7         In one of the cases, the Jacobs case they cite, is

8    performances of plays on Carnival cruise ships.  People are

9    there.  You can see what happens.  In another one, in the

10   Plunkett case, there weren't multiple page schedules, but there

11   was a schedule of nine works of Sir Arthur Conan Doyle that

12   were allegedly exploited without the plaintiffs' permission.

13   The problem there is that plaintiff didn't say that any one of

14   them was at issue.  Here we are 2400 works that are definitely

15   at issue.

16        So, both of those cases are both factually inapposite

17   because in each case the reason that the pleading was

18   insufficient and repleading was allowed was because they didn't

19   identify any specific work that the moving defendant was

20   responsible for.  Here we say here are 2400 works that are

21   absolutely at issue.

22        The other difference is that the records of an

23   Internet company are not available to the public.  The only

24   reason we are even able to make this argument is because we

25   were given the databases by the defendants.  A typical

```
 1    plaintiff, if the pleading rules that defendants are arguing

 2    are adopted, no one will ever be able to bring this case

 3    against an Internet company.

 4           Why?  You have just heard the argument about the

 5    uploads are a specific act and we have an absolute obligation

 6    to tell the Court the time frame of when those uploads took

 7    place in order to even put the case before the Court.  There is

 8    no way that any plaintiff will ever know that, because all that

 9    information is what happens inside the defendants' company, it

10    is reflected on the business records of that company.  It

11    basically would amount to a complete immunity from suit because

12    a plaintiff cannot figure that out.

13           THE COURT:  You mentioned 2400.  You have talked and

14    there are tabulations in the complaint about thousands of

15    uploads.

16           MR. BART:  Right.

17           THE COURT:  The thousands of uploads pertain to the

18    2400 songs or pertain to thousands of songs?

19           MR. BART:  The 2400 songs is a subset of the total

20    number.  I'll tell you exactly what took place, your Honor.  We

21    got lists of uploads.  We asked for them and they said here is

22    our list of uploads.  Nothing about tagging, nothing about

23    anything else.  Here is our list of uploads compiled by us.

24           We looked at that and we said we need to have employee

25    ID numbers to know who did what.  They gave us the employee ID
```

1    numbers.  We didn't go out looking for Munezero or any of these

2    other people.  They gave us the data, we figured it out.  We

3    were able to identify the number of works that each one of

4    these people illegally uploaded.

5            Then we went to a separate database of songs and

6    figured out which songs of each of the plaintiffs had been

7    infringed.

8            THE COURT:  I see.

9            MR. BART:  Those are attached as schedules to the back

10   of the complaint.

11           THE COURT:  Is that the 2400?

12           MR. BART:  Which has 2400, exactly.  So they are

13   completely on notice of what the acts are, and the acts are the

14   uploads.  We are able to give them, through the sheer

15   circumstance of having been involved in a prior litigation with

16   them, detail that would not be available to any other plaintiff

17   in the world and have put them on notice of every element of

18   these cases.

19           The cases that they cite not only arise in the

20   physical world on inapposite facts, but couldn't possibly apply

21   to the Internet world.  I agree with your Honor's ultimate

22   conclusion -- I shouldn't say conclusion, forgive me -- comment

23   that all of this will come out as very, very simple directed

24   discovery permits us to find out how many additional works are

25   at issue.  They can argue whether they are uploads or not.  But

1    we have satisfied our notice pleading obligation to let them

2    know what the acts are, what works are at issue.  Yes, we may

3    supplement them, but that is sufficient for these purposes.

4           Does your Honor want to hear --

5           THE COURT:  No.  I want to conclude this.  In my view,

6    the motion to dismiss the complaint must be denied.  The

7    complaint is sufficient.  Under the circumstances of this, the

8    problem that is created here, this isn't about some individual

9    performance in a nightclub.  It's not about a book or an

10   article.  It's about what is alleged to be a large-scale

11   dealing with a great many works that were put onto this

12   website.

13          There is sufficient information in the complaint to

14   satisfy the pleading requirements.  There is really an

15   allegation of a body of works that were dealt with, and the

16   cases sustain a complaint that alleges a body of works without

17   specifying sometimes every single work.

18          As far as ownership, the reference to the

19   registrations, numbers, and so forth, permits access to

20   ownership.  In other words, the complaint is adequate

21   considering the nature of the case.  It would not be adequate

22   if we were dealing with certain books, certain other kinds of

23   things.  It is adequate for the nature of the case.

24          The motion to dismiss is denied.

25          What do we schedule now as to the further proceedings?

1   Perhaps we have done all we can today.  Maybe we need to have a

2   phone conference.  I think we have gone as long as we probably

3   can today.  Consider what the schedule is from here on out and

4   we will have a phone conference.  Thank you.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25