UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARISTA MUSIC, ARISTA RECORDS LLC, ATLANTIC RECORDING CORPORATION, ELEKTRA ENTERTAINMENT GROUP INC., LAFACE RECORDS LLC, SONY MUSIC ENTERTAINMENT, UMG RECORDINGS, INC., WARNER BROS. RECORDS INC. and ZOMBA RECORDING LLC,<br><br>Plaintiffs,<br><br>against<br><br>ESCAPE MEDIA GROUP, INC., SAMUEL TARANTINO, JOSHUA GREENBERG,<br><br>Defendants. | 11 Civ. 8407 (TPG) |

**MEMORANDUM OF DEFENDANTS ESCAPE MEDIA GROUP, INC.,
SAMUEL TARANTINO AND JOSHUA GREENBERG
IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**ROSENBERG & GIGER P.C.**
250 Park Avenue, 12th Floor
New York, New York 10177

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 4

    The Nature and Evolution of Escape's Music Service. .......................................... 4

    Escape's Extensive Interactions with Plaintiffs Concerning Grooveshark. .......... 7

    UMG Recordings ..................................................................................................... 7

    Sony Music ............................................................................................................... 9

    Warner Music ......................................................................................................... 10

    Plaintiffs' Awareness of Grooveshark's Increasing Growth and Success. ........... 12

    UMG's Filing of the Present Action. .................................................................... 13

ARGUMENT .................................................................................................................... 14

I.    Legal Standards Governing Summary Judgment Motions.................................... 14

II.   Plaintiffs' Evidence Identifying the Allegedly Infringed Works Is Inadmissible and
    Unreliable ............................................................................................................. 15

III.  Factual Issues Exist as to Whether Plaintiffs' Longstanding, Prejudicial Delay in
    Commencing this Action Precludes Plaintiffs' Claims ........................................ 21

    A.  There Exist Material Issues of Fact Concerning Whether Plaintiffs Are
       Equitably Estopped from Asserting Their Claims. ........................................ 22

    B.  Material Issues of Fact Exist Concerning Whether Plaintiffs' Claims Are
       Barred by the Doctrine of Laches. ................................................................ 25

    C.  There Exist Material Issues of Fact Concerning Whether Plaintiffs Waived
       their Copyright Infringement Claims............................................................. 27

    D.  Material Issues of Fact Exist Concerning Whether Certain of Plaintiffs' Claims
       Are Barred By The Copyright Act's Three-Year Statute of Limitations. ...... 29

IV.  Additional Factual Issues Preclude Summary Judgment Against Defendants For
    Certain Categories of the Subject Works.............................................................. 32

    A.  Issues of Fact Exist Concerning Whether Escape's UsersFiles Data During the
       Sharkbyte Era Identifies Scans or Uploads. ................................................. 32

**B. The Court Cannot Properly Grant Summary Judgment on Alleged Employee Uploads Occurring Outside of the Dates of Employment.** ...............................................33

**CONCLUSION** ..................................................................................................................................35

# TABLE OF AUTHORITIES

**Page**

Barhold v. Rodriguez,
863 F.2d 233 (2d Cir. 1988).................................................................. 15

Byron v. Chevrolet Motor Div. of Gen. Motors Corp.,
93 Civ. 1116 (AJP), 1995 U.S. Dist. LEXIS 11115 (S.D.N.Y. 1995)............25, 26

Capitol Records, Inc. v. MP3Tunes, LLC,
821 F. Supp. 2d 627 (S.D.N.Y. 2011)....................................................28, 34

Capitol Records, LLC v. Vimeo, LLC,
09 Civ. 10101, 10105 (RA), 2013 U.S. Dist. LEXIS 133655 (S.D.N.Y. 2013) ............34

CBS, Inc. v. Stokely-Van Camp, Inc.,
522 F.2d 369 (2d Cir. 1975)................................................................. 22

Christian Dior-New York, Inc. v. Koret, Inc.,
792 F.2d 34 (2d Cir. 1986)................................................................23, 28

City of New York v. New York Central R.R. Co.,
275 N.Y. 287 (1937) ........................................................................ 30

Clark Street Wine and Spirits v. Emporos Sys. Corp.,
754 F. Supp. 2d 474 (E.D.N.Y. 2010)....................................................... 34

Colon v. BIC USA, Inc.,
199 F. Supp. 2d 53 (S.D.N.Y. 2001)........................................................ 15

Dallal v. New York Times Co.,
2006 U.S. App. LEXIS 5171 (2d Cir. 2006)..............................................22, 23

DeCarlo v. Archie Comic Pubs., Inc.,
127 F. Supp. 2d 49 (S.D.N.Y. 2001)........................................................ 22

Design Strategy, Inc. v. Davis,
469 F.3d 284 (2d Cir. 2006)................................................................. 17

Doe v. Guthrie Clinic, Ltd.,
11-CV-6089T, 2012 U.S. Dist. LEXIS 20507 (W.D.N.Y. 2012)........................... 34

Fitzpatrick v. Am. Int'l Grp., Inc.,
10 Civ. 0142, 2013 U.S. Dist. LEXIS 151599 (S.D.N.Y. 2013) ........................... 17

Franconero v. UMG Recordings, Inc.,
2013 U.S. App. LEXIS 20765 (2d Cir. 2013).............................................. 17

Gen. Elec. Cap. Corp. v. Armadora,
37 F.3d 41 (2d Cir. 1994)................................................................... 22

Great White Bear, LLC v. Mervyns, LLC,
  06 Civ. 133358 (RMB) (FM), 2008 U.S. Dist. LEXIS 41977 (S.D.N.Y. 2008) ................................. 17

Haas v. Leo Feist, Inc.,
  234 F. 105 (S.D.N.Y. 1916) ..................................................................................................... 26

Hadden v. Consol. Edison Co.,
  45 N.Y.2d 466, 382 N.E.2d 1136 (N.Y. 1978) .......................................................................... 27

In re Rezulin Prods. Liab. Litig.,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ........................................................................................ 27

L.A. Printex Indus., Inc. v. Pretty Girl of California, Inc.,
  09 Civ. 4206 (KBF), 2012 U.S. Dist. LEXIS 19002, at *7 (S.D.N.Y. 2012) ....................................... 26

Legislator 1357 Ltd. v. Metro-Goldwyn-Mayer, Inc.,
  452 F. Supp. 2d 382 (S.D.N.Y. 2006) ........................................................................................ 25

Lego A/S v. Best-Lock Construction Toys, Inc.,
  874 F. Supp. 2d 75 (D. Conn 2012) .......................................................................................... 26

Marshall v. Marshall,
  504 Fed. Appx. 20 (2d. Cir. 2012) ........................................................................................... 15

Morris v. N.Y.C. Emps. Ret. Sys.,
  129 F. Supp. 2d 599 (S.D.N.Y. 2001) ........................................................................................ 15

Nippo Corp. v. Amec Earth & Envtl., Inc.,
  09 Civ. 0956, 2011 U.S. Dist. LEXIS 34994 (E.D. Pa. 2011) ............................................................ 17

Pavlica v. Behr,
  397 F. Supp. 2d 519 (S.D.N.Y. 2005) ........................................................................................ 23

Price v. Fox Entm't Group, Inc.,
  05 Civ. 5259 (SAS), 2007 U.S. Dist. LEXIS 6081 (S.D.N.Y. 2007) ............................................. 23, 27

Psihoyos v. John Wiley & Sons, Inc.,
  Nos. 12-4874-cv(L), 12-5069-cv(XAP) (2d Cir. Apr. 4, 2014) ...................................................... 30

Song v. Yao Bros. Grp. LP,
  10 Civ. 04157 (RKE), 2012 U.S. Dist. LEXIS 62235 (S.D.N.Y. 2012) .............................................. 20

Stone v. Williams,
  1988 U.S. Dist. LEXIS 9989 (S.D.N.Y. 1988), aff'd 873 F.2d 620 (2d Cir.) ...................................... 26

Stone v. Williams,
  873 F.2d 620 (2d Cir. 1989) ............................................................................................... 25, 26

Stone v. Williams,
  970 F.2d 1043 (2d Cir. 1992) ............................................................................................. 26, 31

Travelers Int'l AG v. Trans World Airlines, Inc.,
    722 F. Supp. 1087 (2d Cir. 1989)..................................................................................27

UMG Recordings Inc. v. Veoh Networks Inc.,
    665 F. Supp. 2d 1099 (C.D. Cal. 2009)..........................................................................20

Veltri v. Bldg. Serv. 32 b-J Pension Fund,
    393 F.3d 318 (2d Cir. 2004)............................................................................................23

Webster's Red Seal Pubs., Inc. v. Gilberton World-Wide Publications, Inc.,
    67 A.D.2d 339, 415 N.Y.S.2d 229 (1st Dep't 1979)......................................................27

Williams v. Cnty. of Orange,
    03 Civ. 5182 (LMS), 2005 U.S. Dist. LEXIS 46051 (S.D.N.Y. 2005)...........................16

Zalaski v. City of Bridgeport Police Dep't,
    613 F.3d 336 (2d Cir. 2010)............................................................................................14

Defendants Escape Media Group, Inc. ("Escape"), Samuel Tarantino and Joshua Greenberg, through their counsel, submit this Memorandum in Opposition to plaintiffs' Motion for Summary Judgment (the "Motion").

