UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UMG Recording, Inc., Atlantic Recording Corporation, Zomba Recording LLC., Elektra Entertainment Group Inc., Arista Records LLC, LaFace Records, LLC, Warner Bros. Records Inc., Arista Music, and Sony Music Entertainment<br><br>Plaintiffs,<br><br>v.<br><br>Escape Media Group, Inc., Samuel Tarantino, and Joshua Greenberg<br><br>Defendants. | 11 Civ. 8407<br><br>**OPINION** |

Plaintiffs in this case—nine corporations that own or hold exclusive licenses to the copyrights of a large body of popular sound recordings —have brought this copyright infringement action pursuant to 17 U.S.C §§106 and 501 against defendants Escape Media Group, Inc., ("Escape"), and its two founders, Samuel Tarantino and Joshua Greenberg (collectively "defendants").

The claims in this action arise from defendants online music service "Grooveshark." Plaintiffs allege that via their Grooveshark website, defendants illegally provide tens of millions of users with access to a comprehensive library

1

of popular music that, in part, is comprised of plaintiffs' copyrighted sound recordings.  The claims asserted in this action only relate to the direct upload of plaintiffs' copyrighted music by Escape's officers and employees.  Thus, plaintiffs' claims only relate to a limited portion of the recordings available on the Grooveshark website.

Plaintiffs have moved for summary judgment on their claims that defendants are liable for both direct and secondary copyright infringement. Plaintiffs also allege that individual defendants Tarantino and Greenberg are individually liable for the copyright infringement.

Plaintiffs have also brought a motion for sanctions for the spoliation of evidence.  Plaintiffs request that the court enter certain judgments against defendants and prevent defendants from advancing certain defenses to plaintiffs' copyright claims.

For the reasons set forth below, the court grants plaintiffs' motion for sanctions to the extent discussed in this opinion, though not in its entirety. The court grants plaintiffs' motion for summary judgment with respect to nearly all of its claims.

## Facts

### *The Parties and the Present Litigation*

Plaintiffs in this case—Arista Music, Arista Records LLC, Atlantic Recording Corporation, Elektra Entertainment Group Inc., LaFace Records LLC, Sony Music Entertainment, UMG Recordings Inc., Warner Bros. Records

Inc., and Zomba Recording LLC—are nine corporations that own or hold exclusive licenses to the copyrights of a large body of popular sound recordings.  Together, plaintiffs own and operate many of the largest record labels in the world.  Cumulatively, plaintiffs own, or have exclusive rights to, a large majority of copyrighted sound recordings sold in the United States, such as Michael Jackson, Prince, Beyonce, Green Day, and Elton John.  SUF ¶ 1.

Defendant Escape Media Group is a Delaware corporation with its principal place of business in Gainesville, Florida and offices in New York City. Defendant Tarantino is the co-founder of Escape and its Chief Executive Officer.  Defendant Greenberg is also a co-founder of Escape and its Chief Technology Officer.  Together, Tarantino and Greenberg manage all aspects of Escape's business and have final authority in hiring, firing, and evaluating employee performance.  Id. at ¶¶33, 93.

### Grooveshark

Escape's sole business is the ownership and operation of www.grooveshark.com (the "website" or "site").  This website allows users to listen to any song in the world for free and bills itself as "the world's largest on-demand and music discovery service."  When a user chooses to listen to a given recording on the website, that recording is opened remotely, and its content is played *through the website* (in technology parlance, this process is called "streaming").  The recording is not downloaded (i.e. copied and transferred as a data file) onto the user's computer.  Escape earns revenue by selling

advertising on the website, and it has also explored offering a service on a subscription basis.

Although Grooveshark's music library includes works by all of plaintiffs' top commercial artists and attracts tens of millions of users each month, defendants have never obtained any licenses from plaintiffs to exploit any of their copyrighted sound recordings.

In order to understand the copyright claims at issue in the present litigation, it is necessary to examine the different stages of Grooveshark's development and how it acquired its extensive music library.

### *The Early Development of Grooveshark: The P2P Network*

In 2006, Tarantino and Greenberg founded Escape and began to develop Grooveshark while they were freshmen at the University of Florida. Escape designed and operated the first version of Grooveshark as a "peer-to-peer" network ("P2P network"). Id. at ¶13. Through this system, Escape allowed its users to obtain copies of digital music files directly from other users. Id. Escape believed that Grooveshark could be a new model for the licensed exchange of audio files by internet users that would include a mechanism for the compensation of content owners and would supplant unlicensed P2P file-sharing services such as Napster and Limewire. Tarantino Decl. in Opp. to MSJ ¶5; Greenberg Decl. in Opp. to MSJ ¶5.

In order to launch this P2P network, Escape distributed a proprietary software application called "Sharkbyte" that users installed on their local computers.  SUF ¶5.  This software allowed Grooveshark users to upload, download, or stream copies of sounds recordings to and from other users of the server.[1]  Id.  At all times, Escape maintained a central index and database of the music files being exchanged by its users.  Dr. Horowitz Decl. in Supp. of MSJ ¶26.

Escape was aware that its business model depended upon the use of infringing content.  SUF ¶¶14-15, 65, 7, 105.  Escape acknowledged that it required—but did not have—licenses from plaintiffs to engage in or facilitate the distribution, performance, or sale of their copyrighted music to Grooveshark users.  Id. at ¶¶2, 14-15, 65.  Rather than wait to obtain licenses before launching Grooveshark, Escape decided to launch its service utilizing infringing content in order to grow faster and attempt to strike more favorable licensing deals with plaintiffs.  Id. at ¶65.  Escape's Chairman explained that defendants "bet the company on the fact that [it] is easier to ask forgiveness than it is to ask permission" to use plaintiffs' content.  Id.  Escape discussed the possibility that its strategy of illegally growing its user base before settling with plaintiffs might permit it to collect information about Grooveshark users' listening habits, which it could then sell to plaintiffs for more than Escape

---

[1] The terms "uploading" and "downloading" refer to the distribution and copying of audio files from one computer system to another.  "Uploading" indicates sending a copy of a file to another computer, while "downloading" indicates making a copy of a file from another computer.

would have to pay in licensing fees.  <u>Id</u>.  This would create a scenario whereby Escape would never have to pay for the content it used to build its business. <u>Id</u>.

In order to attract users to its P2P service, Escape needed to offer its Grooveshark users access to a large amount of music.  Soon after its launch, Grooveshark did not have a large user base to leverage as a source for content. In response to this problem, Escape directed its employees to obtain and make available the content necessary to launch Grooveshark.  <u>Id</u>. at ¶¶14-15.  More specifically, Escape instructed its employees and officers to create Grooveshark user accounts and to store hundreds of thousands of digital music files on their computers in order to upload or "seed" copies of these files to other Grooveshark users.[2]  <u>Id</u>. at ¶15

For example, in one company-wide forum post in 2007, Greenberg provided the following instructions to Escape employees:

> Please share as much music as possible from outside the office, and leave your computers on whenever you can.  This initial content is what will help to get our network started—it's very important that we all help out!  If you have available hard drive space on your computer, I strongly encourage you to fill it with any music you can find.  Download as many MP3's as possible, and add them to the folders you're sharing on Grooveshark.  Some of us are setting up special "seed points" to house tens or even hundreds of thousands of files, but we can't do this alone… There is no reason why ANYONE in the company should not be able to

---

[2] Escape referred to this practice of uploading files to other users as "seeding" and referred to their computers as "seed points."  A "seed point" was a computer that contained a large volume of music files and that remained online and connected to the Grooveshark network to serve as a hub for the uploading (i.e. distribution) of music files to Grooveshark's users.

do this, and I expect everyone to have this done by Monday... IF I DON'T HAVE AN EMAIL FROM YOU IN MY INBOX BY MONDAY, YOU'RE ON MY OFFICIAL SHIT LIST.

Id., Ex. 14. (Emphasis in original).

Similarly, defendant Tarantino sent the following email to all employees and officers of Escape:

If you haven't already done so, uninstall the old alpha version of Gshark and install the new one... If you have a home seeding point keep it on at all times.  This is very important as we need to be seeding as many songs as possible.  IF YOU ARE PART OF THIS COMPANY INSTALL/UPDATE GROOVESHARK ASAP.  This is mandatory.  If you don't have the time to install the software you are working for, then I don't know what you're doing here.

Id., Ex. 16 (Emphasis in original).

Along these lines, numerous Escape officers and employees testified that they received these instructions and uploaded popular music to Grooveshark at the direction of defendants.   Id., Ex. 16; Decl. of John Ashenden in Supp. of MSJ ¶10 ("[Defendants Tarantino and Greenberg] made it very clear that all employees were expected to upload as much music as possible into the Grooveshark system, including the most popular and current songs"); Decl. Of Benjamin Westermann-Clark in Supp. of MSJ ¶¶6-7 (same); Decl. of Chanel Munezero in Supp. of MSJ ¶¶6-9 (same); Decl. of Nikola Arabadjiev in Supp. of MSJ ¶¶12-13 (same).

Escape's initial Grooveshark P2P model only allowed users to download or stream music files from other users who were logged into their computes and running the Sharkbyte software.  Horowitz Decl. ¶27.  As a result, the

availability of music files in the Grooveshark music library depended on the number of other users online at any given moment.  <u>Id</u>.  Escape recognized that this feature was a significant limitation to the growth of its business.  SUF ¶19.