## INTRODUCTION

Defendants Samuel Tarantino and Joshua Greenberg founded Escape in 2006, while still freshmen at the University of Florida, with what was unquestionably a bold - - and perhaps naïve - - desire to bring change to the music industry. The initial business model for Escape's Grooveshark service unabashedly sought to replace illegal downloading services such as Napster and Limewire with a new business model, benefiting all participants, in which music labels such as plaintiffs would receive payment for what had become pervasive sharing of audio files by internet users. As early as 2007, while still developing and testing its "Sharkbyte" peer-to-peer file sharing network - - the first version of Grooveshark, ultimately abandoned by Escape in 2008 - - Escape began a dialogue with major content owners, including plaintiffs, seeking licenses to operate its unique service. From that time forward, through the commencement of this action in November 2011, Escape frequently and repeatedly engaged plaintiffs in licensing discussions, keeping them well informed concerning the development of its Grooveshark service.

Thus, plaintiffs were aware when, in the Fall of 2007, Escape launched a "beta" test version of its Sharkbyte peer-to-peer system to a limited group of invited users from outside of the company. Plaintiffs were also aware when, in April 2008, Escape launched a new service called Grooveshark Lite, which moved the company away from its initial peer-to-peer model and toward a web-based "streaming" model, in which users could "upload" audio files to Grooveshark and "stream" those files - - *i.e.*, play back and listen to those files through their computers, but not download them. Similarly, plaintiffs knew when Escape discontinued its original Sharkbyte service in or about October of 2008 because, among other reasons, the service had failed to catch on with users and Escape had failed to obtain major label licenses for the service. Escape similarly kept plaintiffs aware of its progress as it

developed its Grooveshark Lite streaming service, which ultimately became known simply as

"Grooveshark," investing ███████████ into the company, hiring dozens of new employees,

opening additional offices, and expanding its user base over time.

Not only did plaintiffs know the details of Escape's Grooveshark service, and its evolution over

time, they encouraged Escape to develop the service and grow its user base, initially declining to

engage in serious licensing discussions with Escape's CEO, Samuel Tarantino, because of the small

number of Grooveshark users and Mr. Tarantino's youth and inexperience.  In this regard, plaintiff

UMG Recordings, Inc., the largest record company in the world, told Mr. Tarantino to demonstrate

that Grooveshark could build a business and attract a large number of users - - *i.e.*, create a construct

that would be financially appealing to UMG - - and then "come back to us" to further discuss licensing

opportunities.

At the same time that they were engaging in licensing discussions with Escape and encouraging

it to expand its operations, plaintiffs openly claimed from the inception that Escape was infringing

plaintiffs' copyrights in sound recordings available on the Grooveshark service.  Following the launch

of the Grooveshark Lite streaming service in 2008, however, Escape openly contended that its

streaming model, through which Escape stored and permitted access to content on its servers at the

direction of internet users, enjoyed "safe harbor" from federal copyright infringement claims pursuant

to the Digital Millennium Copyright Act ("DMCA").  Indeed, Escape expended substantial amounts of

time, effort and resources ensuring its compliance with DMCA requirements, including establishing

procedures for the receipt and processing of infringement notices from content owners; removal of

audio files from Grooveshark that are the subject of such notices; and barring the continued uploading

of files by users who uploaded those allegedly infringing audio files.  While defendants thus believed

that Escape was immune from infringement claims under the DMCA, it nonetheless continued its

2

licensing discussions with plaintiffs, seeking a business rather than legal, resolution of the

infringement issue.

Despite their longstanding assertions of infringement, *plaintiffs did not pursue any federal infringement claims under the Copyright Act* until the commencement of this action in November 2011, *i.e.*, more than four years after Escape launched its Grooveshark service (and introduced that service to plaintiffs) and more than three years after Escape abandoned its initial Sharkbyte service and moved exclusively to a DMCA-based streaming model. But the action comes too late, for several reasons. <u>First</u>, Escape's Sharkbyte service - - upon which plaintiffs' claims are substantially predicated - - was dead and buried for more than three years prior to plaintiffs' belated attempt to resurrect it for the purpose of asserting its claims in this litigation. Plaintiffs' claims concerning Escape's activities during this bygone era - - which comprise the vast majority of the asserted employee uploads - - fail on a number of separate, but equally dispositive grounds, discussed below, including estoppel, laches, waiver and statute of limitations. <u>Second</u>, even with respect to the more limited number of identified employee uploads occurring in 2009, after the termination of Sharkbyte, plaintiffs always believed (and openly asserted), despite Escape's professed protection under the DMCA safe harbor, that Grooveshark was an infringing service under federal copyright law. Nonetheless, plaintiffs long delayed in asserting any claims for infringement under the U.S. Copyright Act, while Escape - - as plaintiffs well knew - - was expending substantial time, effort and resources building its business. Indeed, plaintiffs seek to directly benefit from their delay, arguing that Escape violated plaintiffs' rights of public performance in the works at issue as a result of user streams of those works ████████

████████ (Pls' Mem. at 16.) But plaintiffs sat back and knowingly allowed these alleged millions of user-requested streams to accumulate despite their ability to easily stop them, whether by submitting a DMCA notification to Escape, which would have responded expeditiously in accordance with its DMCA policies by removing the audio files from Grooveshark, or taking more formal legal

3

action against Escape.  In sum, plaintiffs' claims aimed at the Grooveshark streaming service, whether based upon employee uploads or resulting streams, have been waived and are barred under the equitable doctrines of estoppel and laches.

To deny plaintiffs' present request for summary judgment, the Court need only determine that a single issue of fact exists regarding Escape's asserted statute of limitations, waiver, estoppel and laches defenses - - a hurdle that defendants most assuredly have met.  But there are additional bases for this Court to deny the Motion, including (a) plaintiffs' failure to disclose critical expert testimony during discovery that they rely upon for the first time in connection with the Motion; (b) factual issues concerning whether certain early records from the Sharkbyte era relied upon by plaintiffs show audio file "uploads" or merely "scans" of file information, without any copy being made of the files themselves; and (c) evidence that ████████████ alleged employee uploads occurred either prior to or after the dates of employment of the employee involved, rendering them irrelevant to plaintiffs' claims against defendants.

## FACTUAL BACKGROUND

### The Nature and Evolution of Escape's Music Service

Escape was founded in 2006 by individual defendants Sam Tarantino and Josh Greenberg while they were freshmen at the University of Florida.  (Tarantino Decl. ¶ 3; Greenberg Decl. ¶ 2.)  At its origin, Grooveshark was conceived as a new model for the licensed exchange of audio files by internet users that would include a mechanism for the compensation of content owners (including plaintiffs) and would supplant unlicensed "peer-to-peer" ("P2P")[1] file sharing services such as Napster and Limewire.  (Tarantino Decl. ¶ 5; Greenberg Decl. ¶ 5.)

The first version of Grooveshark was called "Sharkbyte."  While Sharkbyte utilized similar basic technology as other P2P services, unlike such services, Escape's business model included the

---

[1] In a "peer to peer" network, a piece of software installed on the computers of network users permits those users to exchange files with other members of the network.  (Greenberg Decl. ¶ 6; Hostert Decl. ¶ 3.)

sharing of the majority of revenue generated by audio file transfers over the Sharkbyte P2P network with record labels and other content owners. (Tarantino Decl. ¶ 5.) Thus, as discussed in more detail below, Escape engaged with record labels and other content owners from the beginning, seeking licenses to operate under its new and unique business model. (Id. ¶ 7.)

Escape launched its initial, "alpha" test version of Sharkbyte (the "Sharkbyte Alpha") in the Spring of 2007. (Greenberg Decl. ¶ 7.) The Sharkbyte Alpha was made available by invitation to a few hundred users, at most. (Id.) In order to use the Sharkbyte P2P network, internet users were required to download and run the Sharkbyte software, which would communicate with the computers of other users who had installed the same software. (Id. ¶ 6.) At the time of the Sharkbyte Alpha, audio files were made available on the Sharkbyte P2P network when users identified the files on their computers that they wished to share and Sharkbyte copied and stored information concerning those files - - e.g., file name, artist, song name, user information - - on Escape's central servers, which created an index of information that was searchable by users of Sharkbyte in order to identify particular files on the network that they wished to download or play from another user's computer. (Id. ¶ 7.)

The initial versions of Sharkbyte copied only the data concerning audio files identified by users (a "scan"), not the files themselves, which continued to reside on, and were accessed directly from, the computers logged in to the Sharkbyte P2P network (i.e., computers of users simultaneously running the Sharkbyte software). (Id. ¶ 8.) Because the Sharkbyte Alpha was inefficient and resulted in many errors in file transfers over the network, Escape began in mid-2007 to "cache" or "upload" copies of certain audio files submitted by Sharkbyte users - - such as files frequently requested by users - - on a central Escape server, which facilitated and eased access to those files by users of the network. (Id. ¶ 9.)

Escape launched a "beta" version of Sharkbyte (the "Sharkbyte Beta") to a slightly wider base of invitation-only users in the Fall of 2007. During this "beta" phase, the number of Sharkbyte users increased, albeit not substantially. (Id. ¶ 10.) Users of the Sharkbyte Beta continued to experience errors and other technical issues with the Sharkbyte P2P network, and Escape received many complaints about the system. (Id.) Those complaints, in part, led Escape to increase the frequency of its caching activities until, after several months of selective caching, Escape began to cache copies of all audio recordings submitted by Sharkbyte users that were not already stored on Escape's servers. (Id. ¶ 11.) Even after this "cache everything" process became Escape's default policy, however, Sharkbyte users could "opt out" of caching, in which case their submissions through Sharkbyte would merely result in scans of relevant file data to Escape's index. (Id.)

In April 2008, Escape launched a new service named Grooveshark Lite, which ultimately became the "Grooveshark" service offered today. (Id. ¶ 12.) That streaming service permits users to upload files containing audio recordings and then search for and "stream" files from the resulting archive of recordings over the internet - - i.e., listen to (but not download) the recordings on their own computers. (Id.; Hostert Decl. ¶ 5.) Escape undertook the development and launch of Grooveshark Lite, in part, as a result of the technical setbacks and lack of popularity of its Sharkbyte P2P service, as well as its determination that the streaming of content over the Internet, as opposed to the downloading of copied recordings, represented the sector of greatest potential growth in online music. (Tarantino Decl. ¶ 10; Greenberg Decl. ¶ 13.)