### *The Creation of the Central Music Library*

In June 2007, Escape began to use it central servers, which it referred to as their 'cache', as a vast central storage library ("Central Music Library") for all of the music files available on the Grooveshark P2P Network.  <u>Id</u>. at ¶¶18-19. As a result, users could now access all of the music on the Central Music Library regardless of the number of users online at the time.  Horowitz Decl. ¶30.

In order to ensure that the Central Music Library had as much content as possible, Escape designed its Sharkbyte software so that it would automatically copy every unique music file from each of its users' computers and upload them to the storage library.  SUF ¶20.  Escape referred to this as a "cache everything" policy.  <u>Id</u>.

Escape recognized that it needed to continue to add new files to their storage library in order to make Grooveshark commercially attractive.  <u>Id</u>.  As a result, Escape instructed its employees to obtain copies of digital music files from any possible source and to upload them to the central music library.  <u>Id</u>. at ¶21.  For example:

- In an email to all employees in August 2007, Escape's senior programmer wrote: "We have cached about 20,000 songs... in the past

5 days... We need more people caching songs, so please cache your songs... form home preferably since we already have too many people caching songs at the office...." <u>Id</u>., Ex. 24.

- Greenberg responded to this email copying the entire office: "If you have CDs, MP3s or any other music that could conceivably be converted to MP3s at the office, please bring them in...." <u>Id</u>., Ex. 25.

- Greenberg offered Escape employees access to his home computer to expedite the upload process: "I'm also available for caching as well; my place has a pretty decent upload rate.  Give me a DVD, flash drive, external drive, or anything else filled with music and I'd be more than happy to take it from there." <u>Id</u>. Ex. 33.

Escape employees have testified that they uploaded popular music files to the Central Music Library in response to defendants' instructions.  <u>Id</u>. at ¶¶22, 27; Arabadjiev Decl. ¶13 (explaining that Tarantino instructed employees to find "popular artists or albums ... from peer-to-peer services and upload them to Grooveshark"); Ashenden Decl. ¶18 (same); Westermann-Clark Decl. ¶7 (same).

### *Grooveshark Lite*

By early 2008, the Grooveshark service featured a library of more than one million digital music files, including thousands of infringing copies of plaintiffs' sound recordings that were uploaded by defendants and their employees.  SUF ¶8.  Nonetheless, Escape wanted to increase the size and scale of its operation to reach internal projections and raise additional capital from investors.  <u>Id</u>. at ¶46.  Escape believed that one of the impediments to its growth was that users were looking for immediate access to the content in the

Central Music Library without the need to create a user account or download the Sharkbyte software.  Id. at ¶¶23, 24.

In response to these concerns, Escape launched a new streaming service in April 2008, which they referred to as Grooveshark Lite.  Id.  This is the current version of Grooveshark that is available today.  This service provides users with instant access to all of the songs stored in the Central Music Library.  Id. at ¶24-25.  Anyone with an internet connection can navigate to the Grooveshark website, and without creating an account or downloading any software, receive a streamed copy of any song in the Grooveshark catalog.  Id. at ¶23

In order to launch Grooveshark Lite, Escape copied all of the digital music files located in the Central Music Library, including all of the infringing employee uploads, and placed these new copies on a new computer server dedicated to Grooveshark Lite users.  Id. at ¶25.  Greenberg openly acknowledged in an email that "getting all that content online is going to be key to GS Lite's success."  Id., Ex. 30.

In the months leading up to the launch of Grooveshark Lite, Escape instructed its employees to upload as much content as possible to the Central Music Library in an effort to reach a benchmark of 2 million songs (a benchmark that defendants reached).  Id. at ¶26, Ex. 31.  In order to increase the rate of uploads, Escape's senior programmer directed Escape employees to bring their music libraries to him for faster uploading.  Id.  Greenberg

supported this initiative and offered to upload employees' music for them at his home, where he had a high-speed internet connection.  Id., Ex. 32.

Grooveshark Lite eventually attracted an audience of millions of users. Id. at ¶51.  Consequently, by October 2008, Escape discontinued its P2P Network and focused their efforts exclusively on the Grooveshark Lite "on-demand" streaming model.  Horowitz Decl. ¶¶45-49.

### *DMCA Notices*

In 2009, Escape received numerous Digital Millennium Copyright Act ("DMCA") takedown notifications from copyright holders demanding that it remove infringing copies of popular copyrighted songs from Grooveshark. Ashenden Decl. ¶20; See, e.g., SUF ¶28, Ex. 63.  These 'takedown' notices threatened to diminish the Grooveshark music library.  Id.  As a result, Escape considered various methods so that users would not be denied access to any songs because specific infringing files were removed.  Id.  As part of this process, Escape's senior officers searched for infringing songs that had removed in response to DMCA takedown notices and re-uploaded infringing copies of those songs to Grooveshark to ensure that the music catalog remained complete.  SUF ¶28.

In addition, Escape employees regularly uploaded files to Grooveshark in order to "test" the functionality of the uploading process.  Id. at ¶29.  Many of Escape's employees engaged in these tests directly reported the results to Greenberg and other senior personnel at Escape.  Id.  All files uploaded as part

of these "tests" remained part of the Grooveshark music library and were accessible for streaming to all users of the service.   <u>Id</u>. at ¶22.  This testing, or uploading, was a regular part of Escape employees' job responsibilities up and until the initiation of the present litigation in November 2011.  <u>Id</u>. at ¶29.

### Escape's Internal Records of Uploads onto Grooveshark

Escape's records provide data confirming the uploading of thousands of unique files to Grooveshark by its officers and employees.  <u>Id</u>. at ¶8.  Escape maintains a database containing records of the activities of their users, including the uploading and streaming of files.  One database table—the UsersFiles table—keeps track of the files uploaded to Escape's central servers by particular users.  Horowitz Decl. ¶¶16, 23 n.8, 75-76.  The UsersFiles table records information regarding: (1) the date and time of the upload of a file by a Grooveshark user, (2) a serial number for the upload event, (3) and identification number for the uploaded file, and (4) the user's account number. Id. at ¶¶49, 52-52.  At all times, Escape relied on this database table in order to identify the uploader of a file for the purpose of processing DMCA notices. SUF ¶¶5-6.

The portions of the UsersFiles table produced by Escape during discovery contain proof of the uploading of more than one hundred and fifty thousand files to Grooveshark by its employees, including thousands of copies of sounds recordings owned by plaintiffs.  <u>Id</u>. at ¶8.

In addition to the database records, DMCA infringement notifications also provide evidence of illegal uploading by Escape employees.  When Escape received a DMCA infringement notice from a copyright owner, Escape generated an automated notification letter to each user identifying the files they uploaded that were the subject of the DMCA infringement notice.  Id. at ¶6.  Based on the limited sample of data produced during discovery, Escape sent thousands of those notifications to virtually all its officers and employees, including Tarantino and Greenberg, for uploading over tens of thousands of infringing files to Escape's servers.  Id. at ¶75, ex. 56.

Finally, Escape's database records also provide evidence that the uploaded files were also streamed.  Id. at ¶¶10-11.  In all, Escape streamed copies of the infringing employee uploads millions of times to Grooveshark users.  Based on data produced by Escape, it has engaged in the streaming of the uploaded music from August 2009 to the filing of the instant lawsuit.  Id.

***Escape's Interaction with Plaintiffs Concerning Grooveshark***

Beginning in 2007, Escape engaged UMG, Sony, and Warner—three of the plaintiffs in this action—in licensing discussions.  Escape sought to enter into a license agreement with plaintiffs in order to use their sound recordings on Grooveshark.  Tarantino Decl. ¶¶7, 31, 34, 38.  However, none of the plaintiffs entered into a licensing agreement with defendants.  During the discussions, the parties never discussed the issue of ongoing employee uploads of copyrighted material onto the Grooveshark network.  Servodidio Reply Decl.

in Supp. of MSJ ¶2, Ex. 1, Deposition of Tarantino (Q: "There never came a point during your negotiations with the labels that you told them… there were employees that were uploading and caching content."  Tarantino: "It never came up."); Ex. 2, Deposition of UMG Corporative Representative Bryan Stone (Q: "In fact, Universal knew at this juncture that it was Escape that had been seeding the system to get it up and running; isn't that correct?"  Stone: "No." Q: "Do you know if it was ever discussed between anyone at Universal and anyone at Escape? Do you know?"  Stone: "That was not discussed").

**Procedural Posture**

The present litigation arose as a result of an earlier lawsuit by plaintiff UMG Recordings, Inc. ("UMG") against Escape.  On January 6, 2010, UMG initiated an earlier action against Escape in New York state court (the "State Court Action") for common law copyright infringement of UMG's recordings that were created before 1972 and thus, are not subject to federal law.  Reply Decl. of Servodidio, ¶4.  The complaint included allegations relating to Escape's infringement of UMG's common law copyrights in its sound recordings by virtue of the uploading, reproduction, and distribution of UMG's copyright protected works.

In the State Court Action, UMG served discovery requests on Escape seeking, *inter alia*, information as to employee uploading of sound recordings. Id. at ¶5.  On August 23, 2011, for the first time, Escape provided UMG with an Upload Report that detailed employee uploads of plaintiffs' copyrighted work

to Grooveshark.  Id. at ¶7.  It was at this time that UMG and the subsequent plaintiffs learned that Escape employees were uploading plaintiffs' copyright protected sound recordings onto Grooveshark.