In developing Grooveshark Lite, Escape sought to emulate the popular video streaming website YouTube, both in its technological approach and its business model. This included investigating and adopting the types of procedures YouTube used for compliance with the Digital Millennium Copyright Act ("DMCA") (Greenberg Decl. ¶ 14), which provides a "safe harbor" to internet service providers who permit storage and distribution "at the direction of a user of material that resides on a system or

network controlled or operated by or for the service provider" (17 U.S.C. § 512(c)) and who follow

certain practices and procedures for the removal of allegedly infringing content identified by copyright

owners.[2]

For a period of approximately six months, Escape operated both the Sharkbyte and

Grooveshark Lite services simultaneously.  (Id. ¶ 15.)  Ultimately, despite early efforts to obtain

licenses from major content owners, Escape was unable to obtain authorization from those content

owners to pursue its innovative Sharkbyte model, and this, together with the technical difficulties

discussed above and resulting unpopularity of the Sharkbyte Beta with users, led Escape to discontinue

its Sharkbyte service in October 2008.  (Id.; Tarantino Decl. ¶ 15.)  From that point forward, Escape

focused solely on its music streaming service.  (Id.)

Escape's Extensive Interactions with Plaintiffs Concerning Grooveshark

*UMG Recordings*

Beginning in or around mid-2007 - - while Grooveshark was still operating under the peer-to-

peer Sharkbyte model - - Escape began to actively engage UMG in discussions regarding Escape's

desire to enter into a license agreement for the use of UMG's sound recordings on Grooveshark.

(Tarantino Decl. ¶¶ 7, 31 & Ex. D.)  Escape's overtures to UMG ultimately resulted in numerous in-

person meetings and other communications between Escape and UMG concerning a potential license

agreement, beginning in mid-2007 and continuing through the end of 2009.  (Id.; Giger Decl. Ex. A

(Stone Tr. 32:19-25).)  In fact, Escape's efforts to obtain a license from UMG, motivated by business

---

[2] In broad terms, Escape's DMCA procedures adopted in connection with Grooveshark Lite, and still followed today, include the designation of an agent to receive notifications from content owners of claimed infringement; responding to such DMCA notifications by removing access to content identified therein; and terminating uploading privileges of account holders who are the subject of such notices. (Greenberg Decl. ¶ 14.)  In implementing its DMCA and related policies over the course of several years, Escape has removed access on Grooveshark to ████████ audio recordings and terminated the uploading privileges of ██████ user accounts, in an effort to curb infringement on its site. (Hostert Decl. ¶ 19.)

rather than legal concerns (as Escape was entitled to DMCA protection), continued through and even after the commencement of the present action.

During the parties' initial meetings in 2007 and 2008, UMG expressed its view to Escape that Grooveshark was still too insignificant in the marketplace, *i.e.*, had too few users, to warrant serious consideration of the licensing arrangement that Escape was seeking. (Tarantino Decl. ¶ 11; Giger Decl. Ex. B (Tarantino Tr. 141:22-142:12; 248:15-17; 250:15-252:21); Giger Decl. Ex. D (Ashenden Tr. 41:6-24; 53:20-55:21).) UMG told Escape, in essence, to "show us that you can succeed in this and come back to us with users." (Giger Decl. Ex. B (Tarantino Tr. 248:15-17); see also Tarantino Decl. ¶ 12.)

Escape took UMG's urging seriously, continually keeping UMG apprised concerning Grooveshark's development and growth.[3] Despite its urging that Escape continue to grow and develop its Grooveshark service, UMG repeatedly and consistently expressed to Escape its view that Grooveshark was infringing UMG's copyrights, in both the Grooveshark Sharkbyte-era peer-to-peer model and after the Grooveshark streaming service was introduced in April of 2008. (Giger Decl. Ex. A (Stone Tr. 46:10-47:20; 79:11-80:23; 106:11-107:25; 131:12-19; 138:14-139:6); Tarantino Decl. ¶ 31 & Ex. D). Nevertheless, between the parties' first contact in mid-2007 and the beginning of 2010, UMG never ceased its licensing negotiations with Escape (Id.; Giger Decl. Ex. A (Stone Tr. 61:6-62:23; 108:2-18; 138:14-139:22); never conditioned the continuation of those discussions on Escape's removal of UMG's content from the Grooveshark service (Tarantino Decl. ¶ 31 ; Giger Decl. Ex. A (Stone Tr. 60:24-61:15; 75:9-21; 108:2-18; 119:4-120:23); and never took any other steps to assert a copyright claim against Escape (Tarantino Decl. ¶ 31; Giger Decl. Ex. A (Stone Tr. 60:24-62:15; 74:28-76:10; 108:2-10).)

---

[3] In particular, Escape advised Universal by mid-2007 of both Escape's Sharkbyte business model and the fact that the then-existing Grooveshark peer-to-peer service hosted many of Universal's sound recordings for, *inter alia*, downloading by Grooveshark users. (Giger Decl. Ex. A (Stone Tr. 46:10-17; 79:11-80:23).) Top Universal executives and Universal's head of litigation also knew about Escape's transition, in April of 2008, from a peer-to-peer system to its Grooveshark Lite pure streaming model. (Giger Decl. Ex. A (Stone Tr. 87:21-89:22; 105:21-24; 131:12-19; 135:5-20).)

It was not until January of 2010 that UMG first took any action to advance a copyright claim - - albeit not one under the federal Copyright Act - - against Escape, through the filing of a New York State Court lawsuit (the "State Court Action") alleging *common law* copyright infringement of a modest list of UMG recordings fixed prior to February 1972.  Although UMG had known - - for years by that point - - that many of its unlicensed recordings (including post-1972 recordings) had been downloaded and traded via Grooveshark's now discontinued Sharkbyte peer-to-peer system, UMG chose not to assert claims against Escape for federal copyright infringement.  Rather, UMG - - plainly seeking to obtain a judicial determination on a narrow issue of law that was of interest to UMG - - asserted a narrow claim that the exploitation of pre-1972 recordings on Grooveshark implicated state common law intellectual property rights and that Escape was thus not eligible for the protection of the federal safe-harbors afforded by the DMCA in respect of those recordings.   It was not until November 2011 - - more than *four years* after Escape first apprised UMG of its business plans and the operation of its Grooveshark service - - that UMG finally commenced the present litigation, shortly after this Court issued a decision (in litigation regarding the MP3Tunes internet music service) adverse to UMG's asserted position on the applicability of the DMCA to pre-1972 recordings, as asserted in the State Court Action.

### *Sony Music*

Escape first initiated contact with Sony in early 2007 regarding ███████████████

███████████████████████████████████████████████████████████

██████████ (Giger Decl. Ex. H; Tarantino Decl. ¶ 34.)  As early as February of 2007, Escape apprised Sony of the nature of Grooveshark's business model, ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████ (Giger Decl. Ex. H.)  Later in 2007, Sony arranged at least one meeting with Escape at its

New York City offices to discuss the prospect of a license agreement. (Giger Decl. Ex. B (Tarantino Tr. 124:13-125:18); Tarantino Decl. ¶ 34.) During this meeting, Escape explained to Sony in detail its business plan and then-existing Grooveshark technology. (Tarantino Decl. ¶ 34.) Escape continued in its efforts to negotiate a license agreement with Sony throughout the next three years, during which time Sony and Escape exchanged and negotiated numerous drafts of license term sheets and Escape kept Sony apprised of Grooveshark's growth and development, including its transition, in 2008, to a pure streaming service. (Tarantino Decl. ¶¶ 35, 36.) Indeed, in early November of 2008, Escape's CEO confirmed to Sony that "as you're probably aware, we've recently taken down the beta which had the p2p [*i.e.*, peer-to-peer] download functionality in order to advance our negotiations." (Tarantino Decl. ¶ 35 & Ex. E.)

　　　To facilitate these long-running negotiations, and as Sony had repeatedly expressed to Escape its view that Grooveshark had long been infringing Sony's copyrights, Sony and Escape entered into a "standstill agreement" effective September 2, 2009. (Tarantino Decl. ¶ 37 & Ex. G.) In the standstill agreement, ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████ (Tarantino Decl. Ex. G.) By referring to ███████████████████████████████ the Sony Standstill Agreement, by its very terms, does not cover claims based upon Escape's long defunct Sharkbyte service, which was ███████████████ but a P2P network for sharing audio files.

### *Warner Music*

　　　Escape also sought a license to use Warner sound recordings on the Grooveshark service, beginning during the Sharkbyte peer-to-peer era. (Giger Decl. Ex. B (Tarantino Tr. 137:10-20);

Tarantino Decl. ¶ 38.)  Escape had numerous contacts with Warner over the duration of the Sharkbyte and Grooveshark Lite periods, during which Escape explained in detail the nature of its business plan and the Grooveshark service. (Giger Decl. Ex. B (Tarantino Tr. 137:10-20); Tarantino Decl. ¶ 39.)  In early November of 2009, some eighteen months after Escape had launched its streaming service, Escape and a number of Warner representatives met at Warner's New York City offices to discuss a possible license.  Prior to the meeting Escape sent Warner a detailed licensing proposal to discuss at the meeting. (Tarantino Decl. ¶ 40 and Ex. H.)  Following that meeting, and continuing throughout the rest of 2009 and into 2010, Escape and Warner continued their discussions concerning a potential license agreement exchanging a number of further term sheet drafts.  (Id. ¶ 41 & Ex. I.)  During each of these discussions, Escape provided Warner with detailed information concerning, *inter alia*, Escape's past and current Grooveshark business models, its considerable continued investment in growing its business and developing new technologies to support and expand its music streaming service, and Grooveshark's rapidly expanding user base.  (Id. ¶ 42.)