UMG filed the instant action three months later on November 18, 2011, and the remaining plaintiffs joined this case less than one month later on December 15, 2011.  In their complaint, plaintiffs only assert one cause of action against defendants: copyright infringement.  Plaintiffs' claim only relates to the uploading of infringing files by Escape's employees and officers.  Plaintiffs do not seek to hold defendants liable for infringement by users of the Grooveshark service in general.

In their amended complaint, plaintiffs named the instant defendants as well as the following former employees of Escape: Nicola Arabadjiev, John Ashenden, Chanel Munezero, Paul Geller, and Ben Westermann-Clark.  On April 24, 2013, Plaintiffs entered into consent judgments against these individually named defendants permanently enjoining them from uploading infringing copies of plaintiffs' copyrighted works to the Grooveshark service.  See ECF Nos. 57-60.

Plaintiffs' filed their motion for summary for summary judgment on February 18, 2014 and their motion for sanctions for spoliation of evidence on February 19, 2014.

## MOTION FOR SANCTIONS

In conjunction with their motion for summary judgment, plaintiffs have also filed a motion for sanctions for the spoliation of evidence.  Before considering the merits of plaintiffs' motion for summary judgment, the court will first consider plaintiffs' motion for sanctions.  This is because the court's sanctions determinations directly relate to the evidence that the court will consider in its summary judgment analysis.

Plaintiffs have alleged that defendants knowingly destroyed three categories of evidence: (1) records that Escape's Chief of Technology Officer Joshua Greenberg uploaded infringing copyrighted sound recordings onto Grooveshark, (2) records of uploads (in addition to those described above, see supra at 12-13) of copyrighted sound recordings onto Grooveshark, and (3) source code files that would have provided corroborative evidence of how Escape managed the uploading of music to its servers prior to October 2008, or its transition to the Grooveshark Lite platform.

### Facts

**(1) Escape's Obligations to Preserve the Despoiled Evidence**

Since the initial launch of Grooveshark in 2007, Escape has been fully aware of the threat of copyright litigation as well as the relevance of evidence reflecting the use of their service and related technical documents.  For example, in a draft due diligence report from 2007, Escape expressly

16

acknowledged that "to avoid legal actions by various organizations Grooveshark MUST secure" licenses from "Sony, BMG, EMI, Warner, and Universal" (i.e., plaintiffs in this action).  See Servodidio Sanctions Decl. at Ex. 7.  Similarly, Escape openly acknowledged that their business plan was to exploit popular label content in order to grow their service and then "beg forgiveness" from the plaintiffs and seek licenses.  See Id. at Ex. 9.

Moreover, by the end of 2008, plaintiffs' trade association, the Recording Industry of America, forwarded infringement notices to Amazon.com—the internet service provider that provided web hosting and other services to Escape—detailing the widespread copyright infringement taking place via Grooveshark.  Id. at Ex. 11.  Escape was aware of these notices and corresponded with the Amazon.com legal department about this issue on several occasions.  Eventually, these repeated notices resulted in the termination of Escape's account with Amazon.  See Id. at Ex. 1 (Greenberg Tr. at 431:6-432:10).

Escape's general preservation obligations due to the distinct possibility of future copyright litigation took on additional significance when in January 2010, plaintiff UMG initiated the State Court Action.  In connection with this action, in February 2010, UMG served document requests and preservation demands on Escape seeking production of: (i) "[d]ocuments reflecting use of the Grooveshark service by your employees, officers or directors"; and (ii) "all versions of all software (in all available forms, including source code,…) for the

Grooveshark service,... as well as any historical versions of any such software...." <u>Id</u>. at Exs. 13-14.

### (2) Spoilated Evidence

Despite the existence of preservation obligations, plaintiffs contend that defendants destroyed the following relevant evidence.

### (a) Deletion of Greenberg Uploads from UsersFiles

Plaintiffs contend that defendants destroyed Greenberg's upload records during the pendency of the State Court Action.

As described in Dr. Horowitz's declaration, Escape maintained a database table called UsersFiles that contained a record of every file uploaded to Escape's central servers by each user.  Horowitz Sanctions Decl. ¶10.  This table contained the date/time of the upload, a serial number for the upload event, an identification number for the uploaded file, and the user's account number.  <u>Id</u>.  Escape relied on this database in order to identify the uploader of a file for the purpose of processing DMCA notices.  <u>Id</u>. at ¶11.

Greenberg received over thirty-nine DMCA notification letters from Escape for uploading 687 files to Grooveshark.  <u>Id</u>. at ¶17 & Ex. B.  This means that Greenberg uploaded at least 687 sound recordings onto Grooveshark and that the UsersFiles should reflect these uploads.  Greenberg confirmed during his 30(b)(6) position testimony that Escape maintained records in the

UsersFiles of the dates, times, and identification numbers of all the files that he
uploaded:

> Q: So wouldn't it be the case that in the normal course of Escape's
> database as it maintains its records, there should be hundreds of entries
> associated with you user account in … the [UsersFiles] table?
>
> A: With my understanding of how the database works, yes.

Servodidio Decl. at Ex. 1 (Greenberg Tr. at 518:23-519:6).

However, when Escape produced a copy of the UsersFiles table to
plaintiffs, it did not contain any records associated with Greenberg's user
account.  Horowitz Sanctions Decl. ¶21 & Ex. 18.  Plaintiffs requested that
Escape produce any archived copies of Greenberg's uploading records and
explain why his data was missing.  Id. at Ex. 20.  Defendants confirmed that
no archived copies of Greenberg's records exist.  Id.

Given Escape's practices with respect to the creation and storage of
upload data on the UsersFiles, Dr. Horowitz, plaintiffs' expert, concluded that
defendants deleted the uploading records associated with Greenberg's account.
Id. at ¶22.  Dr. Horowitz determined that since Escape sent Greenberg a
number of DMCA take down notifications as late as July 8, 2010, under the
normal operation of the Grooveshark system, Escape should have maintained a
record of Greenberg's uploading activity in the UsersFiles table through this
date.  Id. at ¶23.  Because there are no existing records, Dr. Horowitz
concludes that the records must have been deleted by Escape sometime after
July 8, 2010.  Id.

**(b) Deletion of Additional Upload Records from the UsersFiles Table**

Second, plaintiffs contend that Escape deleted additional upload records from the UsersFiles table during the pendency of the State Court Action.  It is unknown whether these additional uploads were from Escape employees.

During the State Court Action, Escape produced an Upload Report to plaintiffs in February 2011.  The Upload Report contains records of 27 million uploads and submissions of files for uploading to the Grooveshark service through late January 2011.  Horowitz Sanctions Decl. ¶25.  The Upload Report is derived from the UsersFiles table and contains a subset of the fields from the UsersFiles table.  Id.

Based on a comparison of the Upload Report with the data from the UsersFiles tables produced by Escape in November 2013 during the course of the instant litigation, Dr. Horowitz confirmed that Escape permanently deleted records of over 320,000 files that appeared in the Upload Report.  Id. at ¶¶27-28.  As the records are from January 2011, they must have been deleted by Escape employees sometime after January 2011.  These uploads are associated with encrypted user numbers and represent nearly 30% of the files uploaded to Grooveshark.  Id.  Escape also failed to preserve the method of encryption for the user numbers in the Upload Report.  See Servodidio Decl. Ex. 1 (Greenberg Tr. At 19:20-22:14); Horowitz Sanctions Decl. ¶25.  As a result, plaintiffs cannot determine which of these records are associated with employee user accounts.  Horowitz Sanctions Decl. ¶28.

Contemporaneous correspondence between Escape employees demonstrates that defendants deleted the upload records in early 2011: (i) Escape's Vice President of Engineering Jay Paroline deleted employee uploading records "by hand" from the database in April 2011; and (ii) in May 2011, Escape created a script called "deleter" to help purge the uploading records for specific user accounts more efficiently.  Servodidio Sanctions Decl. at Ex. 21; Horowitz Sanctions Decl. ¶¶29-32.

**(c) Deletion of Source Code**

Plaintiffs also allege that Escape failed to preserve over a year and a half of historical source code, relating to the operation of the Grooveshark server from its inception until October 2008.  This time-period constituted the Sharkbyte, or P2P, era in Grooveshark's development.

Before addressing the substance of plaintiffs' claim, the court, relying upon Dr. Horowitz's expert report, provides a brief description of the use and importance of source code.  Source code is a collection of instructions for a computer written by computer programmers.  Id. at ¶3, n.2.  Escape has used various source code management systems for the development of Grooveshark. Id. at ¶35.  A source code management system enables a creator of software to manage a collection of source code files as they are changed to add features, remove features, or fix errors.  Id.  Each source code management system creates a separate repository of source code files, which correspond to various projects developed by the creator of the software.  Id.

Escape's first source code management system was called Subversion or "SVN." Id. at ¶37. Escape maintained multiple SVN repositories, which corresponded to various features or projects on the Grooveshark service. Id. Of relevance, in an SVN repository called "Web," Escape stored source code and revision histories pertaining to the development of the Grooveshark.com website, Grooveshark Lite, and the creation and use of Escape's central music library until October 2008. Id.