In December of 2009 - - two years before Warner joined the present litigation - - a Warner representative, apparently frustrated by the slow progress of the parties' discussions, ████████████

████████████████████████████████████████████████

████████████████████████  (Id. ¶ 43 & Ex. J.)  Warner, however, did nothing to move on this threat.  Nine months later, in August of 2010, Warner reiterated this threat, again ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████  (Id. ¶ 44 & Ex. K.)

Taking seriously Warner's threats of litigation, and hoping to continue Escape's licensing negotiations with Warner, Escape at this time proposed that the parties enter into a "standstill agreement," which would have preserved certain claims that Warner might assert against Escape and

thus facilitated the parties' efforts to negotiate and finalize a license agreement. (Id. ¶ 45.) The parties negotiated and prepared a draft of a standstill agreement, which contained an almost identical provision to that in the Sony standstill agreement, ████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ (Id. ¶ 46 & Ex. L.)  Although Warner had negotiated and seemed receptive to the agreement, once it was finalized in late 2010, Warner abruptly reversed its previous position and refused to sign the agreement. (Id.)  Nonetheless, it was not until one year later that Warner first asserted its claims against Escape in the present lawsuit.

Plaintiffs' Awareness of Grooveshark's Increasing Growth and Success

While Escape's negotiations with each of the plaintiffs continued for years without any attempt by plaintiffs to assert their alleged infringement claims against Escape, all of the plaintiffs closely monitored Grooveshark's continued technological investment and growth and its burgeoning user base. (Id. ¶ 19.)  During the period from 2007 through 2011, Grooveshark's user base grew ████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████ (Id. ¶ 20.)

Fueled by the increasing success of Grooveshark's streaming service, virtually every component of Escape's business substantially expanded between Grooveshark's inception in 2007 and the filing of this lawsuit. ██████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████ (Id. ¶¶ 23, 24 & Exs. B, C.)  To further broaden its

operations, Escape also opened two new offices in 2010 and 2011 and expanded the number of its

employees ███████████████████████████████████████ (Id. ¶ 26.)

Escape's tremendous growth was no mystery to plaintiffs. Indeed, not only did Escape

repeatedly apprise plaintiffs of its continuing development, technological advances and rapidly

expanding user base (id. ¶ 19),[4] but plaintiffs' own employees even signed up for Grooveshark

accounts, allowing them to monitor the service. (Hostert Decl. ¶¶ 58-60.) During all this time, and

with full knowledge of Grooveshark's rapidly increasing sophistication and growth, plaintiffs not only

continued their licensing negotiations with Escape, but took no steps whatsoever to assert any

copyright claims against Escape.

UMG's Filing of the Present Action

UMG commenced the present action on November 18, 2011 - - nearly two years after it had

commenced the State Court Action - - asserting claims for federal copyright infringement *for the first

time*, more than four years after Escape first apprised UMG of its business plans and the operation of

the initial Sharkbyte service, and more than three years after Escape abandoned that service in order to

pursue its present DMCA-based streaming model. The Sony and Warner plaintiffs joined the action on

December 15, 2011, when plaintiffs filed an Amended Complaint. (Doc. #3.) In its present Motion,

plaintiffs seek summary judgment concerning defendants' alleged infringement of approximately four

thousand audio files in which they claim copyright ownership (the "Subject Works") through (1)

uploading of those files to the Grooveshark service by Escape employees, and (2) the subsequent

streaming of those files at the request of Grooveshark's users. Remarkably, plaintiffs have chosen to

focus their claims to a large extent on Escape's activities during the bygone "Sharkbyte" era, more

than three years prior to the commencement of this action.

---

[4] Even had Escape not kept plaintiffs informed about Grooveshark's developing success, it is virtually inconceivable, in light of the extensive industry and mainstream press coverage of Grooveshark at the time, that plaintiffs could have failed to take note of that fact. (Tarantino Decl. ¶ 19 & Ex. A.)

## **ARGUMENT**

The Court should deny plaintiffs' Motion and refuse to grant summary judgment for several reasons, addressed in more detail below. <u>First</u>, plaintiffs' evidence from previously undisclosed expert witness Vance Ikezoye, of Audible Magic Corporation, should be excluded because Mr. Ikezoye, and Audible Magic, did not provide an expert report in this action, and Mr. Ikezoye was not even disclosed as a potential witness by plaintiffs until weeks *after* the close of discovery. <u>Second</u>, a large majority of the alleged uploads of the Subject Works - - upon which plaintiffs' claims are substantially predicated - - occurred more than three years prior to the commencement of this action, and the claims based upon those alleged uploads are therefore barred by the statute of limitations. <u>Third</u>, there are, at a minimum, factual issues as to whether plaintiffs waived their claims and, as a result of their inordinate and prejudicial delay in pursuing federal infringement claims against Escape, plaintiffs' claims are also barred by the doctrines of equitable estoppel and laches. <u>Finally</u>, although the foregoing is entirely dispositive of plaintiffs' Motion, issues of fact preclude the entry of summary judgment, *i.e.*, (a) with respect to certain alleged employee uploads, whether the relevant employee was even employed by Escape at the time of the alleged upload and, (b) with respect to alleged uploads during the Sharkbyte era (even ignoring the statute of limitations defense to claims based on such uploads), whether the data relied upon by plaintiffs records an actual upload of a file, as opposed to a simple "scan" of information related to that file.

## I.   **Legal Standards Governing Summary Judgment Motions.**

Pursuant to Fed. R. Civ. P. 56(a), a Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The moving party bears the burden of establishing the absence of any genuine issue of material fact." <u>Zalaski v. City of Bridgeport Police Dep't</u>, 613 F.3d 336, 340 (2d Cir. 2010). "All ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the

factual record must be drawn in that party's favor." Id. at 340.  The movant "must present sufficient evidence to satisfy its burden of proof on all material facts."  Morris v. N.Y.C. Emps. Ret. Sys., 129 F. Supp. 2d 599, 605 (S.D.N.Y. 2001).  Instructively in the present context, in determining if the moving party has met its burden on summary judgment, the Court "must evaluate evidence for admissibility before it considers that evidence in ruling" on the motion.  Colon v. BIC USA, Inc., 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001).

## II.      Plaintiffs Evidence Identifying the Allegedly Infringed Works Is Inadmissible and Unreliable.

In order to succeed on their asserted infringement claims, plaintiffs must demonstrate their ownership of copyrights in sound recordings that were allegedly uploaded to Grooveshark by Escape's employees during the applicable limitations period.  See Marshall v. Marshall, 504 Fed. Appx. 20, 22 (2d Cir. 2012).  It is obviously of no avail to plaintiffs to prove the uploading of recordings in which they own no copyrights or recordings that were not uploaded by Escape employees.  In order to make this requisite connection between plaintiffs' copyright ownership and the alleged employee uploading, plaintiffs engaged a third party expert, Audible Magic Corporation, to employ its supposed proprietary, patented "fingerprinting" software to analyze the MP3 files produced by Escape during discovery that were allegedly uploaded by Escape employees, and then identify which of those files contain the particular recordings in which plaintiffs claim ownership.

In essence, plaintiffs employed Audible Magic in lieu of having any employee with knowledge of plaintiffs' catalogues of sound recordings listen to the relevant MP3s allegedly uploaded by Escape employees and confirm under oath which of those MP3s contains recordings in which plaintiffs own the copyrights.  While there is nothing necessarily objectionable as a general matter with this approach to identifying the Subject Works - - depending on the accuracy of Audible Magic's methods and analyses - - plaintiffs proffer this critical evidence, which is essential to their claims, in flagrant violation of the Federal Rules of Civil Procedure.  Specifically, plaintiffs, in a transparently tactical

15

maneuver, failed to disclose Audible Magic as an expert witness, failed to provide an accompanying expert report, and failed to even disclose the identity of the Audible Magic witness upon whom plaintiffs' rely until after discovery had closed.  This discovery indiscretion, which, as discussed below, has indisputably prejudiced Escape, requires the preclusion of Audible Magic's analysis in connection with plaintiffs' summary judgment motion.

It is self-evident that Audible Magic has undertaken the role of an expert witness for plaintiffs' identification of the Subject Works, albeit one for which plaintiffs failed to provide an expert report as required by Rule 26(a)(2).  Indeed, plaintiffs did not even identify a witness from Audible Magic until more than two weeks *after* the close of discovery, when, in their supposed "supplemental" disclosures they identified Mr. Ikezoye for the first time, attempting to portray him as a (belatedly disclosed) fact witness. (Giger Decl. ¶ 18 & Ex. K.)  But Audible Magic, and Mr. Ikezoye, are not offering fact testimony based upon Mr. Ikezoye's first-hand knowledge of matters at issue; rather, they are offering expert testimony based upon a technological analysis of Escape's data employing, among other things, Audible Magic's proprietary "fingerprinting" software.  In light of plaintiffs' failure to disclose this analysis in an expert report served in accordance with Rule 26(a)(2) and the discovery schedule imposed by the Court - - which, as described below, has caused significant prejudice to Escape - - this Court should exclude the results of Audible Magic's analysis from consideration in connection with plaintiffs' Motion.

An expert witness report must include "a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2).  Rule 37(c)(1) provides that:  "A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed."  Under this rule, "[s]ubstantial justification means 'justification' to a degree that could satisfy a reasonable person that parties could differ as to whether

the party was required to comply with the disclosure." Williams v. Cnty. of Orange, 03 Civ. 5182 (LMS), 2005 U.S. Dist. LEXIS 46051, at *9 (S.D.N.Y. 2005).  Failure to comply with Rule 26(a)(2) is only "harmless" if the party entitled to the disclosure - - here, Escape - - has not been prejudiced.  See id.; Fitzpatrick v. Am. Int'l Grp., Inc., 10 Civ. 0142, 2013 U.S. Dist. LEXIS 151599, at *13 (S.D.N.Y. 2013) (failure to disclose expert opinion "obviously not harmless, since it deprived defendants of timely access to the expert analysis that plaintiffs now seek to utilize").