In 2010, Escape produced a limited "snapshot" of source code stored in Escape's "SVN" source code management system to UMG in the State Court Action. Id. at ¶38; Servodidio Sanctions Decl. ¶18. The limited snapshot, which is an undated version of the code, did not contain the associated revision histories. Horowitz Sanctions Reply Decl. ¶23. When UMG filed a motion to compel a full production of all source code, i.e., the complete repositories, Escape represented to the court that it did not have in its possession any additional historical source code. Servodidio Sanctions Decl. Ex. 15, Ex. 16 at 18. Following several meet and confer conferences, Escape's counsel confirmed that it had failed to preserve any non-corrupt version of source code repositories including the "Web" repository. Notably, when Escape's lease on a backup server used to store the code expired several years ago, Escape elected not to preserve the data. Id. at ¶21.

Dr. Horowitz explains the relevance of the missing source code in his declaration. He notes that while plaintiffs have obtained other evidence that

definitively establishes the infringement of their works by defendants'
employees, the deleted source code files and related data would have provided
additional corroborative evidence regarding the functionality and development
of the Grooveshark's infringing service during 2007 and 2008.  See Horowitz
Sanctions Decl. ¶¶40-43.

## Discussion

### (1) Spoliation of Evidence

Courts have broad discretion to determine appropriate sanctions for
discovery abuses under both Rule 37 of the Federal Rules of Civil Procedure
and its own inherent powers.  Arista Records LLC v. Usenet.com Inc., 633
F.Supp.2d 124, 138 (S.D.N.Y. 2009).  A party seeking sanctions based on the
destruction of evidence must establish "(1) that the party having control over
the evidence had an obligation to preserve it at the time it was destroyed; (2)
that the records were destroyed with a culpable state of mind; and (3) that the
destroyed evidence was relevant to the party's claim or defense such that a
reasonable trier of fact could find that it would support that claim or defense."
Residential Funding Corporation v. DeGeorge Financial Corporation, 306 F.3d
99, 107 (2d Cir. 2002).

### (a) Whether defendants had an obligation to preserve the evidence

The court's first inquiry is whether defendants had an obligation to
preserve the relevant evidence.  "The obligation to preserve evidence arises

when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Federal Express Corporation, 247 F.3d 423, 436 (2d Cir. 2001).

Since shortly after the launch of the Grooveshark service in 2007, defendants were aware that they may be subject to copyright infringement claims relating to the unlicensed uploading of plaintiffs' recordings onto Grooveshark.  See Servodidio Decl. at Ex. 6-11. Escape's internal communications clearly document that defendants knew and understood that they were engaging in copyright infringement and potentially subject to future litigation.  Id. at Ex. 7, 9.  Moreover, in January 2010, UMG began litigation against Escape in the State Court Action and shortly thereafter, served documents requests and perseveration demands on Escape seeking production of its records of employee uploading and historical source code.  Id. at Exs. 13-14. Thus, there is no doubt that defendants were under a duty to preserve the relevant evidence at issue in this motion for sanctions.

### (b) Whether defendants acted with a culpable state of mind

After a court has found that a party had a duty to preserve the evidence that was destroyed, it must consider whether the party acted culpably in destroying the evidence.  Fujitsu, Ltd., 247 F.3d at 436.  The degree of culpability bears on the severity of sanctions that are warranted.  Severe sanctions, for discovery violations may be imposed for intentional conduct,

such as bad faith or gross negligence.  Usenet.Com, Inc., 633 F.Supp.2d at 124.  Plaintiffs have demonstrated that defendants, in bad faith, deleted Greenberg and other user upload data as well as relevant source code. Defendants have failed to come forward with credible evidence to support the disappearance of this highly relevant information.

Escape's deletion of the uploading records of Greenberg and other users was intentional and performed after Escape had received specific notice to preserve these records.  See Servodidio Decl. at Ex. 13-14, 17.  In February 2010, shortly after it had begun litigation against Escape, UMG served documents requests and preservation demands on Escape seeking production of "documents reflecting use of the Grooveshark service by your employees, officers, or directors."  Servodidio Decl. at Ex. 13-14.  This request encompassed the Greenberg and additional user upload records.  Dr. Horowitz has confirmed that the records of Greenberg's uploads must have existed until as late as July 8, 2010, Horowitz Sanctions Decl. ¶23, and that the records of the additional employee uploads must have existed until February 2011, Id. at ¶25.  Thus, even after receiving express preservation demands and document requests in Feburary 2010, Escape employees still chose to delete these upload records.  See Servodidio Decl. at Ex. 21-22; Horowitz Sanctions Decl. ¶¶29-32. Accordingly, Escape acted in bad faith when it deleted both Greenberg and the additional user upload records during the pendency of the State Court Action.

As for the destruction of Escape's source code, Escape also acted with the requisite culpability.  In the State Court Action, Escape produced from its source code repository only one source code version used in the early period of Grooveshark development.  Servodidio Decl. ¶20-21.  After further discovery in 2013, Escape confirmed that it had failed to preserve any non-corrupt version of source code repositories including the "Web" repository.  Servodidio Decl. ¶21.  Escape explained that when its lease on a backup server used to store the relevant code expired several years ago, it chose not to preserve the source code.  Id.  However, as Escape knew from soon after the creation of Grooveshark that it could very well face copyright infringement litigation, it was under a duty to preserve all relevant evidence.  Fujitsu, 247 F.3d at 423

Based on this evidence, it is clear that defendants acted with a culpable state of mind when it deleted Greenberg and other user upload information as well as the relevant source code.  "Moreover, when evidence is destroyed in bad faith... that alone has been found sufficient to support an inference that the missing evidence would have been favorable to the prejudiced party, and thus relevant."  Usenet.com, Inc., 633 F.Supp.2d 124, at 141 (citing Residential Funding Corporation v. Degeorge Financial Corporation, 306 F.2d 99, 109 (2d Cir. 2002)).   Thus, the court finds that a sanction for discovery abuse is warranted in this case.

### (2) Appropriate Sanction

Having determined that the imposition of sanctions is warranted in this case, the Court must next determine the appropriate remedy.  Tailoring an appropriate sanction lies within the sound discretion of the trial court and is to be assessed on a case-by-case basis.  <u>Fujitsu</u>, 347 F.3d at 779.  In determining the appropriate sanction for spoliation of evidence, the Court of Appeals has explained that "[t]he sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."  <u>Id</u>.; <u>Kyoei Fire & Marine Insurance Company, Ltd. v. M/V Maritime Antalya</u>, 248 F.R.D. 126, 144 (S.D.N.Y. 2007).  Courts must be wary of issuing case-dispositive sanctions; such sanctions "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions."  <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999).  One such lesser sanction is to preclude the wrongdoer from litigating certain claims or defenses during the remainder of the case.  <u>Usenet.com, Inc.</u>, 633 F.Supp.2d at 142.

Below, the court addresses the appropriate sanction for each of the three classes of despoiled evidence.

**(a)  Greenberg Uploads**

Plaintiffs request that the court enter a judgment finding that defendant Greenberg directly infringed upon plaintiffs' copyright protected sound

recordings.  Plaintiffs contend that but for Escape's spoliation, plaintiffs would have been able to irrefutably establish: (i) the total volume of copyrighted works uploaded by Greenberg; (ii) the specific names of each infringing file uploaded or otherwise distributed by Greenberg; (iii) the dates and times of each upload or distribution; and (iv) the ongoing distribution and exploitation of those files by Escape.  Horowitz Sanctions Decl. ¶10.  Plaintiffs request that the court find that Greenberg engaged in the willful infringement of at least 10,000 unique copyrighted works owned by plaintiffs.  In support of this number, plaintiffs point to the following facts: (i) Greenberg ran a "seed point" from his personal computer which stored between ten and one hundred thousand files, See Servodidio Decl. at Ex. 1; (ii) his log file confirms that he submitted over 8,000 files for uploading to Grooveshark during a few month period including popular copyrighted works, Horowitz Sanctions Decl. ¶¶18-20, and (iii) he received multiple DMCA notifications for uploading infringing works to Grooveshark, Horowitz Decl. ¶17; Servodidio Decl. at Ex. 6.

The court finds that Greenberg directly infringed plaintiffs' copyright protected recordings; however, the court does not agree with plaintiffs' request that it find 10,000 instances of infringement.  As a point of reference, plaintiffs, as discussed below, present non-spoliated, or preserved evidence, of 224,000 employee uploads onto Grooveshark.  However, plaintiffs have only established infringement claims for 4,053 recordings, or approximately 1.8% of the total.  Thus, for the purposes of calculating the number of infringing uploads by Greenberg, the court applies this same percentage.

Here, the court accepts Dr. Horowitz's representation that defendant Greenberg uploaded 8,000 recordings to Grooveshark.  Horowitz Decl. ¶18. 1.8% of 8,000 is 144.   Accordingly, the court finds that plaintiffs are entitled to judgment as a matter of law that Greenberg illegally uploaded 144 of plaintiffs' copyright protected sound recordings onto Grooveshark.

Additionally, plaintiffs also request that the court enter a sanction relating to the streaming of Greenberg's uploaded files by Escape.  In his analysis of the non-spoliated, record evidence, Dr. Horowitz found that on average, Escape streamed each one of plaintiffs' illegally uploaded sound recordings 21,000 times.  Horowitz SJ Decl. Ex. I.  Plaintiffs request that the court apply Dr. Horowitz's conclusions to the Greenberg uploads and find that Escape streamed each of Greenberg's illegally uploaded sound recordings 21,000 times.  The court agrees.