The Second Circuit has held that District Courts may preclude expert testimony, at their discretion, upon a consideration of the following factors:  "(1) the party's explanation for the failure to comply with [the disclosure requirement]; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." Great White Bear, LLC v. Mervyns, LLC, 06 Civ. 133358 (RMB) (FM), 2008 U.S. Dist. LEXIS 41977, at *15 (S.D.N.Y. 2008) (quoting Design Strategy, Inc. v. Davis, 469 F.3d 284, 297 (2d Cir. 2006)); Fitzpatrick, 2013 U.S. Dist. LEXIS 151599, at * 14 (same).  In circumstances similar to those presented here, District Courts consistently have excluded expert testimony proffered for the first time in expert witness affidavits, but not previously disclosed in an expert report.  See Franconero v. UMG Recordings, Inc., 2013 U.S. App. LEXIS 20765, at *5 (2d Cir. 2013) (finding that "new opinion was not admissible by means of . . . affidavit" because it was "not included in . . . earlier [expert] report"); Nippo Corp. v. Amec Earth & Envtl., Inc., 09 Civ. 0956, 2011 U.S. Dist. LEXIS 34994, at *17-*19 (E.D. Pa. 2011) (striking summary judgment opinions of expert whose "summary judgment declaration improperly offered new expert opinion and analysis not previously disclosed in any prior report").

In light of this authority, the Court should exclude Audible Magic's "fingerprinting" analysis from evidence for a number of reasons.  First, plaintiffs cannot justify their failure to disclose Audible Magic's testimony, proffered through Mr. Ikezoye, in an expert report during the discovery period,

17

prior to their filing of the present Motion. By November 13, 2013, more than two months prior to the close of discovery, Escape had produced to plaintiffs more than 450,000 MP3 files, over 99.5% of the total files ultimately produced and analyzed by Audible Magic. Yet, when plaintiffs' sole disclosed expert witness, Dr. Horowitz, produced his expert report on December 6, 2013, he made no more than a passing reference to Audible Magic (and none to Mr. Ikezoye), asserting only that Audible Magic "will conduct further analysis" of the MP3 files using its "proprietary content recognition software," which Mr. Horowitz described in only the most rudimentary terms as a system that "'listens' to the recording in each file and compares it against its existing 'knowledge' of millions of copyrighted sounds recordings."

On December 12, 2013 and January 8, 2014, Escape produced an additional 1,300 MP3s and 230 MP3s, respectively - - *i.e.*, the final 0.5% of the more that 450,000 MP3 files that Escape produced. Two days later, on January 10, 2014, plaintiffs produced to Escape a spreadsheet of what it termed "preliminary results" of Audible Magic's analysis, but plaintiffs provided no expert report from Audible Magic or any other explanation of those "preliminary results." Instead, on January 15, 2014, plaintiffs served an "Updated Expert Report" of Dr. Horowitz, in which he referenced the spreadsheets that resulted from Audible Magic's analysis and, without identifying Mr. Ikezoye or elaborating on Audible Magic's methods or processes - - or the historical accuracy thereof - - simply states that those spreadsheets ███████████████████████████████████████████████████████
████████████████████ (Updated Horowitz Report ¶ 72.)

Based on the foregoing, it is clear that Audible Magic received Escape's MP3 files with more than sufficient time to complete its analysis prior to the close of discovery on January 20, 2014. Yet plaintiffs *never* disclosed an employee of Audible Magic as an expert, and never produced an expert report containing such crucially relevant facts as (1) the process by which Audible Magic's software purportedly "listens" to MP3 recordings; (2) the historical rates of error in both its identification of

sound recordings and its matching of those sound recordings to copyright ownership data; and (3) Audible Magic's compensation by plaintiffs. See Fed. R. Civ. P. 26(a)(2)(B) (requiring expert reports to include, *inter alia*, the "basis and reasons" for all opinions, the witnesses "qualifications" and the "compensation to be paid" to the witness).

Thus, at all times leading up to, and even after, the close of discovery, plaintiffs chose to attempt to introduce Audible Magic's analysis into evidence through the vaguely defined, hearsay testimony of Dr. Horowitz, an approach to which defendants explicitly objected in their response to Dr. Horowitz's expert report. Only following the objection, and more than two weeks after the close of discovery, did plaintiffs serve supposed "Supplemental Disclosures" purporting to identify Mr. Ikezoye as a potential fact witness - - not an expert - - "concerning the creation of the Audible Magic report." As the foregoing recitation makes clear, plaintiffs have no legitimate justification for failing to properly identify Mr. Ikezoye as an expert witness, and to provide the requisite expert report under Rule 26(a)(2), prior to the close of discovery.

Second, the importance of Audible Magic's testimony cannot be exaggerated, as it provides the fundamental basis for plaintiffs' identification of the Subject Works. Plaintiffs proffer no witnesses with first-hand knowledge of plaintiffs' relevant sound recordings who listened to the MP3 files allegedly uploaded to Grooveshark by Escape employees and confirmed that those MP3s contain the copyrighted works at issue. Instead, plaintiffs rely on Audible Magic, using its "proprietary" software, to serve this critical function. Without the results of Audible Magic's analysis - - which properly should be excluded - - plaintiffs are left solely with the artist, song title and album "metadata" contained in Escape's database - - hearsay information that is provided, and subject to revision, by the Grooveshark user uploading a file - - to determine what sound recordings may be contained in the relevant MP3 files. That information is completely insufficient and unreliable: no one at Escape

19

curates the artist, song and album metadata added by users to confirm that it accurately describes the sound recording to which it is attached.

Third, plaintiffs' failure to disclose Audible Magic's analysis has manifestly prejudiced Escape, as it has prevented Escape from obtaining documents and deposing Audible Magic on numerous topics affecting both the substance and reliability of its analysis. For example, in his declaration, Mr. Ikezoye asserts that Audible Magic's "fingerprinting" technology is "highly accurate" because it is "based on perceptual characteristics of the sound recording itself." (Ikezoye Decl. ¶ 3.)  Indeed, Mr. Ikezoye claims that Audible Magic's technology "has a false negative rate . . . of less than 1% . . . [and a] false positive rate [of] essentially zero." (Id.)  Defendants have been unable to depose Mr. Ikezoye concerning these assertions. Significantly, despite Mr. Ikezoye's self-laudatory observations, at least one federal court has already questioned the "reliability and verifiability" of Audible Magic's content identification technology. See UMG Recordings Inc. v. Veoh Networks Inc., 665 F. Supp. 2d 1099, 1116 (C.D. Cal. 2009).  Escape's inability to explore and test such issues in discovery warrants the exclusion of Audible Magic's analysis in connection with the Motion. Song v. Yao Bros. Grp. LP, 10 Civ. 04157 (RKE), 2012 U.S. Dist. LEXIS 62235, at *4 (S.D.N.Y. 2012) (precluding expert witness from testifying, inter alia, because failure to adequately disclose proposed conclusions had rendered it "virtually impossible for defendants to adequately prepare for cross-examination or to identify whether a rebuttal report was necessary.").[5]

Fourth, it is too late for a "continuance" to remedy plaintiffs' failure of disclosure.  Indeed, in response to specific inquiry from Escape as to how plaintiffs suggested that the problems created by their late disclosure of the Audible Magic/Ikezoye testimony might be ameliorated, plaintiffs offered

---

[5] If it had been given the opportunity during discovery, Escape would also have deposed Mr. Ikezoye concerning certain discrepancies that appear in Audible Magic's results set forth in Exhibits A and B of his Declaration. For example, even a cursory review of those results shows that Audible Magic's analysis of one MP3 file, bearing a unique File ID, returns numerous conflicting results, with differing song titles, artist information and record label designations. These discrepancies directly call into question Mr. Ikezoye's unsupported assertions concerning the purportedly "highly accurate" nature of Audible Magic's analysis.

that they had "nothing to propose." (Giger Decl. ¶ 19.)  The reason for plaintiffs' inability to offer a proposal to rectify their late disclosure is self-evident:  plaintiffs' belated disclosure of Mr. Ikezoye and provision of Audible Magic's testimony for the *first time* in the Ikezoye Declaration has destroyed any opportunity for Escape to conduct appropriate discovery of Audible Magic without causing significant delay in the resolution of the present Motion and, more generally, in these proceedings.  Rather than rewarding plaintiffs for their wrongful tactics, this Court should exclude Mr. Ikezoye's declaration testimony concerning Audible Magic's analysis[6] and deny the Motion since, without Audible Magic's analysis, plaintiffs have not provided evidence establishing that the Subject Works actually appeared on the Grooveshark service.[7]

### III.   Factual Issues Exist as to Whether Plaintiffs' Longstanding, Prejudicial Delay in Commencing this Action Precludes Plaintiffs' Claims

Even ignoring plaintiffs' failure to prove with admissible evidence that the Subject Works appeared on Grooveshark, the Court should deny their summary judgment request for several reasons. With full knowledge of Escape's Grooveshark service, plaintiffs delayed for years in asserting their federal copyright claims.  Instead, they effectively "sat back and watched" while Escape expended a tremendous amount of time and resources in developing and expanding its DMCA-based streaming service - - opening new offices, hiring employees, paying ballooning expenses - - and then stepped in

---

[6] The Court may also exclude Audible Magic's conclusions to the extent they are offered in the form of hearsay, through the secondhand testimony of Mr. Horowitz (see Fed. R. Evid. 801 & 802), and it should not permit plaintiffs to remedy this defect by offering a reply declaration from Audible Magic, in light of the prejudice to Escape resulting from their failure to disclose Audible Magic as an expert witness during the discovery period.