**(b)   Additional Uploads**

Plaintiffs request that the court enter a judgment finding that Escape employees infringed an additional 100,000 unique copyrighted works by uploading these sound recordings onto Grooveshark.  As discussed above, the Upload Report contained records of over 320,000 additional uploads, which Escape purged from its database through a combination of both automatic and manual deletion.  Horowitz Sanctions Decl. ¶27-28.  These records represent nearly 30% of the files uploaded by Escape's users during a time period when there is evidence that Escape repeatedly directed employees to upload files to

Grooveshark.  Id.  Due to Escape's deletion of the code used to encrypt the user identification numbers in the Upload Report, plaintiffs cannot determine which of these records are associated with employee user accounts.  Id. ¶28; Servodidio Decl. ¶¶24-25. As a result, plaintiffs cannot determine the full scope and scale of Escape's piracy campaign.

Presented with these facts, plaintiffs request that the court enter a judgment finding that Escape employees directly infringed at least 100,000 of plaintiffs' copyrighted sound recordings by uploading copies of these works to Grooveshark.  Once again, the court agrees with plaintiffs' general argument but disagree with the number proposed by plaintiffs.

The court assumes that employees uploaded 100,000 of the 320,000 deleted files.  However, plaintiffs have assumed that all of these uploads constitute original, copyright protected sound recordings that belong to them. Thus, once again, for the purposes of calculating the spoilated, infringing sound-recordings, the court only finds that plaintiffs are entitled to 1.8% of the total.  1.8% of 100,000 is 1,800.  Accordingly, the court finds that plaintiffs are entitled to judgment as a matter of law that Escape employees illegally uploaded 1,800 additional files to Grooveshark.

Moreover, as it did above, see supra at 30, the court finds that Escape streamed a copy of each of the illegally uploaded 1,800 files 21,000 times.

**(c) Spoliation of Source Code**

Finally, plaintiffs request that this court preclude Escape from benefitting in any manner from Escape's failure to preserve source code.  In light of Escape's spoliation of the relevant source code, the court finds that defendants are precluded from raising one of its substantive defenses to plaintiffs' motion for summary judgment.

In their opposition to plaintiffs' motion summary judgment, Defendants contend that it is possible that prior to 2008, or during the Sharkbyte era of Grooveshark's development, that employees might have scanned but not uploaded some of the infringing works onto the UsersFiles table.   Defendants allege that "it is not possible to tell which records from the Sharkbyte era contained in this data table represent scans, in which event no copy of an audio file was made (and thus no infringement could have occurred), and which represent uploads, in which copying did occur."  Def. Opp. to Plt. MSJ, pp. 32-33.

Plaintiffs, relying upon the declaration of Dr. Horowitz, contend that the missing source code would have disproved this argument advanced by defendants in their opposition papers.  In his declaration, Dr. Horowitz explains that the missing source code would have provided important information with regard to the functionality and development of the Grooveshark service during 2007 and 2008, and more specifically, to the upload of music onto Grooveshark.  Horowitz Sanctions Decl. ¶¶40-43.  Dr. Horowitz contends that the deleted source code would have provided further

corroboration that by August 2007, Escape modified the Sharkbyte software to upload—and not scan—all of the songs available on the Grooveshark service to the Central Music Library.  Id. at 43.

Plaintiffs request that defendants should not be able to benefit from any potential uncertainty resulting from the deletion of the source code.  The court agrees.  Accordingly, the court prohibits defendants from raising this defense to plaintiffs' motion for summary judgment.

## MOTION FOR SUMMARY JUDGMENT

In their complaint, plaintiffs assert a claim for copyright infringement. Plaintiffs allege that defendants are liable for both direct and secondary infringement of plaintiffs' copyrights.  Plaintiffs allege that there is a record of additional, non-spoilated evidence that supports their claims.  The court now turns to these contentions.

### Discussion

A motion for summary judgment must be granted if the moving party shows that "there is no genuine issue as to any material fact" and that it "is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986). In showing the existence of a genuine issue of material fact, the non-moving party may not rely on mere conclusory allegations or speculation; instead, it must put forth evidence sufficient to allow a reasonable jury to find in its favor. Usenet.com, Inc., 633 F.Supp.2d at 143.

### (1) Admissibility of Evidence

Before the court addresses the substance of plaintiffs' copyright claims, the court must first address defendants' objection to the admissibility of a report by Audible Magic Corporation—a software vendor—on which plaintiffs and their expert, Dr. Ellis Horowitz, rely to establish that the files uploaded by Escape's employees to Grooveshark correspond to plaintiffs' copyrighted sound recordings. The court must evaluate evidence for admissibility before it considers that evidence in ruling on a summary judgment motion. See Colon v. BIC USA, Inc., 199 F.Supp.2d 53, 68 (S.D.N.Y. 2001). As discussed below, the court finds the contested evidence to be admissible.

Plaintiffs retained Dr. Ellis Horowitz, professor of computer science and electrical engineering at the University of Southern California, to undertake the following four tasks: (1) analyze the operations of the Grooveshark.com music service owned and operated by defendant Escape, (2) identify whether Escape employees uploaded music files to Grooveshark, (3) provide information that can be used to verify whether the music files uploaded by Escape employees

are copies of plaintiffs' copyright sound recordings, and (4) calculate the number of times Grooveshark users have streamed employee-uploaded files. Horowitz Decl. ¶2.

Dr. Horowitz reviewed the data produced by Escape and identified over 224,000 employee uploads from 100 different employee accounts.  Id. at ¶60. For each filed uploaded by an Escape employee, Escape stores various associated metadata for that file, including title, artist, and album information ("metadata").  Id. at ¶67.  In his expert report, Dr. Horowitz explains that in order to identify whether an employee upload file matches one of plaintiffs' copyrighted works, the most straightforward method is to verify that the metadata associated by Escape with an employee uploaded file matches the metadata associated with one of plaintiffs' works; that is, whether plaintiff owns a copyright for a sound recording with such metadata.  Id. at ¶68.   There is a further step that can be used to confirm that the file matches one of plaintiffs' works—this process is called "audio fingerprinting" and has been widely used and relied upon for over a decade as a reliable means to identify audio content.  Id. at ¶69.

Plaintiffs and Dr. Horowitz relied upon a third party, Audible Magic Corporation ("Audible Magic"), to conduct the "audio fingerprinting" analysis. Audible Magic uses content recognition software to create an audio fingerprint or, a mathematical representation, of the way each recording produced by defendants sounds to the human ear.  Id. at ¶70.  Audible Magic maintains a

"Global Rights Registry Database," which is a large media library containing millions of copyrighted sound recordings submitted directly by music labels and other content owners including plaintiffs in this case.  Id.  In this registry, Audible Magic stores various information about each submitted copyrighted sound recording, including the audio fingerprint associated with the sound recording and the sound recording's corresponding title, artist, and release information.  Id.  In effect, Audible Magic's system listens to the recording of each file produced by defendants and compares it against its existing knowledge of millions of copyrighted sound recordings.

The files that Dr. Horowitz identified as employee uploads were sent to Audible Magic for identification via their usual process of creating digital fingerprints for these files and then searching their database for matching fingerprints.  Id.  Audible Magic produced several reports identifying the results of this process including the metadata of the matching files.  Id. at ¶71.  Plaintiffs then checked whether the metadata of the files reflected in the Audible Magic Report matched the metadata of plaintiffs' copyrighted works.  Id.  Ultimately, plaintiffs relied upon Audible Magic's reports to demonstrate that defendants had in fact uploaded plaintiffs' copyrighted protected sound recordings onto Grooveshark.  Plaintiffs' MSJ, at 19 (citing SUF ¶8; Horowitz Decl. ¶69-72).

Defendants allege that Audible Magic is an expert witness and that plaintiffs' failure to both disclose Audible Magic as an expert witness and to

provide an accompanying expert witness report until after discovery had closed violates Federal Rule of Civil Procedure 26(a)(2).  Along these lines, Federal Rule of Civil Procedure 37(c)(1) provides that "a party that without substantial justification fails to disclose information required by Rule 26(a)... is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or non a motion any witness or information not so disclosed."  Accordingly, defendants request that the court exclude the result of Audible Magic's analysis from consideration in connection with plaintiffs' motion for summary judgment.  Defendants argue that they were prejudiced by plaintiffs' failure to disclose Audible Magic as an expert witness and provide an expert report, because they were subsequently unable to serve discovery requests on Audible Magic and conduct depositions on Audible Magic employees.  In particular, defendants allege that they could not investigate the substance and reliability of Audible Magic's analysis.

In their filings, plaintiffs contend that Audible Magic is not an expert witness and the even assuming that it is an expert, that defendants were not prejudiced by Audible Magic's report.  The court need not determine whether Audible Magic is an expert for the purposes of Rule 26 disclosure.  Instead, even assuming that Audible Magic is an expert, the court finds that Audible Magic's report and conclusions are admissible, because defendants were neither prejudiced by the timing of plaintiff's disclosure of Audible Magic's report, nor by the substance of Audible Magic's actual report.  See Design Strategy, Inc. v. Davis, 469 F.3d 284, 297 (2d Cir. 2010).   The court arrives at

this conclusion for four reasons: (1) plaintiffs timely produced Dr. Horowitz's report which detailed that he and plaintiffs would use Audible Magic to conduct "Audio Fingerprinting" analysis, (2) any delay by plaintiffs in producing the results of Audible Magic's analysis is equally attributable to defendants who delayed in providing defendants with workable audio files for plaintiffs and in turn, Audible Magic to analyze, (3) once discovery had been completed, plaintiffs still offered to work with defendants to have depositions or discovery concerning Audible Magic, and (4) defendants, like most parties in the music industry, are likely familiar with Audible Magic's analysis as it is has been relied upon in many similar litigations involving claims of copyright infringement.