[7] Plaintiffs clearly cannot establish an undisputed fact concerning the appearance of the Subject Works on the Grooveshark system by merely comparing the names of plaintiffs' copyrighted works "with the artist, album and song information for these files maintained by Escape in its database." (Wright Decl. ¶ 6.)  Such information is added by users at the time the files are submitted to Grooveshark, and does not necessarily accurately match the actual sound recording contained in the uploaded files. (Hostert Decl. ¶ 13.)  Indeed, many different audio files on Grooveshark nonetheless have the same associated artist, song and album information provided by the users who submitted those files.  Thus, plaintiffs reliance on such data as the sole basis to identify employee uploaded works in which they claim ownership would be severely flawed, and at the very least raise issues of fact that preclude summary judgment.

to assert long-stale claims in an effort to severely injure, if not destroy, the very business that they had

permitted, and in some instances encouraged, Escape to build.

### A.  There Exist Material Issues of Fact Concerning Whether Plaintiffs Are Equitably Estopped from Asserting Their Claims.

Escape plainly has raised material issues of fact concerning whether plaintiffs should be

equitably estopped from asserting their claims in this action.[8]  Equitable estoppel "is properly invoked

where the enforcement of rights of one party would work an injustice upon the other party due to the

latter's justifiable reliance upon the former's words or conduct." Dallal v. New York Times Co., No.

05-2924, 2006 U.S. App. LEXIS 5171, at *4 (2d Cir. 2006).  To establish equitable estoppel, a

defendant accused of copyright infringement must show that:  "(1) the plaintiff had knowledge of

defendant's infringing acts, (2) the plaintiff either intended that defendant rely on his acts or omissions

or acted or failed to act in such a manner that defendant had a right to believe that it was intended to

rely on plaintiff's conduct; (3) the defendant was ignorant of the true facts; and (4) the defendant relied

on plaintiff's conduct to its detriment. Dallal, 2006 U.S. App. LEXIS 5171, at *4 (citing 4 Nimmer on

Copyright § 13.07); accord DeCarlo v. Archie Comic Pubs., Inc., 127 F. Supp. 2d 497, 509 (S.D.N.Y.

2001).

"Silence or inaction in the face of an explicit contrary assumption by the opposing party may be

sufficient to induce justifiable reliance by a defendant that a plaintiff will not later assert a claim."

DeCarlo, 127 F. Supp. 2d at 510 (citing Gen. Elec. Cap. Corp. v. Armadora, 37 F.3d 41, 45 (2d Cir.

1994)).  The obligation to speak is one of "good faith" and arises "when one party in a relationship

---

[8] Defendants' estoppel and waiver claims against the Sony plaintiffs are not barred by the Standstill Agreement, ███████████ ████████████████████████████████████████████████████████████████████ ████████ (Tarantino Decl. Ex. G.)  Waiver and estoppel defenses are not based upon ████████████ ██████████████████████████ As noted below, however, due to the existence of the Standstill Agreement, Escape does not assert statute of limitations and laches defenses against the Sony plaintiffs, although Messrs. Greenberg and Tarantino, who are not parties to that agreement, do assert those defenses against all plaintiffs.

with another has an opportunity to speak in order to avoid harm or injury to the other party." <u>DeCarlo</u>, 127 F. Supp. 2d at 510 (quoting <u>CBS, Inc. v. Stokely-Van Camp, Inc.</u>, 522 F.2d 369 (2d Cir. 1975)). Moreover, "it is immaterial to a claim of estoppel that there was no actual attempt to defraud or mislead." <u>Id.</u>

Courts of this Circuit have not hesitated to deny summary judgment in copyright infringement actions on the basis of triable issues of fact concerning whether a plaintiff should be equitably estopped from asserting its claims. <u>See</u> <u>Dallal</u>, 2006 U.S. App. LEXIS 5171, at *6 (finding that lack of clarity concerning plaintiffs' objections to "unauthorized" use of photographs gives rise to a "viable estoppel claim, but one that cannot be resolved as a matter of law"); <u>Christian Dior-New York Inc. v. Koret, Inc.</u>, 792 F.2d 34, 37-38 (2d Cir. 1986) (reversing summary judgment for plaintiff and finding that affidavits submitted by defendant were "sufficiently specific" such that defendant should be permitted to argue equitable estoppel at trial); <u>Pavlica v. Behr</u>, 397 F. Supp. 2d 519, 527 (S.D.N.Y. 2005) (finding "triable issue[s] of fact" on defendant's estoppel claim).

Applying these principles, there plainly exist material issues of fact regarding Escape's equitable estoppel defense. <u>First</u>, as discussed above, plaintiffs admittedly knew of Escape's alleged infringement and consistently advised Escape that they possessed federal copyright infringement claims based on Escape's conduct dating back to the 2007 launch of its Sharkbyte system. And, it is immaterial whether plaintiffs' specifically knew that certain of those claims might rest upon uploads undertaken by Escape employees. <u>See</u> <u>Price v. Fox Entm't Group, Inc.</u>, 05 Civ. 5259 (SAS), 2007 U.S. Dist. LEXIS 6081, at *21 (S.D.N.Y. 2007) (holding that plaintiffs had knowledge of alleged infringement for estoppel purposes because they "believed that defendants had copied" the subject work and it was "not material" whether they "had *all* of the evidence" concerning the infringement) (emphasis in original).

23

Second, plaintiffs' inordinate delay in asserting their federal copyright claims, coupled with

Escape's belief, and open assertion, that it was protected from such claims by the DMCA safe harbor

with respect to its streaming-based service, and its concomitant expenditure of substantial time, effort

and resources in building its business, surely raise an issue of fact regarding Escape's reasonable

reliance on plaintiffs' manifest inaction.  Indeed, UMG's commencement and pursuit of the limited

State Court Action in January 2010, without the assertion of any federal infringement claims, only

bolstered defendants' reliance on plaintiffs' failure to assert those claims against Escape.  And

defendants' reliance was all the more reasonable when considered in the context of UMG's instruction

to Escape that it should continue to build its business into one that provided sufficient financial

incentive to UMG to enter into a licensing agreement, and that Escape should return to UMG when it

has done so.  Plainly, the reliance issue presents a fact-bound inquiry not properly subject to resolution

on summary judgment.

Finally, the evidence shows that Escape's reliance was detrimental, or at least raises a factual

issue on the question.  While plaintiffs sat on their federal copyright claims and monitored Escape's

activities - - including through numerous Grooveshark accounts opened by plaintiffs' employees

(Hostert Decl. ¶¶ 58-60 & Ex. C) - - Escape invested in and expanded its business, opening new

offices, hiring additional employees and significantly increasing its expenses.  (Tarantino Decl. ¶¶ 23-

28.)  Perhaps no better illustration exists of the detriment to defendants from plaintiffs' unjustified

delay in asserting federal infringement claims than plaintiffs' demands for damages resulting from the

alleged          streams of the Subject Works.  Plaintiffs cannot sit back and wait for the number of

streams of their works by Grooveshark's users to accumulate over several years - - with full knowledge

of Escape's Grooveshark system, the ability to monitor the streaming of their works on the

Grooveshark website and a ready means to have those works promptly taken down from the site - - and

24

then seek to profit from their inaction by relying on the allegedly vast number of streams to inflate their claimed damages.

In short, factual issues exist on defendants' estoppel defense, warranting the denial of plaintiffs' Motion.

### B. Material Issues of Fact Exist Concerning Whether Plaintiffs' Claims Are Barred by the Doctrine of Laches.

Plaintiffs' delay in commencing this action also supports, and thus raises a factual issue regarding defendants' laches defense.[9]  The doctrine of laches addresses "whether the plaintiff in asserting [its] rights was guilty of unreasonable delay that prejudiced the defendants." Byron v. Chevrolet Motor Div. of Gen. Motors Corp., 93 Civ. 1116 (AJP), 1995 U.S. Dist. LEXIS 11115, at *17 (S.D.N.Y. 1995).  The dismissal of claims on the basis of laches requires evidence of "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." Id. (citing Stone v. Williams, 873 F.2d 620, 623 (2d Cir. 1989)); see also Legislator 1357 Ltd. v. Metro-Goldwyn-Mayer, Inc., 452 F. Supp. 2d 382, 391 (S.D.N.Y. 2006) (laches applies when a defendant "suffers prejudice because of a plaintiff's unreasonable and inexcusable delay in bringing the claim.")

In assessing the delay element, "the focus is on the reasonableness of the delay rather than on the number of years that have elapsed." Byron, 1995 U.S. Dist. LEXIS 11115, at *20.  "A delay of longer than the three year statute of limitations, however, creates a presumption that the delay is unreasonable, and shifts the burden away from the moving party to the plaintiff, who must then excuse the delay and prove the absence of prejudice to the defendant from the passage of time." Id.  With respect to the "prejudice" element, a "sliding scale" applies:  "Where there is no excuse for delay . . . defendants need show little prejudice; a weak excuse for delay may, on the other hand, suffice to

---

[9] In light of the Standstill Agreement, Escape does not assert this defense, or its statute of limitations defense, against the Sony plaintiffs, although Messrs. Tarantino and Greenberg, who are not parties to that agreement, do.

defeat a laches defense if no prejudice has been shown." Id. at *23 (citing Stone, 873 F.2d at 625). These are, of course, all fact-bound inquiries.