First, in accordance with the court's Amended Pretrial Scheduling Order, plaintiffs produced a timely and detailed expert report from Dr. Horowitz on December 6, 2013, almost two months prior to the close of fact and expert discovery on January 20, 2014.  Servodidio Reply Decl. ¶14.  In the report, Dr. Horowitz identified hundreds of thousands of audio files uploaded by Escape employees to Grooveshark, and confirmed that Audible Magic's results could be used to verify that the employee-uploaded files corresponded to plaintiffs' copyright protected material.  Id. at ¶16.  Dr. Horowitz outlined the basis for his opinion and provided a description of Audible Magic's proprietary content recognition software.   Id.

Second, any alleged prejudice alleged by defendants with regard to the timing of their receipt of the Audible Magic reports is largely attributable to defendants who delayed in providing plaintiffs with usable productions of audio files until mid-November 2013.  Servodidio Reply Decl. ¶11.  Defendants then provided supplemental productions that continued until early January 2014, which was after the formal completion of discovery.  Id. at ¶9.  Plaintiffs produced a first set of Audible Magic results to defendants prior to the close of discovery on January 10, 2014 and then, produced a second set of Audible Magic results on January 15, 2014.  Id. at ¶17.  On January 15, plaintiffs also provided defendants with an updated version of Dr. Horowitz's initial report in which he confirmed that Audible Magic's software was an appropriate means to verify that the employee-uploaded files corresponded to plaintiffs' copyrighted works and attached the full results of Audible Magic's review.  Id. at ¶18.

Third, defendants chose not to depose Dr. Horowitz or a representative from Audible Magic as well as not to serve discovery requests upon these parties.  Initially, defendants informed plaintiffs that they intended to depose Dr. Horowitz concerning his expert reports, and the parties scheduled a date for this deposition to take pace in Los Angeles on January 22, 2014.  Id. at ¶19.  However, defendants cancelled this deposition and declined to pursue any discovery from Dr. Horowitz.  Id.  In addition, even though plaintiffs had disclosed Audible Magic to defendants on December 6, 2013, Defendants also declined to pursue any discovery from Audible Magic.  Id.  After the filing of plaintiffs' motion for summary judgment, defendants requested and plaintiffs

agreed to extensions of time that provided defendants with more than two months to file their opposition papers.  Id. at ¶21.  During this time, plaintiffs continued to offer to meet and confer with defendants in an effort to resolve any possible disputes regarding Audible Magic.  Id. at ¶22.

Finally, it is important to note that Audible Magic is a vendor that has been repeatedly used in entertainment copyright cases and thus, its methods are well-known to those within the entertainment industry.  See Arista Records LL v. Lime Wire LLC, 2010 WL 10031251, No. 06-cv-05936 (KMW) (S.D.N.Y. Aug. 2010); Arista Records LLC v. Myxer Inc., 2011 WL 11660773, No.08-cv-03935 (GAF), (C.D. Cal. Apr. 2011); UMG Recordings, Inc. v. Veoh Networks Inc., 665 F.Supp.2d 1099 (C.D. Cal. 2009).  In short, Audible Magic's methods of analysis are not a secret and have been relied upon in various similar copyright litigations.

Accordingly, the court does not accept defendants' representations of prejudice resulting from plaintiffs' failure to disclose Audible Magic as an expert witness.  The court finds Audible Magic's report to be admissible.

**(2) Defendants' Affirmative Defenses**

Defendants rely on four affirmative defenses as reasons why the court should not enter summary judgment in favor of plaintiffs on their copyright infringement claims: (1) equitable estoppel, (2) laches, (3) waiver, and (4) expiration of the statute of limitations.  For each of these four defenses, the crux of defendants' argument is that the court should not grant summary

judgment because there are factual issues as to whether plaintiffs' delay in beginning this action precludes plaintiffs' claim.  The defendants have the burden of proof to establish a factual basis for all of their affirmative defenses in opposition to a motion for summary judgment.  See In re Livent, Inc. Noteholders Securities Litigation, 355 F.Supp.2d 722, 728 (S.D.N.Y. 2005). Where a non-moving party fails to introduce any evidence sufficient to support an essential element of a defense, the court may properly grant summary judgment dismissing such a defense as a matter of law.  See Id.

### (a) Statute of Limitations

The statute of limitations for copyright infringement claims is three years.  17 U.S.C. § 507(B).  The Court of Appeals has held that copyright infringement claims accrue when the copyright holders discover, or with due diligence should have discovered, the infringement giving rise to the claim. Psihoyos v. John Wiley & Sons, Inc., 748 F.3d 120, 124 (2d Cir. 2014). Plaintiffs began this action on November 18, 2011; thus, any claims that defendants infringed plaintiffs' sound recordings accruing on or prior to November 18, 2008 are barred by the three-year statute of limitations.

Defendants allege that plaintiffs knew of Escape's alleged infringement beginning in 2007.  In support of this claim, defendants allege that during their licensing discussions, plaintiffs consistently advised defendants that they possessed federal copyright infringement claims based on Escape's conduct dating back to the 2007 launch of its Sharkbyte system.  Tarantino Decl. ¶31,

43.  Defendants contend that it is immaterial whether plaintiffs' specifically knew that certain of those claims might rest upon uploads by Escape employees.

While plaintiffs and defendants engaged in licensing discussions, during these meetings, plaintiffs never learned that defendants' employees were engaged in uploading copyright protected material onto Grooveshark. Servodidio Reply Decl. ¶2.  During his deposition, defendant Tarantino acknowledged that during the course of the meetings, the issue of employee uploads "never came up" in discussion.  Id., Ex. 1, Dep. of Tarantino. Similarly, in his deposition, UMG Corporate Representative Bryan Stone explained that UMG never knew that defendant employees were involved in illegal uploads.

Ultimately, it was not until the parties were engaged in discovery with respect to plaintiff UMG's State Court Action that plaintiffs learned of Escape's employee uploads.  Servodidio Reply Decl. ¶5.  It was at this time, in August 2011, that defendants first disclosed its internal employee account information and database records.  Id. at ¶7.  UMG filed the instant action within three months of receiving this information on November 18, 2011, and the remaining plaintiffs joined this case less than month later on December 15, 2011. Accordingly, the court finds that plaintiffs timely filed suit and that their claims are not barred by the statute of limitations.

### (b) Equitable Estoppel, Laches, and Waiver

Along these lines, defendants cannot set forth a claim for equitable estoppel, laches, or waiver.  All three of these defenses are predicated upon plaintiffs waiting, or delaying, to bring a claim against defendants.  As discussed above, plaintiffs promptly filed suit against defendants three months after learning of the employee uploads.  Accordingly, the court finds that all of defendants' affirmative defenses must fail as a matter of law.

### (3) Plaintiffs' Copyright Claims

The court now turns to considering the substance of plaintiffs' copyright claims.  Plaintiffs allege that defendant Escape is liable for both direct and secondary copyright infringement.  Plaintiffs claim that defendant Escape is liable for direct copyright infringement under the theory of *respondeat superior*. Plaintiffs set forth three independent bases for secondary copyright infringement: (1) vicarious liability for infringement, (2) inducement of copyright infringement, and (3) contributory copyright infringement.

Finally, plaintiffs allege that defendants Tarantino and Greenberg, as corporate officers for Escape, are personally liable for all of the infringing employee uploads.  Moreover, plaintiffs claim that Tarantino and Greenberg uploaded copyrighted sounds recordings to Grooveshark and are therefore also liable as direct infringers.

### *(a) Copyright Infringement*

To establish a claim of copyright infringement, a plaintiff must establish (1) ownership of a valid copyright and (2) unauthorized copying or a violation of one of the exclusive rights afforded copyright owners pursuant to the Copyright Act. Twin Peaks Productions, Inc. v. Publishing International, Ltd., 996 F.2d 1366, 1372 (2d Cir. 1993). Plaintiffs contend that defendants' directly infringed upon their copyrights by engaging in the unauthorized reproduction, distribution, and public performance of their sound recordings. See 17 U.S.C. § 106(1) (right to reproduction); id. § 106(3) (right to distribution); id. § 106(4) (right to public performance).

It is undisputed that plaintiffs own the copyrights to the subject sound recordings. Defendants have not challenged the validity of plaintiffs' copyrights. It is also undisputed that plaintiffs did not approve of the reproduction, distribution, and public performance of the works in the suit. Courts have found that the unauthorized reproduction. distribution, and public performance of sound recordings via the internet violates the Copyright Act. See Capitol Records, LLC v. ReDigi Inc., 934 F.Supp.2d 640, 648-652 (S.D.N.Y. 2013); WPIX, Inc. v. IVI Inc., 765 F.Supp.2d 594, 601 (S.D.N.Y. 2011).