While noting that the applicability of laches to bar copyright claims based upon alleged infringement within the three-year limitations period is "uncertain," this Court has recognized an exception in "cases that involve ongoing infringement - - i.e., 'although the action was timely because the last act of infringement occurred within the three-year period, the plaintiff had been on notice of its claim long beforehand due to previous acts of infringement that spanned many years.'" L.A. Printex Indus., Inc. v. Pretty Girl of California, Inc., 09 Civ. 4206(KBF), 2012 U.S. Dist. LEXIS 19002, at *7 (S.D.N.Y. 2012); see also Lego A/S v. Best-Lock Constr. Toys, Inc., 874 F. Supp. 2d 75, 92 (D. Conn. 2012) (noting "uncertainty" of application of laches in copyright infringement, but holding that "[t]he existence of laches vel non depends upon the facts of each case" and finding that "discovery is necessary to explicate" the issues concerning delay and prejudice in that case).

A defendant's investment in its business and exploitation of the relevant copyrights constitutes "prejudice" under laches doctrine. As this Court has recognized, "it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success." Byron, 1995 U.S. Dist. LEXIS 11115, at *25 (quoting Haas v. Leo Feist, Inc., 234 F. 105, 108 (S.D.N.Y. 1916) (Hand, L.)). Prejudice also can be evidenced where a defendant has been lulled into a "false sense of security" by plaintiff's delay. Id. (citing Stone v. Williams, 1988 U.S. Dist. LEXIS 9989, at *20 (S.D.N.Y. 1988), aff'd 873 F.2d 620 (2d Cir.)). "One form of prejudice is the decreased ability of the defendants to vindicate themselves that results from . . . fading memories or stale evidence." Stone, 873 F.2d at 625.

In this case, for the same reasons advanced in support of defendants' equitable estoppel defense, defendants have been prejudiced by plaintiffs' unreasonable delay in asserting their federal

copyright infringement claims. Escape's "false sense of security" concerning plaintiffs' failure to pursue those claims against its streaming service led it to expend substantial time, effort and resources expanding its business operations. In addition, plaintiffs' long delay, coupled with their present focus on activities of Escape's employees in respect of early versions of Grooveshark, including the long-defunct Sharkbyte service, led to depositions of the individual defendants in this action occurring *five or more years* after the events at issue. Similarly, it is perhaps not surprising, given plaintiffs' delay, that certain evidence concerning the early functionality of the Grooveshark service - - *i.e.*, the corrupt source code repositories concerning pre-October 2008 versions of Sharkbyte - - have been lost, albeit through no fault of Escape. (Hostert Decl. ¶ 44.)

Given the foregoing, it is apparent that defendants have at least raised an issue of fact regarding the two elements of their laches claim, delay and prejudice, if not established that defense as a matter of law. Nothing further is required in the present context and Escape should be permitted to present its laches defense against UMG and the Warner plaintiffs to the jury.

### C.    There Exist Material Issues of Fact Concerning Whether Plaintiffs Waived their Copyright Infringement Claims.

There is ample evidence to support, and thus create an issue of fact, in respect of Escape's waiver defense. A waiver of copyright infringement claims occurs when a plaintiff "relinquishe[s] a right with both knowledge of the existence of the right and an intent to relinquish it." Price, 2007 U.S. Dist. LEXIS 6081, at *19. Waiver need not be explicit, but may arise "by such conduct or failure to act as to evidence an intent not to claim the purported advantage." Id.; accord Hadden v. Consol. Edison Co., 45 N.Y.2d 466, 469, 382 N.E.2d 1136, 1138 (N.Y. 1978). "Unexplained delay is evidence of waiver" under New York law. See Webster's Red Seal Pubs., Inc. v. Gilberton World-Wide Pubs., Inc., 67 A.D.2d 339, 342, 415 N.Y.S.2d 229, 231 (1st Dep't 1979).

Waiver focusses on the intent of the party seeking to enforce a right, and "unlike equitable estoppel," "does not require a showing of detriment by a party claiming to have been misled."

Travelers Int'l AG v. Trans World Airlines, Inc., 722 F. Supp. 1087, 1098 (2d Cir. 1989).  In the
context of an asserted waiver defense, a party's intent is a *fact-bound question* generally reserved for
the trier-of-fact.    In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (noting
that "the question of intent is a classic jury question").  As a result, courts will deny summary
judgment when a defendant successfully raises an issue of fact concerning whether a plaintiff's
conduct exhibited an intent to waive its intellectual property rights.  See Christian Dior-New York, 792
F.2d at 40.

   As set forth above, plaintiffs refrained for *more than four years* from asserting federal
copyright infringement claims against Escape, despite detailed knowledge of the operations of
Grooveshark and notwithstanding their own undisputed belief that Escape's service, from its very
inception, was engaged in the infringement of plaintiffs' copyrights.  Indeed, by plaintiffs own
reckoning - - based on plaintiffs' own admonitions - - Escape has been "fully aware of the threat of
copyright litigation" since the launch of Grooveshark in 2007.  (Pls' Sanctions Mem. at 5.)  But, after
transitioning Grooveshark to its DMCA-based streaming model in October 2008, Escape believed, and
made clear to plaintiffs, that it sought the "safe harbor" protection offered by the DMCA from federal
copyright infringement claims.  (Tarantino Decl. ¶ 22.)

   Confirmatory of the existence of factual issues in respect of Escape's waiver defense, when
Escape's licensing discussions with UMG stalled in 2009, UMG did not pursue federal copyright
infringement claims; instead, 2010, it commenced the State Court Action, asserting narrow claims in
New York state court explicitly limited to common-law copyright infringement of certain pre-1972
recordings, in an overt effort to create new law limiting the ability of internet service providers to rely
upon the DMCA safe harbor protections.  Even after the commencement of the State Court Action,
neither UMG nor the other plaintiffs asserted any federal infringement claims for nearly *two years*.
Indeed, plaintiff UMG commenced this action on its own, on November 18, 2011, shortly after this

Court (Pauley, J.) addressed for the first time, and rejected, UMG's position asserted in the State Court Action that the DMCA safe harbor does not apply to state common-law claims. See Capitol Records, Inc. v. MP3Tunes, LLC, 821 F. Supp. 2d 627, 641-42 (S.D.N.Y. 2011). This suggests that UMG, followed shortly thereafter by the Sony and Warner plaintiffs, abruptly back-tracked, and decided for the first time to assert federal copyright claims, when UMG suddenly faced the proposition that its position in the State Court Action was in jeopardy. The point is that a factual issue quite plainly exists as to plaintiffs' intent in waiting so long to assert their present claims, which supports Escape's waiver defense and requires the denial of plaintiffs' summary judgment Motion. Simply put, defendants should be permitted to argue to the jury that, by the time plaintiffs commenced this action, it was too late: plaintiffs had already waived their federal copyright infringement claims.[10]

### D.   Material Issues of Fact Exist Concerning Whether Certain of Plaintiffs' Claims Are Barred By The Copyright Act's Three-Year Statute of Limitations.

Even if plaintiffs' claims were not barred entirely by the doctrines of estoppel, laches and waiver as discussed above, their inordinate delay in pursuing their federal copyright infringement claims nonetheless leads to the preclusion, pursuant to the applicable statute of limitations, of those claims to the extent they are predicated on a substantial majority of the alleged uploads of the Subject Works. Claims for copyright infringement under the Copyright Act must be "commenced within three years after the claim accrued." 17 U.S.C. § 507(b). UMG commenced this action on November 18, 2011, so any claims that defendants infringed UMG-owned sound recordings accruing on or prior to November 18, 2008 are barred by the three-year statute of limitations. Similarly, because the Warner

---

[10] Escape anticipates that plaintiffs will argue that, while they believed that they had federal copyright infringement claims against Escape dating back to the launch of the initial version of Grooveshark in 2007, they did not verify that Escape employees had engaged in uploading until later, in connection with discovery in the State Court Action. This is truly a "distinction without a difference," as it is not necessary for plaintiffs to have knowledge of all the detailed facts underlying their claims in order to knowingly waive what they believed were substantial federal copyright claims against Escape. In any event, plaintiffs had the ability to discern, at least as early as the beginning of 2009, that Escape employees, including the CEO and other officers, had potentially engaged in the uploading of audio files to Grooveshark, as account-holder's music "collections" were publicly accessible on the Grooveshark website. (Hostert Decl. ¶ 7.)

29

and Sony plaintiffs first asserted claims against defendants with the filing of the Amended Complaint

on December 15, 2011, any claims by those plaintiffs accruing prior to December 15, 2008 are barred

by the statute of limitations.[11]   The sole exception to the foregoing is claims asserted by the Sony

plaintiffs against defendant Escape, which must be analyzed in the context of the September 2, 2009

"Standstill Agreement."   As discussed further below, all defendants assert statute of limitations

defenses against the UMG and Warner plaintiffs, and Messrs. Tarantino and Greenberg - - who are not

parties to the Standstill Agreement - - assert statute of limitations defenses against the Sony plaintiffs

as well.

 Escape's data produced in this action demonstrates that over 2300 of the alleged employee

uploads of the Subject Works, a substantial majority of the alleged uploads in this action, occurred

more than three years prior to UMG's filing of the Complaint on November 18, 2011.   (Hostert Decl. ¶

27.)   Considering plaintiffs' separately:   (1) 725 alleged uploads of UMG Subject Works occurred

prior to November 18, 2008; (2) 758 alleged uploads of Sony Subject Works occurred prior to

December 15, 2008; and (3) 991 alleged uploads of Warner Subject Works occurred prior to December

15, 2008.   (Id. ¶¶ 29-31.)   Thus, in total, 2474 of the Subject Works were uploaded more than three

years prior to plaintiffs' assertion of their respective claims in this action.