Escape's database records definitively establish that their employees uploaded copies of plaintiffs' sound recordings to computer servers owned or operated by defendants. SUF ¶3-8. As explained by Dr. Horowitz in his declaration, plaintiffs identified all of the specific files uploaded by Escape's

employees using the same methodology that Escape followed to determine uploaders of infringing files subject to DMCA takedown notices.  Horowitz Decl. ¶58; SUF ¶6.   More specifically, in order to identify the user who uploaded the file to Grooveshark, defendants selected from the database—the UsersFiles tables—the earliest record for the submission of the file that is implicated by the DMCA notice.  Id.  Escape has acknowledged that this methodology is the most reliable and appropriate means to identify the uploader of a file to Grooveshark.  SUF ¶6.

Furthermore, plaintiffs established that the infringing employee uploads correspond to plaintiffs' copyrighted works.  Id. at ¶8.  Plaintiffs conducted a detailed analysis of the available audio files uploaded by Escape employees and confirmed that certain of these files are copies of plaintiffs' copyright protected sound recordings.  Id.  This process included enlisting Audible Magic to use industry-recognized audio-fingerprinting technology to confirm that copies of certain files uploaded by defendants and their employees corresponded to plaintiffs' copyrighted sound recordings.  Id.; Horowitz Decl. ¶¶69-72.  In all, plaintiffs identified 3,676 employee uploaded files as matching plaintiffs' copyrighted works.  Wright Decl. in Supp. of MSJ, ¶5.

Moreover, in order to address the employee uploads for which Escape did not produce audio files, plaintiffs also analyzed the metadata stored by Escape, which was associated with the employee–uploaded files, to confirm that the uploaded files corresponded to plaintiffs' copyrighted work.  SUF ¶8; Horowitz

Decl. ¶¶67-68.   Based on this comparison, plaintiffs determined that an additional 377 employee-uploaded files match plaintiffs' works.   Wright Decl. ¶6.

Based upon this analysis, plaintiffs have established that defendants illegally uploaded 4,053 of plaintiffs' copyrighted sound recordings.   Moreover, the court must add to this total the number of illegal uploads that it found in deciding plaintiffs' motion for sanctions for the spoliation of evidence.   The court found that plaintiffs were entitled to a finding of 1,800 illegal uploads and 144 illegal uploads based upon defendants' respective deletion of employee upload files and defendant Greenberg's upload files.   See supra at 30-32. Accordingly, in all, the court finds that defendants are liable for illegally uploading 5,977 copies of plaintiffs' copyrighted sound recordings.

Finally, Escape's database records also confirm that it has streamed, or publicly performed, copies of plaintiffs' copyrighted sound recordings at least 36 million times.   SUF ¶11; Horowitz Decl. ¶¶73-78.   Each time Escape streamed one of plaintiffs' song recordings, it directly infringed upon plaintiffs' exclusive performance rights.

In support of these claims, plaintiffs have created a substantial and largely uncontroverted record of evidence.   Confronted with this body of evidence, defendants have chosen a purposeful litigation strategy.   As discussed above, defendants have primarily mounted procedural and evidentiary challenges to plaintiffs' copyright infringement claims.   Defendants

devote very little of their summary judgment memorandum to actually engaging with the substance of plaintiffs' copyright claim.  At the end of their brief, defendants raise two substantive challenges, contending that there are factual issues that preclude summary judgment.

First, defendants contend that there are factual questions surrounding the employee uploads to Grooveshark that plaintiffs rely upon in their claims for copyright infringement.  Defendants contend that it is possible that prior to 2008, or during the Sharkbyte era of Grooveshark's development, that employees might have scanned but not uploaded some of the infringing works onto the UsersFiles table.   Defendants allege that "it is not possible to tell which records from the Sharkbyte era contained in this data table represents scans, in which event no copy of an audio file was made (and thus no infringement could have occurred), and which represent uploads, in which copying did occur."  Def. Opp. to Plt. MSJ, pp. 32-33.

However, as discussed above in addressing plaintiffs' motion for sanctions, the court has precluded defendants from raising this defense.  Notably, defendants deleted the "Web" source code, which would have provided important information with regard to the functionality and development of the Grooveshark service during 2007 and 2008, and more specifically, to the uploading of music onto Grooveshark.  Horowitz Sanction Dec. ¶¶40-43.  Defendants cannot benefit from any ensuing uncertainty resulting from the

deletion of the "Web" source code.  Accordingly, defendants are precluded from raising this defense to plaintiffs' motion for summary judgment.

Second, defendants advance a much more limited, albeit successful challenge to plaintiffs' motion for summary judgment.  Defendants have identified 377 uploads that occurred outside of the confirmed employment dates of the relevant employees.  Hostert Decl. ¶32, 33, Ex. A.  In this analysis, defendants compared the dates associated with UsersFiles entries for the works-at-suit against the employment dates obtained from records maintained in the usual course of business by Escape's Human Resources department.  Id. at ¶32.  The results demonstrate that 377 of the uploads at issue occurred either before the relevant employee (or intern) began work at Escape or after that individual's employment had ended.  Accordingly, the court finds that defendants cannot be held liable for the 377 employee uploads that took place outside the scope of the employees' employment.

### (b) Liability

Having determined that employee uploads of the works-in-suit to Grooveshark violated plaintiffs' copyrights, the court turns to whether Escape is directly and/or secondarily liable for that infringement.  Direct liability requires "volitional conduct" that "causes" the reproduction or distribution to be made.  See Carton Network, 536 F.2d at 131.  Secondary infringement occurs when a defendant contributed or benefited from a third party's infringement such that is "just" to hold the defendant accountable for the

infringing activity.  Sony 464 U.S. at 435.  Defendants have not opposed plaintiffs' arguments.  Instead, as discussed above, defendants have chosen to raise procedural objections as well as limited factual objections to plaintiffs' claims of direct and secondary copyright infringement.  Nevertheless, the court will discuss these theories of liability, although they are essentially undisputed.

For the reasons stated below, the court finds that defendants directly and secondarily infringed plaintiffs' copyrights.

**(i) Direct Infringement**

In order to be found liable for direct infringement, a defendant must have engaged in some volitional conduct sufficient to show that it actively violated one of plaintiffs' exclusive copyrights.  ReDigi Inc., 934 F.Supp.2d at 656-657 (citing Usenet.com, Inc., 633 F.Supp.2d at 147-148).  Plaintiffs allege that under the doctrine of *respondeat superior*, Escape bears direct liability for acts of copyright infringement committed by its employees while acting within the scope of their employment.  See Restatement of Agency (Third) § 2.04 (2006); Shapiro, Bernstein & Co. v. H.L. Green Co., 316 F.2d 304, 307 (2d Cir. 1963) ("*respondeat superior* applies to copyright infringement by a servant within the scope of his employment").

Here, the court finds that plaintiffs have established a factual record demonstrating defendants' direct infringement of plaintiffs' copyright protected works.  Defendants engaged in the required volitional conduct necessary to support a finding of direct infringement.  More specifically, defendants

instructed their employees to repeatedly upload substantial volumes of popular copyrighted music files to Grooveshark.  SUF ¶¶15, 21, 26.  For example, in one company-wide forum post in 2007, Greenberg provided the following instructions to Escape employees:

> Please share as much music as possible from outside the office, and leave your computers on whenever you can.  This initial content is what will help to get our network started—it's very important that we all help out!  If you have available hard drive space on your computer, I strongly encourage you to fill it with any music you can find.  Download as many MP3's as possible, and add them to the folders you're sharing on Grooveshark.  Some of us are setting up special "seed points" to house tens or even hundreds of thousands of files, but we can't do this alone... There is no reason why ANYONE in the company should not be able to do this, and I expect everyone to have this done by Monday... IF I DON'T HAVE AN EMAIL FROM YOU IN MY INBOX BY MONDAY, YOU'RE ON MY OFFICIAL SHIT LIST.

Id., Ex. 14. (Emphasis in original).

Similarly, defendant Tarantino sent the following email to all employees and officers of Escape:

> If you haven't already done so, uninstall the old alpha version of Gshark and install the new one... If you have a home seeding point keep it on at all times.  This is very important as we need to be seeding as many songs as possible.  IF YOU ARE PART OF THIS COMPANY INSTALL/UPDATE GROOVESHARK ASAP.  This is mandatory.  If you don't have the time to install the software you are working for, then I don't know what you're doing here.

Id., Ex. 16 (Emphasis in original).

Along these lines, numerous officers and employees of defendants testified that they received these instructions and uploaded popular music to Grooveshark at the direction of defendants.   Id., Ex. 16; Decl. of John Ashenden ¶10 ("[Defendants Tarantino and Greenberg] made it very clear that

all employees were expected to upload as much music as possible into the Grooveshark system, including the most popular and current songs"); Decl. Of Benjamin Westermann-Clark ¶¶6-7 (same); Decl. of Chanel Munezero ¶¶6-9 (same); Decl. of Nikola Arabadjiev ¶¶12-13 (same).

Accordingly, as plaintiffs' have submitted uncontroverted evidence that defendants instructed their employees to upload copyright protected music onto Grooveshark, the court grants plaintiffs' motion for summary judgment on its claim for direct copyright infringement of its distribution, reproduction, and public performance rights.