 In this case, plaintiffs were well informed concerning the operations of the Grooveshark service

as early as 2007.[12]   In addition to Mr. Tarantino's communications, since April of 2008, when

Grooveshark Lite was launched, any individual had the ability to simply log on to Grooveshark to see

---

[11] The claims asserted by the Sony and Warner plaintiffs in the Amended Complaint do not "relate back" to the separate claims asserted by UMG in the original Complaint. See Promotora Hispano Americana de Musica, S.A. v. Peer Int'l Corp., 78 Civ. 3925 (LBS), 1987 U.S. Dist. LEXIS 3739, at *2-3 (S.D.N.Y. 1987) (holding that claims asserted by new plaintiff do not "relate back" to the original complaint and "the applicable limitation periods shall be measured from the date of the amended complaint).

[12] Resolving a split of authority among decisions of this Court, the Second Circuit recently "conclude[d] that copyright infringement claims do not accrue until actual or constructive discovery of the relevant infringement." Psihoyos v. John Wiley & Sons, Inc., Nos. 12-4874-cv(L), 12-5069-cv(XAP) (2d Cir. Apr. 4, 2014). Under this "discovery rule," accrual occurs when "the copyright holder discovers, or with due diligence should have discovered" the alleged infringement. Id.

what works were available for streaming, and plaintiffs also had the ability to monitor the service through the Grooveshark accounts that their employees maintained. Thus, plaintiffs either knew or should (and readily could) have known when the Subject Works became available on Grooveshark, and their federal copyright infringement claims with respect to the uploading and streaming of such works thus accrued upon the availability of those Works on Escape's service.

While plaintiffs assert claims in this action based upon alleged uploading activity of certain Escape employees, their asserted position has always been that Grooveshark is an infringing service, irrespective of the source of the uploads stored on and streamed from Escape's servers. Indeed, as noted above, plaintiffs assert in their memorandum supporting their sanctions motion (at 12) that defendants "have been aware since the launch of the Grooveshark service that they were subject to copyright infringement claims." But if defendants allegedly knew of such claims, so did plaintiffs, who consistently advised Escape of their belief that Grooveshark was an infringing service. It simply will not suffice for plaintiffs to now make fine distinctions between various sources of uploads for statute of limitations purposes when they have previously asserted that the entire Grooveshark service was blatantly infringing.

In sum, there are, at the very least, issues of fact concerning when plaintiffs' claims accrued, and, as a result, the extent to which plaintiffs' claims based upon alleged employee "uploads" prior to November or December of 2008 (as the case may be) are barred by the statute of limitations. In light of those issues, Escape should be permitted to present at trial its defense that all alleged uploads predating the assertion of plaintiffs' claims by more than three years - - most of the asserted infringements - - are barred by the statute of limitations.[13]

---

[13] It is irrelevant to this analysis that plaintiffs' allegations of infringement also concern certain alleged uploads and streaming of certain Subject Works occurring within the limitations period. The Second Circuit has made it clear that the existence of "continuing infringement" both outside and within the limitations period does not toll the statute of limitations for acts outside of the limitations period in the copyright infringement context. See Kregos v. Associated Press, 3 F.3d 656, 662 (2d Cir. 1993) (noting the "disfavor that the continuing-infringement doctrine has received in the copyright infringement context"). Rather, "when infringements occur during the limitations period, recovery may not be had for the

**IV.    Additional Factual Issues Preclude Summary Judgment Against Defendants
For Certain Categories of the Subject Works.**

In addition to the foregoing, which is entirely dispositive of plaintiffs' Motion, there are

alternative bases to deny summary judgment to plaintiffs with respect to the alleged infringement of

certain categories of the Subject Works. <u>First</u>, significant issues of fact concerning plaintiffs'

interpretation of Escape's data preclude summary judgment on more than 2300 of the alleged

"uploads" by Escape employees - - *i.e.*, those occurring prior to November 2008, during Escape's

Sharkbyte era. <u>Second</u>, more than 300 of the alleged employee uploads were undertaken outside the

dates of employment for the relevant employees, raising triable issues of fact precluding defendants'

liability for those activities under plaintiffs' asserted *respondeat superior* and secondary liability

theories. (<u>See</u> Pls' SJ Mem. at 24-30.)

**A.    Issues of Fact Exist Concerning Whether Escape's UsersFiles
Data During the Sharkbyte Era Identifies Scans or Uploads**

As noted above, for a period of months following its launch in the Spring of 2007, Escape's

Sharkbyte P2P service did not permit account-holders to upload or "cache" audio files to Escape's

servers. Instead, account-holder's submissions of files to Sharkbyte during that period resulted in

"scans" of artist, song, album and similar information, but not the copying of the files themselves, on

Escape's servers. Importantly, even after Sharkbyte began caching audio files in mid-2007, Escape

provided its users with the ability to "opt-out" of caching. For this reason, Escape's data in the

UsersFiles table from the Sharkbyte era - - *i.e.* October 2008 and before - - upon which plaintiffs rely

in identifying alleged employee "uploads," includes records of both scans and actual uploads during

that period, without distinguishing between the two. (Greenberg Decl. ¶ 11.) Indeed, it is not possible

to tell which records from the Sharkbyte era contained in this data table represent scans, in which event

---

earlier infringements; rather, 'recovery is allowed only for those acts occurring within three years of suit.'" <u>Id.</u> (citing
<u>Stone v. Williams</u>, 970 F.2d 1043, 1049-50 (2d Cir. 1992).

no copy of an audio file was made (and thus no infringement could have occurred), and which

represent uploads, in which copying did occur.

While plaintiffs may protest that Escape did not maintain data during the Sharkbyte-era that

permits them to distinguish between scans and uploads, as the parties bearing the burden of proof, they

have no cognizable recourse for that ambiguity in Escape's database.  This issue is the result of

Escape's judgments concerning data collection that occurred many years prior to the commencement

of the present action, and clearly was not designed in any way to defeat plaintiffs' claims.  Indeed, if

plaintiffs had not delayed so long in asserting their federal copyright infringement claims, additional

data might still exist to clarify this factual issue, such as the original Sharkbyte tables imported into

Escape's UsersFiles table in March 2008.  (Hostert Decl. ¶ 14.)  Under the present circumstances,

however, plaintiffs cannot meet their burden of proving, by undisputed facts, that the alleged employee

uploads occurring prior to November 2008 - - ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ (id. ¶ 27) - - constitute actual copying of audio files to Escape's servers, as opposed to simply

"scans" of file data into the index of information maintained by Sharkbyte, rendering summary

judgment unavailable as to those files.

**B.** **The Court Cannot Properly Grant Summary Judgment on Alleged Employee Uploads Occurring Outside of the Dates of Employment.**

Plaintiffs also cannot establish defendants' liability for copyright infringement based upon

alleged uploads that occurred outside of the confirmed employment dates of the relevant employees.

(Hostert Decl. ¶¶ 32, 33 & Ex. A.)  In this regard, Escape compared the dates associated with first

UsersFiles entries for the Subject Works against the employment dates obtained from records

maintained in the usual course of business by its Human Resources department.  (Id. ¶ 32.)  The

results, set forth in Exhibit A to the accompanying Hostert Declaration, show ▮▮▮▮▮▮ alleged

uploads of the Subject Works that occurred either before the relevant employee (or intern) commenced

33

employment at Escape or after that individual's employment has ended.  Escape and its officers,

Messrs. Tarantino and Greenberg, plainly cannot be held liable on summary judgment for such alleged

uploads, as, at a minimum, questions of fact exist concerning whether such activities were undertaken

within the scope of employment at Escape.

      As such, this evidence raises issues of fact with respect to plaintiffs' assertion of both

*respondeat superior* liability and secondary copyright infringement liability under vicarious and

contributory liability theories.  It is well established that *respondeat superior* may operate to hold an

employer liable for the conduct of an employee "*only* when the employee was acting within the scope

of his or her employment," which is "heavily dependent on factual considerations" and "ordinarily a

question for the jury."  Clark Street Wine and Spirits v. Emporos Sys. Corp., 754 F. Supp. 2d 474, 486

(E.D.N.Y. 2010); accord Doe v. Guthrie Clinic, Ltd., 11-CV-6089T, 2012 U.S. Dist. LEXIS 20507, at

*10 (W.D.N.Y. 2012).  This Court has repeatedly held that factual issues concerning the scope of

employment preclude summary judgment dismissing a DMCA safe harbor defense to copyright

infringement claims based upon employee uploads.  See Capitol Records, LLC v. Vimeo, LLC, Nos.

09 Civ. 10101, 10105 (RA), 2013 U.S. Dist. LEXIS 133655, at *45-46 (S.D.N.Y. 2013) (finding that a

"triable issue has been raised" with respect to a service provider's entitlement to the DMCA safe

harbor, as "[r]easonable minds could differ . . . as to the extent to which the videos at issue here were

uploaded by Vimeo employees in their personal capacities as opposed to as agents of Vimeo");

MP3Tunes, LLC, 821 F. Supp. 2d at 649 (denying summary judgment on a service provider's DMCA

defense because a "genuine dispute" existed as to "whether employees of MP3Tunes downloaded

music files "during the course of their employment").

      In short, defendants' evidence of alleged uploads outside of the dates of employment is more

than sufficient to create issues of fact concerning whether they can be held liable for such uploads.

## CONCLUSION

For the reasons set forth above, the Court should deny the Motion and permit Escape's

substantial and well supported defenses to plaintiffs' claims, as set forth above, to proceed to trial.

Dated:   April 14, 2014
         New York, New York

**ROSENBERG & GIGER P.C.**

By:  /s/ Matthew H. Giger
     John J. Rosenberg
     Matthew H. Giger
     Brett T. Perala
     250 Park Avenue, 12th Floor
     New York, New York 10177
     Tel  (646) 494-5000
     Fax  (646 595-0590

*Attorneys for Defendants Escape Media Group,
Inc., Samuel Tarantino and
Joshua Greenberg*