### (ii) Secondary Infringement

"The Copyright Act does not expressly render anyone liable for infringement committed by another."  Sony Corporation of America v. Universal City Studios, Inc., 464 U.S. 417, 434 (1984); ReDigi Inc., 934 F.Supp.2d at 658.  However, under common law doctrines, a court may impose secondary liability where "just" and appropriate.  Id. at 435.  Plaintiffs assert that defendant Escape is secondarily liable based on its integral role in its employees' direct copyright infringement.  Plaintiffs advance three theories of secondary liability: (1) vicarious copyright infringement, (2) inducement of copyright infringement, and (3) contributory copyright infringement.  The court finds for plaintiffs on all three theories of liability.

### (a) Vicarious Copyright Infringement

A defendant is liable for vicarious copyright infringement if it profits from direct infringement while declining to exercise a right to stop or limit it. Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005); Arista Records LLC v. Lime Group LLC, 784 F.Supp.2d 398, 434 (S.D.N.Y. 2011).  In order to establish liability, a plaintiff must demonstrate that the defendant (1) had the right and ability to supervise the infringing activity and (2) has a direct financial interest in such activities.  Gershwin Publishing Corporation v. Columbia Artists Management, Inc., 443 F.2d 1159, 1162 (2d Cir. 1971).

The first element of the test for vicarious liability is met if the plaintiff demonstrates that the defendant had the ability to supervise or control the infringing activity.  Lime Group LLC, 784 F. Supp. At 435.  Here, the record is clear that Escape had the right and ability to supervise and control its employees infringing activity.  In fact, Escape directed its employees to engage in copyright infringement.  For example, Tarantino and Greenberg directed Escape's employees to "seed" files to promote the Grooveshark service, to upload as many digital music files to the Central Music Library as possible, to bring music files to the office uploading, and to test the functionality of Grooveshark by uploading files.  SUF ¶¶ 15, 20-21, 26, 29-30, 24-35, 37.  Escape's employees obeyed these directions, uploading over one hundred and fifty thousand files to Grooveshark.  Id. ¶¶ 8, 16, 22, 27-29, 36-39.

The second element of the vicarious infringement test requires showing a causal relationship between the infringing activity and any financial benefit

that the defendant gains.  <u>Lime Group LLC</u>, 784 F.Supp.2d at 435.  The relationship is established when the infringing material acts as a draw to attract users to a defendant's service.  <u>Usenet</u>, 633 F. Supp. 2d at 156-157. "[T]he law is clear that to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even a significant, draw—rather, it need only be a draw."  <u>Id</u>. at 157.

Here, the undisputed record evidence demonstrates that Escape received a financial benefit from the infringing employee uploads, which served as a draw for Grooveshark users.  <u>Id</u>. ¶¶ 14-15, 17, 24-25, 42-44, 46, 48-53. Escape relied on the uploaded sound recordings to build a comprehensive music catalog in order to attract users to the service and then monetize the illegal content by generating advertising revenues and other fees.  <u>Id</u>. ¶¶ 14, 17, 25-26.

Accordingly, as the undisputed facts demonstrate that Escape had the ability to control its employees infringing activity and that Escape continues to directly benefit from the copyright infringement, plaintiffs' motion for summary judgment on their claim for vicarious copyright infringement is granted.

### (b) Inducement of Copyright Infringement

In order to establish a claim for the inducement of copyright infringement, plaintiffs must demonstrate that Escape "(1) engaged in purposeful conduct that encouraged copyright infringement with the (2) intent to encourage such infringement."  <u>Lime Group LLC</u>, 784 F.Supp.2d at 425.  A

defendant's intent to foster infringement can be established by evidence of the defendant's "clear expression" of such an intent, or of affirmative steps that the defendant has taken to foster infringement.  Id.  Direct evidence of inducement constitutes an advertisement or solicitation that sends a message designed to encourage others to commit copyright violations.  Id.

Here, as described above, Escape and its executives directed their employees to engage in the uploading of digital music files to Grooveshark.  See supra at 49-51.  Ultimately, by overtly instructing its employees to upload as many files as possible to Grooveshark as a condition of their employment, Escape engaged in purposeful conduct with a manifest intent to foster copyright infringement via the Grooveshark service.

Accordingly, the court grants plaintiffs' motion for summary judgment on their claim of inducement of infringement.

### (c) Contributory Copyright Infringement

A defendant may be held liable for contributory copyright infringement if, with knowledge of the infringing activity, the defendant materially contributes to the infringing conduct of another.  Lime Group LLC, 784 F. Supp. 2d at 432. The plaintiff must demonstrate that defendant "(1) had actual or constructive knowledge of the infringing activity, and (2) encouraged or assisted others' infringement or provided machinery or goods that facilitated infringement."  Id. The defendants' contribution must be material to give rise to a claim for contributory copyright infringement.  Id.

Here, as discussed above, the record clearly establishes that Escape had actual knowledge that its employees were uploading copyright-protected files onto Grooveshark.  Escape was actively encouraging this very behavior.

Moreover, the record evidence also establishes that Escape materially contributed to the infringing conduct of its employees.  Escape executives actively directed, encouraged, and condoned the company-wide infringement through instructing employees to upload copyrighted sounds recordings and through creating a Central Music Library to store and stream copies of plaintiffs' works.  SUF ¶¶ 15-22, 24-27, 78-82, 84-85, 87, 90.  Additionally, senior Escape officers personally participated in the copyright infringing activity and made their home internet connections available to increase the number of uploaded files.  Id. ¶¶ 20-21, 26, 82-83, 88-89.  Finally, senior Escape employees went so far as to restock popular sound recordings that had been removed following DMCA takedown notices.  Id. ¶¶ 28, 86.

Accordingly, as the record evidence makes clear that Escape knew of and materially contributed to the infringing employee uploads, the court grants plaintiffs' motion for summary judgment on their claim for contributory copyright infringement.

### (iii)   Liability of Defendants Tarantino and Greenberg

Plaintiffs allege that Escape's co-founders, defendants Tarantino and Greenberg, are jointly and severally liable for Escape's direct and secondary copyright infringement.

It is well settled in this Circuit that "[a]ll persons and corporations who participate in, exercise control over, or benefit from the infringement are jointly and severally liable as copyright infringers." Sygma Photo News, Inc. v. High Society Magazine, Inc., 778 F.2d 89, 92 (2d Cir. 1985). "[A]n individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity, is *personally* liable for infringement." Lime Group LLC, 784 F.Supp.2d at 437 (emphasis in original). These principles apply equally to claims of direct infringement claims based on secondary liability. Id.

Here, defendants Tarantino and Greenberg satisfy the criteria for corporate officer liability. Tarantino and Greenberg are the co-founders of Escape. Tarantino is the Chief Executive Officer and Greenberg is the Chief Technology Officer. Together, Tarantino and Greenberg manage all aspects of Escape's business. They both directed the infringements at issue in the present litigation by: (1) creating a business model that was based upon the unlicensed sharing of copyright protected material, see SUF ¶¶ 2, 14-15, 65, 91-95; (2) sending written instructions to the entire company requiring employees to operate "seeding points" so that they could launch the Grooveshark P2P Network, Id. ¶¶ 15-16, 96, 98; (3) creating the Central Music Library and directing employees to upload files to the Library, Id. ¶¶ 18-19, 46, 96-97; (4) deciding to launch the Grooveshark Lite streaming service and instructing Escape employees to upload files for that service, Id. ¶¶ 25, 100; and (5) personally uploading copyrighted protected material, Id. ¶¶ 75, 103,

107.  Moreover, they both have a substantial equity interest in Groovershark and thus, directly benefit from the infringing activity.  Id. ¶ 106.

Accordingly, the court finds that Tarantino and Greenberg are jointly and severally liable with Escape for direct and secondary copyright infringement.

Finally, the court also finds that defendants and Greenberg are direct infringers of plaintiffs' work based on their uploads of copyrighted files to Grooveshark.  As discussed above, a copyright holder's exclusive right of distribution and reproduction encompasses the uploading and transferring a copyrighted work.  ReDigi Inc., 934 F. Supp. 2d at 649-651.  Thus, a finding of infringement against Tarantino and Greenberg for their own uploads only requires that they uploaded works-in-suit to Grooveshark without authorization.  Island Software & Computer v. Microsoft Corporation, 413 F.3d 257, 261 (2d Cir. 2005).

Here, Tarantino and Greenberg each uploaded copies of plaintiffs' copyrighted works to Grooveshark.  Defendants produced records demonstrating that Tarantino personally uploaded copyrighted sound recordings to Grooveshark.  SUF ¶108. Additionally, as discussed above, due to defendants' deletion of Greenberg's upload records, the court has entered a judgment finding that Greenberg uploaded 144 sound recordings onto Grooveshark.  See supra at 30.

## Conclusion

Accordingly, the record evidence reveals no genuine issue of material fact as to any of plaintiffs' theories of direct or secondary liability for copyright infringement on the part of defendants Escape, Tarantino, and Greenberg. The court finds that plaintiffs are therefore entitled to judgment as a matter of law on all of its claims except for the employee uploads that took place outside the employees' dates of employment.

The Clerk of this Court shall close all open motions in this matter and enter judgment in favor of the plaintiffs on all causes of action. The parties shall submit supplemental briefing of no more than ten (10) pages and proposed orders on the scope of permanent injunctive relief within twenty-one (21) days of the date of this Opinion and Order.

SO ORDERED.

Dated:  New York, New York
        September 29, 2014

Thomas P. Griesa
United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/29/14